# EXHIBIT A

**MARK K. SCHONFELD**
**Regional Director**
**Attorney for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**3 World Financial Center – Room 400**
**New York, New York 10281-1022**
**(212) 336-0175 (Szczepanik)**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------------x
                                                                        :
**SECURITIES AND EXCHANGE COMMISSION,**                                 :
                                                                        :
          **Plaintiff,**                                :
                                                                        :        **07-CV-8385 (GEL)**
    - against-                                                    :
                                                                        :        **COMPLAINT**
**MORRIS GAD AND NATHAN ROSENBLATT,**                                    :
                                                                        :
        **Defendants.**                              :
-----------------------------------------------------------------------x

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against

Defendants Morris Gad ("Gad") and Nathan Rosenblatt ("Rosenblatt") (collectively the

"Defendants"), alleges as follows:

## SUMMARY

1.    The Commission charges Defendants with illegal insider trading in the securities

of NBTY, Inc. ("NBTY"), a distributor of nutritional supplements. In July 2004, Rosenblatt, a

director of NBTY and member of its audit committee, tipped his close friend Gad with inside

information about the company's significant revenue and earnings shortfall for its third quarter

of 2004.

2.    NBTY's financial results for its third quarter, which Rosenblatt received on July

20, 2004, were scheduled to be released to the public after the close of the market on July 22,

2004. The results showed a 12% decline in net income from the previous year's third quarter, as well as a decline in earnings per share to $.37 from the previous year's third quarter earnings per share of $.43. This number was significantly lower than Wall Street's earnings per share estimate of $.50.

3. On July 21, 2004, Rosenblatt and Gad placed several telephone calls to each other. Within moments of the last telephone call, Gad called his broker and quickly placed a large bet that the price of NBTY stock would soon decline.

4. Specifically, during the two days prior to the company's public announcement of the financial results, Gad sold his entire position of 13,920 NBTY shares, sold short 40,000 NBTY shares, and purchased 200 NBTY put contracts. Gad also sold a total of 105 NBTY call contracts from the accounts of his three children. These transactions created a significant risk of substantial losses to Gad if the price of NBTY stock were to rise rather than decline.

5. On July 22, 2004, NBTY's stock price closed at $24.50 per share. As scheduled, NBTY announced its financial results for the 2004 third quarter after the market closed. The following day, July 23, 2004, the stock closed at $19.68 per share, down 20% from the prior day's closing.

6. By engaging in insider trading before the public disclosure of NBTY's disappointing financial results, Gad made trading profits and avoided losses of approximately $400,000.

7. Both Gad and Rosenblatt invoked their Fifth Amendment privilege against self incrimination and declined to testify during the Commission's investigation into this matter.

8. By the conduct alleged herein, including Rosenblatt's tipping and Gad's trading, the Defendants have engaged, directly or indirectly, in transactions, acts, practices, or courses of

business that constitute violations of Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a), Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5, 17 C.F.R. § 240.10b-5. Absent permanent injunctions and other relief sought in this complaint, the Defendants will continue to engage in the transactions, acts, practices and courses of business set forth in this Complaint and in transactions, acts, practices and courses of business of similar type and object.

## JURISDICTION AND VENUE

9.    The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act, 15 U.S.C. § 77t(b), and Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d), for permanent injunctive relief against the Defendants, from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint, and for civil penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).

10.    The Commission also brings this action pursuant to Section 21A of the Exchange Act, 15 U.S.C. § 78u-1, for civil penalties against the Defendants under the Insider Trading and Securities Fraud Enforcement Act of 1988.

11.    In addition, pursuant to Section 20(e) of the Securities Act, 15 U.S.C. § 77t(e), and Section 21(d)(2) of the Exchange Act, 15 U.S.C. § 78u(d)(2), the Commission seeks an order barring Rosenblatt from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act, 15 U.S.C. § 78l, or that is required to file reports pursuant to Section 15(d) of the Exchange Act, 15 U.S.C. § 78o(d). Pursuant to Section 21(d)(5) of the Exchange Act, 15 U.S.C. § 78(u)(d)(5), the Commission further seeks such other relief as the Court may deem appropriate or necessary.

3

12.    The Defendants, directly and indirectly, singly or in concert, made use of the means or instruments of transportation or communication in, or the means or instrumentalities of, interstate commerce, or of the mails, or of a facility of a national securities exchange, in connection with the transactions, acts, practices, and courses of business alleged herein.

13.    Certain of the alleged transactions, acts, practices, and courses of business occurred in the Southern District of New York, including, but not limited to, the execution of certain of the NBTY trades on the New York Stock Exchange ("NYSE").

14.    Moreover, as detailed below, Rosenblatt's tipping of material, nonpublic information to Gad occurred during telephone conversations between them, as well as during a social evening over dinner, in Manhattan.

15.    Accordingly, this Court has jurisdiction over this action, and venue is proper in this district, pursuant to Sections 20(b) and 22(a) of the Securities Act, 15 U.S.C. §§ 77(b), 77v(a), and Sections 21(d), 21(a), and 27 of the Exchange Act, 15 U.S.C. §§ 78u(d), 78u-1(a), 78aa.

## DEFENDANTS

16.    Gad is 45 years old and resides in Great Neck, New York. He is an officer and principal shareholder of Almod Diamonds, Ltd., a family-owned jewelry retailer that operates stores throughout the Caribbean and has its headquarters in Manhattan. Gad and Rosenblatt have been good friends for many years. They live close to each other, speak to and see each other frequently, and vacation together with their families.

17.    Rosenblatt is 50 years old and resides in Great Neck, New York. Rosenblatt was at all relevant times a director of NBTY and a member of its three-person audit committee. He is the president and chief executive officer of Ashland Maintenance Corp., a commercial maintenance organization located in Long Island City, New York.

4

## RELEVANT ENTITY

18.    NBTY is a Delaware corporation headquartered in Bohemia, New York. It develops, markets and distributes nutritional supplements worldwide under several brand names, including Nature's World and Rexall. NBTY's securities are registered with the Commission pursuant to Section 12(b) of the Exchange Act, 15 U.S.C. § 78l(b), and are traded on the NYSE. NBTY's options are traded on the Philadelphia Stock Exchange.

## FACTS

### NBTY'S 2004 THIRD QUARTER ANNOUNCEMENT OF FINANCIAL RESULTS

19.    NBTY's third quarter closed on June 30, 2004. Between July 1 and July 14, 2004, NBTY staff began gathering information and preparing preliminary earnings and financial statements for NBTY's third quarter.

20.    On July 20, 2004, at 3:17 p.m., NBTY's chief financial officer ("CFO"), faxed the members of the audit committee, including Rosenblatt, a reminder that a telephonic meeting of the audit committee would take place on July 21 at 11:00 a.m. The CFO attached for the audit committee's review the actual financial results for NBTY's 2004 third quarter.

21.    On July 20, 2004, at 6:04 p.m., the CFO faxed a draft press release concerning the 2004 third quarter financial results to the members of the audit committee, including Rosenblatt, for their approval.

22.    The financial results showed a 12% decline in NBTY's net income, from $29.5 million in the previous year's third quarter to $25.9 million, as well as a slump in its U.S. retail and catalogue sales. They also showed earnings per share of $.37, down from $.43 in the previous year's third quarter. Though sales in the wholesale division increased by 83% from the

previous year's third quarter, profits for the division actually decreased by 5%. NBTY's revenues were below analysts already lowered expectations.

23.    On July 21, 2004, the audit committee members met at 11:00 a.m. for an hour and approved the financial results and the press release.

24.    On July 22, 2004, the company announced its third quarter results after the close of trading.

25.    The following day, on July 23, 2004, the price of the stock dropped to a new 52-week low, to close at $19.68 per share, down 20% from the prior day's close of $24.50 per share. Trading volume that day jumped to over 8.5 million shares from the previous day's volume of under one million shares.

## THE ILLEGAL CONDUCT

### Rosenblatt Tipped Gad About NBTY's Third Quarter Financial Results

26.    As part of NBTY's corporate policy, officers and directors who are aware of material, nonpublic information relating to the company are prohibited from trading NBTY securities or disclosing such information to outsiders.

27.    Rosenblatt had certified that he was aware of the company's insider trading policy and that he had complied and would continue to comply with it.

28.    Gad knew that Rosenblatt was a director of NBTY, and he knew or recklessly disregarded that Rosenblatt owed a duty to keep confidential material, nonpublic information about the company.

29.    As noted above, by no later than the afternoon of July 20, 2004, Rosenblatt possessed the actual financial results for the third quarter of 2004, which reflected the lower sales figures for two of the four divisions and the earnings decline. He also had a copy of the press release that the company intended to issue.

6

30.     The following morning, July 21, 2004, at 8:57 a.m., prior to that day's scheduled audit committee meeting, Gad called Rosenblatt. Within the next hour, Rosenblatt placed three calls to Gad, the last of which was at 9:59 a.m. and lasted 3 minutes.

31.     At 11:00 a.m. on July 21, 2004, the audit committee had a one-hour telephonic conference, during which it approved the issuance of the financial results in the form of the press release previously circulated. At 11:29 a.m. and again at 12:50 p.m., Gad placed calls to Rosenblatt. Two minutes after the second call, at 12:52 p.m., Gad called his broker.

32.     During these communications between Gad and Rosenblatt, and possibly other communications, Rosenblatt intentionally or recklessly, for his own direct or indirect benefit, and in breach of his fiduciary duty to NBTY, conveyed, in words or in substance, the material, nonpublic information about NBTY's 2004 third quarter financial results to his close friend Gad. Some or all of these communications took place while Gad was at his offices in Manhattan.

**Gad Sold His Entire Position of NBTY Stock, Sold NBTY Stock Short, Purchased NBTY Put Contracts, and Sold NBTY Call Contracts From His Children's Custodial Accounts.**

33.     On July 21, 2004, beginning at 12:59 p.m., Gad sold his entire position of 13,920 NBTY shares at prices between $24.86 and $25 per share. Thereafter, beginning at 2:20 p.m., Gad sold short 30,000 NBTY shares at prices between $24.75 and $24.86 per share. At 2:32 p.m. he purchased 50 August 30 put contracts at $5.40 per contract.

34.     Gad also directed the sales of 35 August 20 call contracts out of each of the accounts of his three children at $4.50 per contract on that day.

35.     Later that evening, Gad and Rosenblatt spent the evening together at a small dinner party to celebrate the birthday of a mutual friend.

36.     The next morning, July 22, 2004, at 10:47 a.m., Gad attempted to sell short an additional 20,000 shares of NBTY stock at $24.20 per share. Although he was unable to sell

short that number of shares at the order price of $24.20, he was able to sell short 10,000 shares at prices between $24.34 and $24.53. This gave Gad a total short position in NBTY stock of 40,000 shares.

37.    On July 22, 2004, Gad also bought an additional 150 August 30 put contracts at $5.92 per contract, which gave him a total position of 200 put contracts.

38.    As noted above, NBTY's third quarter announcement of financial results was made after the close of the market on July 22, 2004.

39.    The following day, July 23, 2004, NBTY stock closed at $19.68 per share, down from the prior day's close of $24.50 per share, losing nearly 20% of its value. Gad's August 30 put contracts increased in value to $10.15 per contract, and his August 20 call contracts, which Gad had sold out of his children's accounts, decreased in value to $1.05 per contract. That same day, Gad closed out his 40,000 share short position, sold all his puts, and repurchased call options in his children's accounts to cover their option sales.

## By Trading Prior to NBTY's 2004 Third Quarter Announcement of Financial Results, Gad Made Approximately $400,000 in Trading Profits and Losses Avoided.

40.    Gad made approximately $400,000 in trading profits and losses avoided by trading in NBTY securities while he was aware of material, nonpublic information concerning NBTY's financial results.

41.    By selling his entire position of 13,920 shares prior to NBTY's announcement, Gad avoided losses of approximately $73,000 that he would have sustained had he sold after NBTY's public announcement of its 2004 third quarter financial results.

42.    By selling short 40,000 shares prior to NBTY's announcement, Gad made a profit of a little over $200,000 after he closed out his position.

8

43.    By purchasing 200 put contracts prior to NBTY's announcement, Gad made a profit of approximately $87,000 after he sold his position.

44.    By selling a total of 105 call contracts out of his three children's accounts prior to NBTY's announcement, Gad made a total profit of over $38,000 in his children's accounts after he repurchased the calls.

## CLAIM FOR RELIEF

*The Defendants Violated Section 17(a) of the Securities Act,*
*Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5,*
*When Rosenblatt Illegally Tipped Gad, Who Then Traded NBTY Securities*

45.    The Commission realleges and incorporates by reference the allegations contained in Paragraphs 1 through 44 above.

46.    The Defendants, directly or indirectly, singly or in concert, by the use of the means or instruments of transportation or communication in, or the means or instrumentalities of, interstate commerce, or by use of the mails, or of a facility of a national securities exchange, in the offer or sale, and in connection with the purchase or sale, of NBTY securities:  (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of, or otherwise made, untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, acts, practices and courses of business which operated or would have operated as a fraud or deceit upon purchasers of NBTY securities and upon other persons, as more fully described above.

47.    By reason of the activities described herein, the Defendants, singly or in concert, directly or indirectly, violated, and absent an injunction would again violate, Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5.

### RELIEF SOUGHT

**WHEREFORE**, Plaintiff respectfully requests a Final Judgment:

A.    Permanently enjoining the Defendants, their officers, agents, servants,
      employees, and attorneys, and all persons in active concert or participation with
      them, who receive actual notice of the injunction by personal service or
      otherwise, and each of them, from future violations of Section 17(a) of the
      Securities Act, 15 U.S.C. § 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C.
      § 78j(b), and Exchange Act Rule 10b-5, 17 C.F.R. § 240.10b-5;

B.    Ordering them jointly and severally to disgorge Gad's trading profits and losses
      avoided from all of the trading in NBTY securities as set forth herein, and to pay
      prejudgment interest thereon;

C.    Ordering them to pay civil money penalties pursuant to Section 20(d) of
      the Securities Act, 15 U.S.C. § 77t(d), and Sections 21(d) and 21A of the
      Exchange Act, 15 U.S.C. §§ 78u(d)(3), 78u-1;

D.  Ordering that Rosenblatt be barred from acting as an officer or director of a

public company pursuant to Section 20(e) of the Securities Act, 15 U.S.C. §

77t(e), and Section 21(d)(2) of the Exchange Act, 15 U.S.C. § 78u(d)(2); and

E.  Granting such other relief as the Court shall deem just and proper.

Dated:      New York, New York
            September   , 2007
                                    Respectfully submitted,


                            By:     _____
                                    MARK K. SCHONFELD
                                    Regional Director
                                    Attorney for Plaintiff
                                    SECURITIES AND EXCHANGE COMMISSION
                                    New York Regional Office
                                    3 World Financial Center – Room 400
                                    New York, New York 10281-1022
                                    (212) 336-0175 (Szczepanik)

**Of Counsel:**
Andrew M. Calamari
Valerie A. Szczepanik
Doria Bachenheimer
Meaghan Cheung
Audry Weintrob

# EXHIBIT B

David Rosenfeld (DR-8646)
**Associate Regional Director**

**Attorney for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
New York Regional Office
3 World Financial Center, Suite 400
New York, New York 10281
(212) 336-0153

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ SEP 20 2007 ★

BROOKLYN OFFICE

CV 07        3928

GLEESON, J.

LEVY, M.J.

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

SECURITIES AND EXCHANGE COMMISSION,         :
                                            :
                        Plaintiff,          :
                                            :
        -against-                           :        **Civil Action No.**
                                            :
JOSEPH SIMONE; ISLAND CAPITAL MANAGEMENT,   :
INC.; JOSEPH LANDO; JOSEPH CARACCIOLO; ALFRED :
VARRICCHIO; ANTHONY PIANELLI; JILL PIANELLI; :
JAP JAP ENTERPRISES, LLC; BRIAN FABRIZZI;   :        **COMPLAINT**
DONALD SORRENTINO; ANTHONY CARANNANTE,      :
individually and d/b/a A&C MANAGEMENT; STEVEN :
DARONZIO, individually and d/b/a A&C MANAGEMENT; :
ROCHELLE ROMAN; SHAUN SARNICOLA; ANTHONY    :
TANICO; ANDREA LANDO-TANICO; AJT LTD.; AJGT :
LTD.; MICHAEL McCORMACK; DONNA CENTOLA;     :
DMAC SERVICES, INC.; ANDREW CACCIOPPOLI;    :
THOMAS MACLI; DONNA MACLI; LUMAC CORP.;     :
GARY MANFRE; RICHARD MANFRE; and RAM        :
SOLUTIONS, INC.,                            :
                                            :
                        Defendants.         :
                                            :

---

        Plaintiff Securities and Exchange Commission ("Commission"), for its complaint against

defendants Joseph Simone ("Simone"); Island Capital Management, Inc. ("Island"); Joseph

Lando ("J. Lando"); Joseph Caracciolo ("Caracciolo"); Alfred Varricchio ("Varricchio");

Anthony Pianelli ("A. Pianelli"); Jill Pianelli ("J. Pianelli"); JAP JAP Enterprises, LLC ("JJE");

Brian Fabrizzi ("Fabrizzi"); Donald Sorrentino ("Sorrentino"); Anthony Carannante ("Carannante"), individually and d/b/a A&C Management ("A&C"); Steven Daronzio ("Daronzio"), individually and d/b/a A&C; Rochelle Roman ("Roman"); Shaun Sarnicola ("Sarnicola"); Anthony Tanico ("Tanico"); Andrea Lando-Tanico ("Lando-Tanico"); AJT Ltd. ("AJT"); AJGT Ltd. ("AJGT"); Michael McCormack ("McCormack"); Donna Centola ("Centola"); DMAC Services, Inc. ("DMAC"); Andrew Caccioppoli ("Caccioppoli"); Thomas Macli ("T. Macli"); Donna Macli ("D. Macli"); LUMAC Corp. ("LUMAC"); Gary Manfre ("G. Manfre"); Richard Manfre ("R. Manfre"); and RAM Solutions, Inc. ("RAM"), alleges as follows:

## SUMMARY OF ALLEGATIONS

1.      This action concerns widespread fraudulent conduct by twenty-one individuals and seven entities involved in the securities lending industry, colloquially known as the "stock loan" business. The defendants include twelve current and former stock loan traders ("Traders") at several major Wall Street brokerage firms, including Van der Moolen Specialists USA, LLC ("VDM"), Janney Montgomery Scott, LLC ("Janney") and Nomura Securities International, Inc. ("Nomura"). From at least 1999 through early 2005, these Traders conspired in various schemes with sixteen purported stock loan "finders" ("Finders") to skim profits on stock loan transactions. The defendants made over $8 million from their unlawful schemes.

2.      The Traders routinely defrauded brokerage firms by engaging in collusive loan transactions and causing sham finder fees to be paid to purported Finders that were in fact entities controlled by the Traders themselves or by their friends and relatives. Acting as fronts for the Traders, these entities received hefty finder fees on thousands of stock loan transactions even though they did not provide any legitimate finding services and, in many cases, were simply shell

2

companies that were not even involved in the stock loan business. The persons controlling the phony Finders included a mailman, a perfume salesman, and a dental receptionist. The Traders shared in the sham finder fees through secret kickback arrangements. Some defendants met monthly at New York City bars and restaurants to exchange thousands of dollars in cash, often wrapped in newspapers or stuffed into envelopes.

3.      The defendants engaged in multiple schemes with overlapping participants, and many of the defendants participated in more than one scheme. The fraudulent schemes involved literally thousands of stock loan transactions in which the following purported Finders received sham finder fees: Island, A&C, AJT, AJGT, DMAC, LUMAC, RAM, and JJE. The defendants' schemes and their respective roles are summarized below.

**The Interrelated Schemes**

4.      While Simone was co-head of the stock loan trading desk at VDM, he engaged in several schemes to defraud VDM using Island, a shell company that he controlled. Simone caused VDM to pay several million dollars in sham finder fees to Island. The following Traders also colluded with Simone to increase his illegal profits through circular loan transactions known as "ring" and "run-through" deals: J. Lando, then head of sales for Janney's stock loan desk; Caracciolo at National Investor Services Corp. ("NISC"); Varricchio at A.G. Edwards & Sons, Inc. ("A.G. Edwards"), and A. Pianelli at Weiss, Peck & Greer, LLC ("Weiss Peck"). Simone paid monthly cash kickbacks to these Traders out of the sham finder fees paid to Island. Simone himself made approximately $3.6 million.

5.      Fabrizzi, the other co-head of VDM's stock loan trading desk, also defrauded VDM through the payment of sham finder fees. Fabrizzi conspired with Carannante, a Finder doing business as A&C, and Sorrentino, a trader at Oppenheimer & Co., Inc. ("Oppenheimer").

3

Fabrizzi and Sorrentino colluded on "run-through" loans between VDM and Oppenheimer that enabled Fabrizzi to have VDM pay sham finder fees to A&C. Carannante kept a portion of the fees and funneled the rest back to Fabrizzi, who paid monthly cash kickbacks to Sorrentino.

6.      Roman and Sarnicola, two Traders at Kellner Dileo & Co. ("Kellner"), conspired with Carannante and Daronzio, another A&C Finder, to cause Kellner to pay sham finder fees to A&C. Carannante and Daronzio kept a portion of the sham fees, and Carannante paid the balance in cash kickbacks to Roman and Sarnicola.

7.      Roman also defrauded Kellner by causing it to pay sham finder fees to AJT and AJGT, two Finders run by relatives of J. Lando -- Tanico and Lando-Tanico, who is J. Lando's sister and Tanico's wife. Tanico paid Roman monthly cash kickbacks and kept the balance of the sham finder fees for himself and Lando-Tanico. J. Lando also caused Janney to pay sham fees to AJT and AJGT.

8.      McCormack, while a Trader at A.G. Edwards, schemed with Centola (his wife), J. Lando and Roman to defraud A.G. Edwards through sham finder fees paid to DMAC, a shell company owned by Centola. McCormack arranged for J. Lando and Roman to have Janney and Kellner borrow stock from A.G. Edwards at inferior rates and then lend the stock to other firms specified by McCormack at better rates. DMAC's sham finder fees were paid out of these artificial profits.

9.      Caccioppoli, a Trader who supervised Janney's stock loan desk, schemed with his sister, D. Macli, and her husband, T. Macli, to defraud Janney by having the firm pay sham finder fees to LUMAC, a shell company owned by D. and T. Macli. T. Macli was a mailman, and D. Macli was a dental receptionist.

4

10.     G. Manfre, a Trader at Nomura, schemed with his brother R. Manfre, Simone and J. Lando to defraud Nomura through sham finder fees paid to RAM, a shell company owned by R. Manfre, a perfume salesman. Simone and J. Lando had VDM and Janney pay sham fees to RAM after G. Manfre had Nomura lend stock to VDM and Janney at inferior interest rates. Simone and J. Lando loaned the same stock to other firms at better rates, and RAM's finder fees were paid out of these artificial profits.

11.     A. Pianelli also schemed with J. Lando to defraud Weiss Peck and Janney by paying sham finder fees to JJE, a purported Finder owned by J. Pianelli, A. Pianelli's wife. J. Lando had Janney pay fees to JJE on loan transactions with Weiss Peck that were arranged entirely by A. Pianelli and J. Lando.

12.     By virtue of the foregoing conduct, each of the defendants, directly or indirectly, singly or in concert, violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R § 240.10b-5]; and each of them is also liable in the alternative, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], for aiding and abetting the violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] committed by those defendants with whom they schemed. Unless each of the defendants is permanently restrained and enjoined, they will again engage in the acts, practices, transactions and courses of business set forth in this complaint and in acts, practices, transactions and courses of business of similar type and object.

## JURISDICTION AND VENUE

13.    The Commission brings this action pursuant to the authority conferred by Section

20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d) of the Exchange Act

[15 U.S.C. § 78u(d)], and seeks to restrain and enjoin the defendants permanently from engaging

in the acts, practices, transactions and courses of business alleged herein.  The Commission also

seeks a final judgment ordering the defendants to disgorge their ill-gotten gains and pay

prejudgment interest thereon, and ordering the defendants to pay civil money penalties pursuant

to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange

Act, [15 U.S.C. § 78u(d)(3)].

14.    This Court has jurisdiction over this action, and venue lies in this District,

pursuant to Sections 20(d) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(d) and 77v(a)] and

Sections 21(d) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d) and 78aa].  The defendants,

directly and indirectly, have made use of the means or instrumentalities of, or the means or

instruments of transportation or communication in, interstate commerce, or of the mails, or of the

facilities of a national securities exchange, in connection with the transactions, acts, practices and

courses of business alleged herein.  Some of these transactions, acts, practices and courses of

business occurred in the Eastern District of New York, where many of the defendants reside or

transact business.

## THE DEFENDANTS

15.    **Simone**, age 65, resides in Staten Island, New York.  From June 1997 until

January 2005, he was a stock loan trader and a registered representative associated with VDM.

Simone was co-head of VDM's stock loan desk and was known in the industry as "The Chief

Inspector."

6

16.     **Island** is a New York corporation with a business address in Bethpage, New York. Simone controlled Island, which purported to provide stock loan finding services.

17.     **J. Lando**, age 34, resides in Milestone, New Jersey. From May 1997 to July 2005, J. Lando was a stock loan trader employed by Janney and head of sales for its stock loan trading desk. J. Lando was then known in the industry as "Joe Janney." He is currently employed as a securities lending representative at Penson Financial Services, Inc. ("Penson"), a registered broker-dealer.

18.     **Caracciolo**, age 33, resides in Staten Island, New York. From in or about June 2000 through July 2005, he was a stock loan trader and registered representative employed by NISC and was known in the industry as "Stock Loan Joe."

19.     **Varricchio**, age 48, resides in Lynbrook, New York. From October 1979 through October 2006, he was a stock loan trader employed by A.G. Edwards.

20.     **A. Pianelli**, age 53, resides in Middletown, New Jersey. From February 1983 through May 2004, A. Pianelli was a stock loan trader employed by Weiss Peck. From June 2004 through December 2004, he was affiliated with JJE, a purported Finder.

21.     **J. Pianelli**, age 51, resides in Middletown, New Jersey. She is married to A. Pianelli. J. Pianelli is the sole shareholder and officer of JJE. She has never been associated with a broker-dealer or otherwise employed in the securities industry.

22.     **JJE** is a New Jersey limited liability company formed in or about February 2004. A. and J. Pianelli controlled JJE, which purported to provide stock loan finding services. JJE's initial business address was the Pianelli residence in Middletown, New Jersey, but was later changed to an office in Red Bank, New Jersey.

7

23.    **Fabrizzi**, age 63, resides in Edison, New Jersey.  From May 1997 to February 2005, he was a stock loan trader employed by VDM and co-head of its stock loan trading desk.

24.    **Sorrentino**, age 61, resides in Valley Stream, New York.  From June 2002 to February 2005, he was a stock loan trader employed by Oppenheimer.

25.    **Carannante**, age 63, resides in Brick, New Jersey.  Since 1993, he has operated a Finder business under the name A&C out of his home.

26.    **Daronzio**, age 47, resides in Hazlet, New Jersey.  From April 2003 through December 2004, he was employed by A&C purportedly as a Finder.  From May 1999 to March 2003, he was a stock loan trader employed by a registered broker-dealer.

27.    **Roman**, age 39, resides in Hazlet, New Jersey.  From October 1997 to January 2005, she was a stock loan trader employed by Kellner.

28.    **Sarnicola**, age 29, resides in Brooklyn, New York.  From May 1998 through September 2006, he was a stock loan trader employed by Kellner.

29.    **Tanico**, age 39, resides in Manalapan, New Jersey.  From 2000 to December 2004, he purportedly worked as a Finder through AJT and then AJGT.  Tanico formed AJT in or about 2000 and installed his mother as the sole officer.  From 1994 to 1999, he was a registered representative associated with various broker-dealers located in Staten Island, New York.  In December 1999, he consented to an NASD order barring him from association with any NASD member firm as a result of charges that he had an impostor take the Series 7 and 63 exams for him.

30.    **Lando-Tanico**, age 36, resides in Manalapan, New Jersey.  She is married to Tanico and is the sister of J. Lando.  From April 1997 to February 2002, she was a stock loan trader employed by Southwest Securities Inc. ("Southwest").  After leaving Southwest, she

8

began working as a Finder through AJT. In or about January 2003, she formed AJGT and continued working as a Finder. From April 2005 to June 2005, she was employed by Janney as a stock loan trader.

31.    **AJT** is a New York corporation with a business address in Staten Island, New York. Even though Tanico's mother is the only person identified in the corporation's records, AJT was controlled by Tanico. AJT purported to provide stock loan finding services.

32.    **AJGT** is a New Jersey corporation with a business address in Morganville, New Jersey. Lando-Tanico is the sole officer and shareholder of AJGT, which purported to provide stock loan finding services.

33.    **McCormack**, age 32, resides in Staten Island, New York. From April 1994 to March 2005, he was employed as a stock loan trader by A.G. Edwards and was known in the industry as "Mikey Irish."

34.    **Centola**, age 31, resides in Staten Island, New York. She has been married to McCormack since in or about September 2002, although they separated in or about April 2004. From March 2001 through April 2004, Centola purportedly worked as a Finder through DMAC. Before forming DMAC, she was a stock loan trader employed by a registered broker-dealer.

35.    **DMAC** is a New York corporation with a business address in Brooklyn, New York. Centola is the sole officer and shareholder of DMAC, which purported to provide stock loan finding services.

36.    **Caccioppoli**, age 47, resides in Mahopac, New York. From December 1991 to July 2005, he was a stock loan trader employed by Janney and supervised Janney's securities lending desk. Caccioppoli is currently employed by Penson as a stock loan trader.

37.    **D. Macli**, age 44, resides in Cortlandt Manor, New York. She is Caccioppoli's sister and has been employed as a dental receptionist for the past 20 years.

38.    **T. Macli**, age 51, resides in Cortlandt Manor, New York. He is married to D. Macli and has been employed as a letter carrier for the past 23 years.

39.    **LUMAC** is a New York corporation with business addresses in Cortlandt Manor, New York and Jefferson Valley, New York, which is the address of an apartment that Caccioppoli's brother was living in during the relevant period. D. Macli and T. Macli are the sole officers and shareholders of LUMAC, which purports to provide stock loan finding services.

40.    **G. Manfre**, age 44, resides in Metuchen, New Jersey. From July 1998 through February 2006, he was a stock loan trader and a registered representative associated with Nomura.

41.    **R. Manfre**, age 38, resides in Bethpage, New York. He is the brother of G. Manfre and has been employed as a perfume salesperson since 1992.

42.    **RAM** is a New York corporation whose business address is R. Manfre's home in Bethpage, New York. R. Manfre is the sole officer and shareholder of RAM, which purported to provide stock loan finding services.

## RELEVANT ENTITIES

43.    **VDM** is registered with the Commission as a broker-dealer and maintains its principal place of business in New York, New York. VDM is a subsidiary of Van der Moolen Holding N.V., which is based in Amsterdam, The Netherlands. VDM closed its stock loan department in or about February 2005.

44.    **Janney** is registered with the Commission as a broker-dealer and maintains its principal place of business in Philadelphia, Pennsylvania.

10

45.     **NISC** was registered with the Commission as a broker-dealer and maintained its principal place of business in New York, New York during the relevant period.  In or about January 2006, NISC was acquired by Ameritrade Holding Corporation and ceased operating an independent securities lending desk several months later.

46.     **Nomura** is registered with the Commission as a broker-dealer and maintains its principal place of business in New York, New York.

47.     **A.G. Edwards** is registered with the Commission as a broker-dealer and maintains its principal place of business in St. Louis, Missouri.

48.     **Oppenheimer** is registered with the Commission as a broker-dealer and maintains its principal place of business in New York, New York.

49.     **Kellner** is registered with the Commission as a broker-dealer and maintains its principal place of business in New York, New York.

50.     **Weiss Peck** was registered with the Commission as a broker-dealer and maintained its principal place of business in New York, New York during the relevant period.  In 2003, Weiss Peck merged with Robeco USA.

## BACKGROUND

### Typical Stock Loan Transactions

51.     A securities loan is a collateralized, temporary exchange of securities.  The collateral is usually cash or other securities.  Generally, broker-dealers borrow securities to cover short sales and lend securities to gain short-term access to cash.  If the security is liquid (*i.e.* readily available and thus called "easy-to-borrow"), the broker-dealer borrowing the security also receives interest for the duration of the loan on the cash collateral it makes available to the lender.  The interest payment is called a "rebate."  If the security is in limited supply (*i.e.* "hard-to-

11

borrow"), the borrower generally pays interest to the lender for the right to borrow the security. This interest payment is called a "negative rebate." The rebates and negative rebates are a percentage of the total market value of the securities and are quoted as annual percentage rates. Stock loan transactions may stay open for as little as one trading day or as long as several months or even a year.

## Roles Of Securities Lending Firms

52.     There are generally three types of securities lending firms, referred to in the industry as "retail" firms, "prime broker" firms and "conduit" firms. The retail firms, which have a large retail customer base, are primarily in the securities lending business to lend securities from their inventory, or "box," to gain short-term access to cash for financing needs. By lending easy-to-borrow securities from their box, retail firms can obtain cash at a more favorable interest rate (*i.e.* the rebate) than they could obtain from a bank or similar lending institution. When retail firms lend hard-to-borrow securities at negative rebates, they make a profit from the interest they receive. Prime broker firms typically have large institutional and hedge-fund clients, and they often need to borrow significant blocks of securities to cover their customers' short sales. Because prime broker firms have the greatest demand for securities, their loan transactions significantly influence the rates for borrowing those securities. Conduit firms typically borrow securities at low rates, generally from retail firms, and then lend them at higher rates, generally to prime broker firms. The conduit firms profit on the spread between the rates.

## Role And Compensation Of Finders

53.     During the relevant period, most prime broker firms and retail firms, such as NISC, Nomura and Oppenheimer, had policies prohibiting payments to Finders. Many of the

conduit firms, such as VDM, Janney and Kellner, did not prohibit payments to Finders and were the primary source of compensation for Finders.

54.    In the past, Traders typically employed the services of Finders to locate hard-to-borrow stock. In today's securities market, however, Traders rarely need the services of Finders. Technological advances and other improvements have made it easier and faster for Traders to locate hard-to-borrow securities on their own. On April 29, 2005, the New York Stock Exchange ("NYSE") issued an advisory opinion cautioning all member firms about continuing to do business with Finders and stating as follows: "We have seen only limited instances where a finder is actually providing services that an effective stock loan department could not provide."

55.    The Finder's fee would typically be negotiated by the lender and borrower as part of the terms of the loan and, like the rebate rate, expressed in basis points as a percentage of the total market value of the stock. In order to be paid, some Finders submitted an invoice to the broker-dealer that typically included representations to the effect that the Finder performed the services for which the firm was being invoiced.

56.    Although the rebate rates and corresponding finder fees on any particular stock loan transaction may not be large, Traders generally engage in dozens, if not hundreds, of stock loan transactions each day. The rebates and finder fees are calculated and paid on a daily basis, and the brokerage firms and Finders continue to receive payments until the borrowed stock is returned or recalled. Accordingly, loans that remain open for extended periods generate substantial profits for both brokerage firms and Finders even if the rates and spreads are small.

## THE DEFENDANTS' FRAUDULENT CONDUCT

### Simone's Multiple Schemes Using Island

57.     From at least 1999 through early 2005, Simone used his position as co-head of

VDM's stock loan trading department to misappropriate several million dollars in trading profits

from VDM and other brokerage firms. Simone took control of Island after the death of its

owner, who had operated Island as a Finder, and installed a relative as the sole officer and

shareholder. After Simone took over Island, it functioned as a depository for the proceeds of

Simone's fraud.

58.     During this period, Simone employed multiple schemes, some involving other

Traders, to divert stock lending profits to Island in the form of finder fees on transactions in

which neither Island nor anyone else performed finding services. Simone and the Traders that

facilitated his schemes defrauded VDM and other brokerage firms out of several million dollars

in sham finder fees paid to Island in connection with thousands of stock loan transactions.

Simone used a portion of the sham finder fees to pay cash kickbacks to the other Traders and

diverted the balance to himself and his family. Simone made approximately $3.6 million from

all of his schemes.

59.     When Simone acted alone, he simply placed Island as the finder on order tickets

for otherwise legitimate stock loan transactions between VDM and other broker-dealers when, in

fact, Island performed no services on those transactions. In doing so, Simone falsely represented

to VDM that Island had performed bona fide finding services for those transactions. Simone had

the discretion to determine Island's "fee," and he often paid Island the majority of the profit

generated by a VDM loan, *i.e.* Island (that is Simone) made more money than VDM did from the

transaction.

14

60.    When the profit margin on an available loan -- the difference between the rebate rates to be paid and received by VDM -- was too narrow, Simone colluded with Traders at other firms to arrange otherwise unnecessary intermediate, or "run-through," loans at inferior rates to generate a larger spread for VDM. By colluding with other Traders, Simone was able to increase the volume of profitable deals and the amount of money he could funnel to Island while still recording a profit for VDM. Simone paid cash kickbacks to these Traders to secure their participation in the scheme.

61.    Simone engaged in this kickback scheme with J. Lando, Caracciolo, Varricchio and A. Pianelli. In addition to scheming with Simone to defraud VDM, these Traders also defrauded their own firms by causing them to lend or borrow stock at rates that were inferior to other rates available in the marketplace. The rates were dictated by Simone and were chosen solely to facilitate the fraud. J. Lando, Caracciolo, Varricchio and A. Pianelli colluded with Simone in exchange for secret, undisclosed cash kickbacks that Simone personally handed out to them each month at restaurants and bars in envelopes or wrapped in newspapers. The cash kickbacks that Simone paid to these Traders equaled approximately 20 to 30 percent of the sham finder fees that Island received on the deals in which they participated.

62.    Simone did not disclose, and in fact concealed from VDM, that he was causing VDM to pay sham finder fees to Island and was also paying cash kickbacks to the Traders that colluded with him on these transactions. Simone falsely marked, and caused others at VDM to falsely mark, the order tickets for the relevant loans to reflect that Island provided bona fide finding services for the transactions. J. Lando, Caracciolo, Varricchio and A. Pianelli did not disclose to their respective firms that they were receiving payments from Simone.

15

63.     Simone's kickback schemes with J. Lando, Caracciolo, Varricchio and A. Pianelli are described more fully below, along with illustrative examples of transactions in which VDM paid sham finder fees to Island and on which Simone paid the other Traders cash kickbacks.

**"Run Through" Deals With J. Lando**

64.     In or about January 2003, Simone and J. Lando agreed that in exchange for cash kickbacks from Simone, J. Lando would cause Janney to lend securities to VDM at inferior rates than were otherwise available in the marketplace. From in or about January 2003 through November 2004, Simone and J. Lando caused VDM and Janney to engage in a series of loans that were purposely structured to enable Simone to siphon profits from VDM. These transactions were known as "run-through" deals because VDM was simply acting as an intermediary between Janney and the broker-dealer, usually a prime broker firm needing to cover short-sales, that was actually going to borrow the stock at the better rate than Janney was charging VDM.

65.     For example, on April 8, 2004, J. Lando caused Janney to loan 24,000 shares of Leapfrog (LF) to VDM at a flat rate (*i.e.* a 0% rebate, meaning neither party was paying interest). Later that same day, Simone caused VDM to loan 24,000 shares of LF to Lehman Brothers in an arms-length transaction at a better rate of negative 3.25% (*i.e.* Lehman was paying interest to VDM). VDM's artificially inflated profit margin on this transaction was therefore a full 3.25%. At the same time, Simone caused VDM to pay Island a 3% finder fee even though Island did not do anything with respect to that transaction, leaving VDM with a nominal profit of 0.25%. This loan remained open for eight days, and VDM paid Island a total of $344, which Simone and J. Lando later divided among themselves according to their agreed split of the illegal profits.

16

66.    A recorded telephone conversation between J. Lando and Simone on April 8, 2004, shows that J. Lando and Simone orchestrated both sides of the transaction to facilitate Simone's fraud and confirms that no Finder was involved. In this conversation, J. Lando tells Simone that Janney is going to lend the stock to VDM at an inferior rate so that Simone can then lend the same stock to another firm at a better rate, as follows: "I'm sending you . . . Got my early pushes . . . Leapfrog. You can move it at a good negative . . . twenty-four thousand [shares] . . . [a]t a zero." There is no discussion of why J. Lando was willing, contrary to Janney's interests, to loan the stock to Simone at a flat rate when he knows that other firms are willing to pay "a good negative."

67.    In this instance, J. Lando took further advantage of the transaction to cause Janney also to pay a sham finder fee to Lando-Tanico, his sister. J. Lando had obtained the LF shares earlier that day at a positive rebate rate of 1.05% (*i.e.* Janney received interest at that rate) from his other sister, a Trader at Nomura who conducted Nomura's limited conduit stock loan business. The exceptionally favorable rate that Janney received from Nomura allowed J. Lando to pay a sham finder fee to Lando-Tanico on Janney's loan to VDM -- the very same loan on which VDM paid Island its sham finder fee. J. Lando's frequent payment of sham finder fees to Lando-Tanico and Tanico, her husband, is described more fully in paragraphs 102-104 below.

68.    The April 8, 2004, telephone conversation and other recorded conversations between Simone and J. Lando make it clear that their run-through transactions were the product of collusion, not arms-length negotiations, and were purposely structured to generate, at Janney's or another firm's expense, an inflated profit for VDM that Simone could then divert to Island. Simone paid J. Lando monthly cash kickbacks for a period of approximately 23 months, totaling approximately $100,000 or more.

17

69.    J. Lando did not disclose, and in fact concealed from Janney, that he was receiving cash kickbacks from Simone and colluding with Simone on stock loan transactions that were disadvantageous to Janney and designed to generate a sham finder fee for J. Lando's and Simone's benefit.

### "Ring" Deals With J. Lando And Caracciolo

70.    Simone also engaged in a series of more complicated collusive transactions, called "ring" deals, with J. Lando and Caracciolo at NISC. Simone and J. Lando alternately refer to these deals in recorded telephone conversations as "ringing," "swinging" or "working" the stock. In or about September 2003, J. Lando arranged a meeting with Simone and Caracciolo. At the meeting, Caracciolo agreed to provide Simone with hard-to-borrow stock from NISC's inventory at favorable rates in exchange for undisclosed cash kickbacks from Simone. Because NISC was not authorized at that time to lend stock directly to VDM, J. Lando agreed to allow Caracciolo to run the transactions through Janney. As in the foregoing scheme, Simone then caused VDM to lend the stock to another firm at a much better rate and pay a sham finder fee to Island out of the profits.

71.    For example, on March 22, 2004, Caracciolo caused NISC to loan 10,000 shares of Martha Stewart Living Omnimedia, Inc. stock (MSO) to Janney at a low negative rebate of 1%. J. Lando then caused Janney to loan 10,000 shares of MSO to VDM at a somewhat higher negative rebate of 2%. Simone then caused VDM to loan 10,000 MSO shares to Lazard Freres ("Lazard") at a much higher negative rebate of 7%, and Simone also caused VDM to pay Island a sham finder fee of 4% -- that is, 80% of the profit. As usual, Simone effected the payment to Island by falsely indicating on the order ticket that Island performed finding services. J. Lando then caused Janney to borrow 10,000 shares of MSO from Lazard at a negative rebate of 7.25%

and lend 10,000 MSO shares to Bear Stearns at a negative rebate of 8%. All of these loans

occurred on the same day. The loan from Janney to VDM stayed open for 49 days, and VDM

paid a total of $563.89 to Island, which Simone shared with Caracciolo. The following chart

shows each leg of this ring deal:



72.    Recorded telephone conversations between Simone and J. Lando confirm that this

and other ring transactions that they arranged were not the product of arms-length negotiations

and did not involve a Finder. For example, J. Lando and Simone agreed up front in a telephone

conversation on March 22, 2004, that in the above transaction VDM would pay a negative rebate

of 2% and then lend the stock to Lazard at a negative rebate of 7%. As with the conversation

described above in paragraph 66, there is no discussion of why J. Lando was willing, contrary to

Janney's interests, to loan the stock to VDM for 5% less than what J. Lando knew Lazard was

willing to pay at the time.

73.    Other recorded conversations show that Simone, J. Lando and Caracciolo

orchestrated numerous other collusive ring deals. The three generally spoke each trading day to

find out what hard-to-borrow stocks Caracciolo had available for Janney to "ring," and Simone

and J. Lando then prearranged the other legs of the transaction.

19

74.     Simone paid monthly cash kickbacks to Caracciolo from the loan profits that Simone diverted to Island. This scheme lasted until about November 2004, and Simone paid Caracciolo several thousand dollars per month over the course of approximately 15 months. J. Lando benefited from these ring deals by marking up the rates on Janney's loans to VDM for a risk-free profit that increased his compensation from Janney. In some cases, J. Lando had also arranged for Janney to get the stock back from the firm that borrowed it from VDM and re-lend the stock to yet another firm at an even higher rate.

75.     Caracciolo did not disclose, and in fact concealed from NISC, that he was receiving cash kickbacks from Simone and colluding with Simone and J. Lando on stock loan transactions that were disadvantageous to NISC and designed to generate a sham finder fee for Simone's benefit. Even if a particular brokerage firm did not necessarily require its Traders to obtain the *best* rate for certain securities, Traders at each relevant firm were required to investigate and negotiate favorable rates in arms-length transactions. By lending stock to VDM at rates designed to further Simone's scheme in exchange for undisclosed cash kickbacks, Caracciolo breached his duties to his firm. Similarly, J. Lando did not disclose, and in fact concealed from Janney, that he was colluding with Simone and Caracciolo on stock loan transactions that were designed to generate a sham finder fee for Simone's benefit.

76.     From in or about January 2003 through early 2005, Simone caused VDM to pay Island over $500,000 in sham finder fees on over two thousand stock loan transactions involving Janney. In some of these transactions, Simone acted alone, where the available profit margin was already sufficient to accommodate a sham payment to Island. In others, Simone colluded with J. Lando on run-through deals and with Caracciolo and J. Lando on ring deals to inflate the profit margin in the manner described above.

20

### "Run-Through" Deals With Varricchio

77.    From in or about September 2003 through November 2004, Simone also schemed with Varricchio to obtain stock for VDM at inferior rates from A.G. Edwards. Varricchio agreed to collude with Simone in a fraudulent run-through scheme whereby Varricchio would cause A.G. Edwards to lend stock to VDM at inferior rates than were otherwise available in the marketplace in exchange for cash kickbacks from Simone. As in the other run-through schemes described above, Varricchio caused A.G. Edwards to lend stock from its inventory to VDM at inferior rates to enrich himself and Simone, thereby defrauding A.G. Edwards. Simone then caused VDM to loan the same securities to other firms at better rates, while paying Island a sham finder fee out of the inflated profits.

78.    For example, on November 4, 2004, Varricchio caused A.G. Edwards to loan 4,700 shares of Northfield Laboratories stock (NL) to VDM at an inferior positive rebate rate of 1.25%. Later that day, Simone caused VDM to loan the same 4,700 shares of NL to Credit Suisse First Boston at a better rate of negative 12% and to pay Island a sham finder fee of 11.5%. The payment to Island was possible because Varricchio loaned the stock to VDM at an inferior rate, thereby creating a 13.25% spread between VDM's borrowing and lending rates and enabling Simone to divert most of that inflated profit to Island yet still record a 1.75% profit for VDM. This loan remained open for 25 days, and VDM paid Island a total of $560.40, a portion of which Simone later kicked back to Varricchio. Recorded telephone conversations between Varricchio and Simone show that Varricchio was generally aware of the better rates for the securities that he caused A.G. Edwards to loan to VDM.

79.    Each month, Simone paid Varricchio a cash kickback approximately equal to between 20 and 30 percent of the sham finder fees received by Island on transactions that

21

Varricchio facilitated. Simone paid Varricchio cash kickbacks over a period of approximately 15 months.

80.    Varricchio did not disclose, and in fact concealed from A.G. Edwards, that he was receiving cash kickbacks from Simone and colluding with him on stock loan transactions that were disadvantageous to A.G. Edwards and designed to generate a sham finder fee for Simone's benefit.

81.    From in or about September 2003 through early 2005, Simone caused VDM to pay Island over $500,000 in sham finder fees in connection with over two thousand stock loan transactions involving A.G. Edwards and VDM. The vast majority of these transactions, occurred because Varricchio colluded with Simone to cause A.G. Edwards to loan securities to VDM at artificially low rates in exchange for cash kickbacks. In the remaining transactions, Simone acted alone and simply placed Island on the order tickets for the loans.

### "Run-Through" Deals With A. Pianelli

82.    Simone also engaged in a similar kickback scheme with A. Pianelli at Weiss Peck. From in or around at least 2000 through February 2004, A. Pianelli colluded with Simone in a fraudulent run-through scheme whereby A. Pianelli would cause Weiss Peck to borrow stock from VDM at inferior rates, in exchange for cash kickbacks from Simone. As in the other run-through schemes described above, the rates at which A. Pianelli caused Weiss Peck to borrow stock from VDM were not the result of an arms-length negotiation, but were instead designed to enrich himself and Simone, thereby defrauding Weiss Peck. Simone first caused VDM to borrow the securities it would lend to Weiss Peck from another firm at a better rate, and then Simone caused VDM to pay Island a sham finder fee out of the inflated profit that VDM made on the loan to Weiss Peck. Simone caused VDM to pay Island a total of over $200,000 in sham

22

finder fees in connection with hundreds of stock loan transactions involving Weiss Peck and VDM.

83.    For example, on December 8, 2003, Simone caused VDM to borrow 166,200 shares of NASDAQ 100 (QQQ) stock from another broker-dealer, where A. Pianelli's son was employed as a Trader, at a positive rebate rate of 0.1%, *i.e.* the stock was easy-to-borrow and the lender paid interest to VDM. Later that day, A. Pianelli caused Weiss Peck to borrow the same number of shares of QQQ stock from VDM at a negative rebate of 0.1%, *i.e.* this time the borrower (Weiss Peck) paid interest to the lender (VDM). Out of the total of 0.2% in interest that VDM received on these two loans, Simone caused VDM to pay a sham finder fee of 0.1% to Island and VDM kept the remaining 0.1% as a risk-free profit. This transaction remained open until January 6, 2004, and Island received a total of $193 in sham finder fees from VDM, some of which Simone later kicked back to A. Pianelli in cash.

84.    Several recorded telephone conversations on December 8, 2003, between Simone and A. Pianelli show that they arranged the above transaction without any Finder's involvement, and that A. Pianelli could have readily obtained the QQQ shares for Weiss Peck from his son's firm at a better interest rate than the rate he received from Simone. After Simone called A. Pianelli to find out what stocks Weiss Peck was interested in that day, A. Pianelli told Simone that Weiss Peck needed 166,200 shares of QQQ and Simone should borrow the shares from A. Pianelli's son. When Simone asked what rate he should get from A. Pianelli's son, A. Pianelli told Simone not to "worry about it." When Simone was unable to reach A. Pianelli's son, A. Pianelli told Simone that A. Pianelli himself would talk to his son about it and "take care of" arranging the loan from his son's firm to VDM.

23

85.    There is no discussion of why A. Pianelli was willing, contrary to Weiss Peck's interests, to borrow the QQQ stock from VDM and *pay* 0.1% when he knew that he could instead just borrow the stock directly from his son's firm and *receive* 0.1%. There was no legitimate business reason for A. Pianelli to engage in a run-through transaction with VDM, as Weiss Peck and the broker-dealer for which A. Pianelli's son was a Trader were authorized at the time to engage in stock loan transactions directly with each other.

86.    Each month, Simone paid cash kickbacks to A. Pianelli in an amount approximately equal to 25% of the sham finder fees that Island received on the transactions that A. Pianelli facilitated, resulting in an approximate total of over $100,000 in kickbacks. A. Pianelli did not disclose, and in fact concealed from Weiss Peck, that he was receiving monthly cash kickbacks from Simone and colluding with him on stock loan transactions that were disadvantageous to Weiss Peck and designed to generate a sham finder fee for Simone's benefit.

87.    As alleged in paragraphs 128-134 below, A. Pianelli ended his kickback arrangement with Simone in or about February 2004 in order to conduct a fraudulent scheme with J. Lando and JJE, a sham Finder owned by A. Pianelli's wife.

**Fabrizzi's Run-Through Scheme With Carannante And Sorrentino**

88.    Fabrizzi, the other co-head of VDM's stock loan desk, also defrauded VDM and other broker-dealers through the payment of kickbacks and sham finder fees. From in or about May 2003 through December 2004, Fabrizzi engaged in a fraudulent run-through scheme with Sorrentino, a Trader at Oppenheimer, and Carannante, a Finder who did business as A&C.

89.    Sorrentino colluded with Fabrizzi by causing Oppenheimer to loan securities to VDM from Oppenheimer's inventory at inferior rates than were otherwise available in the marketplace in exchange for cash kickbacks from Fabrizzi, thereby defrauding Oppenheimer.

24

Fabrizzi subsequently caused VDM to loan the same securities to other broker-dealers at better rates. On each transaction, Fabrizzi caused VDM to pay A&C a finder fee out of the inflated profit even though neither Carannante nor anyone else associated with A&C performed any finding services on the transaction, thereby defrauding VDM. Fabrizzi falsely represented on the relevant VDM order tickets that A&C had performed finder services. Carannante made the same misrepresentation in the invoices that he submitted to VDM in order for A&C to receive the fee.

90.    To keep track of the sham finder fees paid to A&C, Fabrizzi set up a separate billing number on VDM's books for those payments. Carannante typically kept approximately 10% of the sham fees that Fabrizzi diverted to A&C, and Carannante funneled the remaining 90% back to Fabrizzi by making payments to an entity that Fabrizzi controlled named Javon LLC ("Javon"). Fabrizzi then paid monthly cash kickbacks out of his share to Sorrentino in amounts ranging up to several thousand dollars. From May 2003 to early 2005, Fabrizzi caused VDM to pay a total of nearly $500,000 in sham finder fees to A&C in connection with over one-thousand stock loan transactions between VDM and Oppenheimer. During this period, Carannante paid a total of $454,885 to Fabrizzi via Javon and kept the balance of the sham fees. In most, if not all, of these transactions, Sorrentino caused Oppenheimer to loan securities to VDM at inferior rates in exchange for cash kickbacks from Fabrizzi.

91.    For example, on April 12, 2004, Sorrentino caused Oppenheimer to loan 35,000 shares of Nanogen Inc. stock (NGEN) to VDM at a positive rebate of 0.5%. That same day, Fabrizzi caused VDM to loan 35,000 shares of NGEN to Goldman Sachs in an arms-length deal at a better rate of negative 2.5%. Fabrizzi also caused VDM to pay A&C a 1.75% finder fee even though A&C did not provide any finding services. The sham finder fee paid to A&C amounted to more than 50% of VDM's profit on the transaction. The loan remained open for twenty-three

days, and VDM paid A&C a total of $276.60 in sham fees that ultimately went to Fabrizzi, Sorrentino and Carannante.

92.    A recorded telephone conversation on April 12, 2004 between Fabrizzi and Sorrentino confirms that Sorrentino intentionally loaned the NGEN stock from Oppenheimer's inventory to VDM at an inferior rate simply to enable Fabrizzi to generate an inflated profit by re-lending the stock to another firm at a better rate. Sorrentino asked Fabrizzi about the going rate for NGEN, and Fabrizzi told him that it is "definitely going negative something," to which Sorrentino responds: "I'll give you a [positive] half." There is no discussion of why Sorrentino was willing, contrary to Oppenheimer's interests, to loan the stock to Fabrizzi at a positive rebate after learning that others were willing to pay a negative rebate. This conversation also confirms that a Finder was not involved in the transaction.

93.    Fabrizzi did not disclose, and in fact concealed from VDM, that he was causing VDM to pay sham finder fees to A&C and was also paying cash kickbacks to Sorrentino for colluding with him on those transactions. Fabrizzi falsely marked, and caused others at VDM to falsely mark, the order tickets for the relevant loans to reflect that A&C provided bona fide finding services for the transactions.

94.    Sorrentino did not disclose, and in fact concealed from Oppenheimer, that he was receiving monthly cash kickbacks from Fabrizzi for colluding with him on loan transactions that were disadvantageous to Oppenheimer and designed to generate a sham finder fee for Fabrizzi's benefit.

**A&C's Kickback Scheme With Traders At Kellner**

95.    Carannante and Daronzio, another Finder associated with A&C, also engaged in two straightforward kickback schemes with Roman and Sarnicola, two Traders at Kellner. In or

about June 2003, Daronzio and Roman, who were friends, agreed that Kellner would pay finder

fees to A&C on loans in which A&C did not perform any services and that A&C would kick

back a portion of the sham fees to Roman. Carannante approved the arrangement. From in or

about June 2003 through early 2005, Roman regularly caused Kellner to pay a finder fee to A&C

on profitable Kellner loans that she negotiated on her own without the benefit of A&C or any

other Finder, thereby defrauding Kellner.

96.     In or about March 2004, Carannante and Daronzio entered into a similar kickback

arrangement with Sarnicola. From in or about March 2004 through early 2005, Sarnicola caused

Kellner to pay a finder fee to A&C on profitable Kellner loans that he negotiated on his own

without the benefit of A&C or any other Finder, thereby defrauding Kellner. From June 2003

through December 2004, Roman and Sarnicola caused Kellner to pay A&C approximately

$200,000 in sham finder fees. In furtherance of the scheme, Carannante and Daronzio submitted

phony invoices to Kellner requesting payment of finder fees to A&C for services that were never

performed.

97.     Carannante kept the majority of the sham fees for himself and A&C, and then

distributed the balance in cash to Daronzio, who met Roman and Sarnicola in person once a

month to deliver their share of the cash kickbacks.

98.     Roman and Sarnicola did not disclose, and in fact concealed from Kellner, that

they were causing Kellner to pay sham finder fees to A&C. Roman and Sarnicola both falsely

marked, and caused others at Kellner to falsely mark, the order tickets for the relevant loans to

reflect that A&C performed bona fide finding services on those transactions. Roman and

Sarnicola also did not disclose, and in fact concealed from Kellner, that they were receiving cash

kickbacks from Carannante and Daronzio.

27

### Roman's Kickback Scheme With AJT And AJGT

99.     Roman also defrauded Kellner by causing the firm to pay sham finder fees to AJT
and AJGT, which were formed and operated by Lando-Tanico and Tanico, in exchange for cash
kickbacks from Tanico. Tanico, who had on occasion performed finding services for Kellner,
proposed the kickback scheme to Roman in or about January 2002. Roman agreed to participate
and, at Tanico's suggestion, she set up a separate account at Kellner to keep track of the sham
finder fee payments to AJT and AJGT and keep those payments separate from any legitimate
finder fees.

100.     From in or about January 2002 through December 2004, Roman caused Kellner to
pay sham finder fees to AJT and AJGT totaling approximately $200,000 on thousands of loan
transactions in which AJT and AJGT did not perform any services. In furtherance of the scheme,
Tanico submitted phony invoices to Kellner requesting payment of finder fees to AJT and AJGT
for services that were never performed. During this period, Tanico paid monthly cash kickbacks
to Roman totaling over approximately $30,000.

101.     Roman did not disclose, and in fact concealed from Kellner, that she was causing
Kellner to pay sham finder fees to AJT and AJGT. Roman falsely marked, and caused others at
Kellner to falsely mark, the order tickets for the relevant loans to reflect that AJT and AJGT
performed bona fide finding services on those transactions. Roman also did not disclose, and in
fact concealed from Kellner, that she was receiving cash kickbacks from Tanico.

### J. Lando's Scheme With AJT And AJGT

102.     AJT and AJGT also received sham finder fees from Janney. From in or about
November 2002 through early 2005, J. Lando caused Janney to pay finder fees to AJT and AJGT
on stock loan transactions in which AJT and AJGT did not perform any finding services. During

28

this period, J. Lando caused Janney to pay AJT and AJGT a total of $343,497 in finder fees. AJT and AJGT were formed and operated by J. Lando's sister, Lando-Tanico, and brother-in-law, Tanico.

103. In an interview conducted by the NYSE in 2005 as part of an inquiry into stock lending practices at member firms, J. Lando admitted that he routinely caused Janney to pay finder fees to AJT and AJGT on certain stock loan transactions even though AJT and AJGT did not perform any services on those transactions. J. Lando had not previously disclosed this practice to, and in fact concealed it from, the relevant operations and compliance personnel at Janney, and J. Lando never disclosed to Janney that AJT and AJGT were run by his sister and her husband.

104. J. Lando caused Janney to pay sham finder fees to AJT and AJGT by falsely marking, or causing others at Janney to falsely mark, the relevant order tickets to reflect that AJT and AJGT performed bona fide finder services on those transactions. In furtherance of and to cover up the scheme, Lando-Tanico falsely certified in writing to Janney that AJGT had provided finding services on those loans.

### McCormack's Scheme With J. Lando, Roman And Centola

105. J. Lando and Roman also engaged in a scheme with McCormack, a Trader at A.G. Edwards, to defraud their respective firms through the payment of sham finder fees to DMAC, a company owned by McCormack's wife, Centola. McCormack and Centola formed DMAC in or about March 2001 after Centola lost her job as a Trader at a brokerage firm, and they continued the scheme until approximately January 2005. During this period, DMAC received several hundred thousand dollars in sham finder fees arranged by McCormack. J. Lando and Roman colluded with McCormack by causing their respective firms, Janney and Kellner, to act as run-

29

throughs for McCormack and pay DMAC a finder fee even though DMAC did not perform any

services. The scheme was structured in this manner because A.G. Edwards prohibited its

Traders from paying Finders.

106.    From March 2001 through December 2004, Janney and Kellner paid DMAC over

$600,000 in sham finder fees on thousands of stock loan transactions. McCormack arranged the

loans on his own and DMAC did not perform any services at all for the fees it received.

McCormack caused A.G. Edwards to lend stock to Janney and Kellner at inferior rates, and J.

Lando and Roman then caused their firms to lend the same stock at better rates to other broker-

dealers identified in advance by McCormack.

107.    McCormack knew from the outset that these other firms were looking to borrow

the stock at the better rates, and he could have had A.G. Edwards lend the stock directly to them.

Instead, McCormack had the run-through firms make the profit and use that profit to pay DMAC

a sham finder fee. J. Lando and Roman facilitated McCormack's scheme because Janney and

Kellner made a risk-free profit on the difference between what they paid A.G. Edwards and what

they received from the firm to which they loaned the stock, less the payment to DMAC.

108.    Emails from McCormack to persons working for J. Lando and Roman confirm

that J. Lando, Roman and McCormack did not engage in arms-length negotiations on these

transactions. The emails further confirm that McCormack arranged the transactions solely to

extract a sham payment to DMAC at the expense of A.G. Edwards. Specifically, the emails

demonstrate that McCormack orchestrated the deals and told the Traders at the run-through

firms: (i) the inferior rates at which A.G. Edwards would lend stock to the run-through firms;

(ii) the better rates the run-through firms would receive from the other firms for the stock; and

(iii) how much the run-through firms were to pay DMAC. These emails further demonstrate that DMAC did not provide any finding services on any of these loans.

109.    For example, on April 7, 2004, McCormack caused A.G. Edwards to run a loan of 9,800 shares of Nanogen stock (NGEN) through Kellner at an inferior rate of positive 0.75% (*i.e.* A.G. Edwards the lender pays Kellner the borrower) instead of loaning the shares directly to Bank of America ("BOA") at the better rate of negative 2.0% that BOA then paid to Kellner. Kellner paid DMAC a 2.0% finder fee on its loan to BOA.

110.    Earlier that day, McCormack sent an email to a Trader working for Roman. This email confirms that McCormack himself arranged both legs of the deal, knew that the available rate for NGEN was significantly better than the run-through rate he selected for A.G. Edwards' loan to Kellner, and that DMAC was not involved in the transaction: "I have a run through for you. I'm sending you 9800 [shares of] NGEN price is 10 [dollars per share]. I'll pay you 0.75. Send it to 773 [BOA Securities]. Pay them negative [*i.e.* receive] 2.00. Pay Donna [Centola] 2.00 on the borrow side." In other words, McCormack chose to have A.G. Edwards *pay* Kellner on the loan instead of *receive* payment from BOA. As a result, Kellner made a profit of 0.75% for acting as the run-through firm, McCormack and Centola made 2.0% profit through DMAC, and A.G. Edwards lost money on this transaction.

111.    McCormack never disclosed, and in fact concealed from A.G. Edwards, that he was colluding with other Traders and causing A.G. Edwards to enter into stock loan transactions that were disadvantageous to A.G. Edwards for the purpose of generating sham finder fees for McCormack's own benefit.

112.    Roman did not disclose, and in fact concealed from Kellner, that she was colluding with McCormack and causing Kellner to pay sham finder fees for McCormack's

31

benefit. Roman falsely marked, and caused others at Kellner to falsely mark, the order tickets for the relevant loans to reflect that DMAC provided bona fide finding services on those transactions.

113.    J. Lando did not disclose, and in fact concealed from Janney, that he was colluding with McCormack and causing Janney to pay sham finder fees for McCormack's benefit. J. Lando falsely marked, and caused others at Janney to falsely mark, the order tickets for the relevant loans to reflect that DMAC provided bona fide finding services on those transactions.

114.    In furtherance of the scheme, Centola (a) submitted phony invoices to Kellner requesting payments of finder fees to DMAC for services that were never performed; and (b) falsely certified in writing to Janney that DMAC had provided finding services on loans for which DMAC was seeking payment but as to which DMAC had not, in fact, performed any services. McCormack and Centola shared the payments to DMAC for the duration of the scheme.

**Caccioppoli's Scheme With The Maclis**

115.    While supervising Janney's stock loan desk, Caccioppoli routinely defrauded the firm. From at least December 2002 through early 2005, Caccioppoli caused Janney to pay sham finder fees to his sister, D. Macli, and her husband, T. Macli. The Maclis owned LUMAC, a purported Finder, and Janney paid over $350,000 in sham finder fees to LUMAC on over one thousand stock loan transactions during this period. LUMAC did not perform any services on any of those transactions.

116.    Both Maclis had full-time jobs outside the securities industry during this period. T. Macli was a letter carrier for the Postal Service, and D. Macli worked for a dentist as a

receptionist. Neither one of them ever had any experience in the securities industry. Caccioppoli simply placed LUMAC as the Finder on order tickets for transactions he had negotiated without the services of LUMAC or any Finder, and where there was a sufficient profit margin for Janney to pay LUMAC and still record a profit.

117.    In an interview conducted by the NYSE in 2005 as part of its inquiry into stock lending practices at member firms, Caccioppoli admitted that he routinely caused Janney to pay finder fees to LUMAC on certain stock loan transactions even though LUMAC did not perform any services on those transactions. Caccioppoli had not previously disclosed this practice to, and in fact concealed it from, the relevant operations and compliance personnel at Janney, and he never disclosed to Janney that LUMAC was run by his sister and her husband. As described above, Caccioppoli falsely marked, and caused others at Janney to falsely mark, the relevant order tickets to reflect that LUMAC provided bona fide finding services for the transactions on which it was paid.

118.    In furtherance of and to cover up the scheme, T. Macli and D. Macli falsely certified in writing to Janney that LUMAC was a genuine finder business and had provided finding services on the loans for which it was being paid. The Maclis transferred the funds that Janney paid to LUMAC to their personal accounts, wrote numerous checks to themselves and then cashed those checks.

**The Manfres' Scheme With Simone And J. Lando**

119.    Simone and J. Lando also colluded with G. Manfre, a Trader at Nomura, in a scheme to defraud their respective firms through the payment of sham finder fees to RAM, a shell company owned by G. Manfre's brother, R. Manfre. G. Manfre was the Nomura Trader responsible for lending stock from Nomura's inventory, and he used his position to engage in a

33

run-through scheme with Simone and J. Lando whereby G. Manfre would cause Nomura to lend

stock to VDM and Janney at inferior rates in exchange for sham finder fee payments to RAM.

Pursuant to the scheme, Simone and J. Lando then loaned the same stock to other firms at better

rates, creating enough of a spread to allow VDM and Janney to pay RAM and still record a

profit. The scheme was structured in this manner because Nomura prohibited payments to

Finders.

120.    G. Manfre and Simone agreed to this arrangement in or about November 2002,

and G. Manfre entered into the same arrangement with J. Lando in or about February 2003.

From November 2002 through early 2005, Simone and J. Lando respectively caused VDM and

Janney to pay a total of approximately $80,848 in finder fees to RAM on over two thousand

transactions in which RAM did not perform any finding services.

121.    Simone and J. Lando benefited from the Nomura transactions that G. Manfre ran

through VDM and Janney because they increased the profitability of their stock loan desks and,

as a result, increased their incentive compensation. Manfre would not have steered the same

volume of Nomura business to VDM and Janney if Simone and J. Lando had not agreed to pay

RAM. G. Manfre's loans from Nomura's inventory represented significant additional business

for VDM and Janney. Simone and J. Lando made a risk-free profit on the difference between the

low rate they paid Nomura and the higher rate they received from the firm to which they later

loaned the stock, less the payment to RAM.

122.    R. Manfre is a perfume salesman who, earlier in 2002, tried but failed to find

work with a broker-dealer as a Trader. After several unsuccessful attempts, G. Manfre advised

R. Manfre to start a Finder business. R. Manfre then formed RAM but continued working as a

perfume salesman and never performed bona fide finding services. All the loans by Nomura for

34

which RAM was paid were prearranged by G. Manfre and were not arms-length transactions. G. Manfre told Simone and J. Lando which stocks he wanted them to borrow from Nomura and at what rates. Each morning, G. Manfre sent an email to J. Lando and someone who worked for Simone listing Nomura's "Specials and Hard Stocks in [inventory]" that G. Manfre was willing to loan to Janney or VDM in exchange for finder payments to RAM.

123.    For example, on March 31, 2004, G. Manfre emailed his daily "Specials and Hard Stocks" list to J. Lando at Janney and someone at VDM acting on Simone's behalf. The list included Winn-Dixie Stores, Inc. stock (WIN) and, later that day, J. Lando caused Janney to borrow 29,300 shares of WIN from Nomura at a flat rate of 0%. J. Lando then had Janney lend 29,300 shares of WIN to another brokerage firm at a better rate of negative 2% and pay RAM a 0.25% finders' fee even though RAM did not provide any services. These loans remained open for fifty-four days, and Janney paid RAM a total of $71.28 in fees.

124.    G. Manfre never disclosed, and in fact concealed from Nomura, that he was colluding with other Traders and causing Nomura to enter into stock loan transactions that were disadvantageous to Nomura for the purpose of generating sham finder fees for his own benefit.

125.    Simone did not disclose, and in fact concealed from VDM, that he was colluding with G. Manfre and causing VDM to pay sham finder fees to RAM for G. Manfre's benefit. Simone falsely marked, and caused others at VDM to falsely mark, the order tickets for the relevant loans to reflect that RAM provided bona fide finding services on those transactions.

126.    J. Lando did not disclose, and in fact concealed from Janney, that he was colluding with G. Manfre and causing Janney to pay sham finder fees to RAM for G. Manfre's benefit. J. Lando falsely marked, and caused others at Janney to falsely mark, the order tickets for the relevant loans to reflect that RAM provided bona fide finding services.

127.    In furtherance of and to cover up the scheme, R. Manfre falsely certified in writing to Janney that RAM was a genuine finder business and had provided finding services on the loans for which it was being paid.

**The Pianellis' Scheme With J. Lando**

128.    J. Lando also schemed with A. Pianelli at Weiss Peck to pay sham finder fees to JJE, a purported Finder owned by A. Pianelli's wife, J. Pianelli. J. Pianelli formed JJE in or about February 2004 at A. Pianelli's direction, because he was purportedly planning to work as a Finder after Weiss Peck closed its stock loan department, which occurred in or about May 2004. J. Lando's father previously worked for Weiss Peck and was A. Pianelli's boss, and J. Lando subsequently developed a relationship with A. Pianelli.

129.    From in or about February 2004 through May of 2004 -- while A. Pianelli was still at Weiss Peck -- J. Lando caused Janney to pay over $50,000 in sham finder fees to JJE on over one hundred stock loan transactions with Weiss Peck in which JJE did not perform any services. These loans were prearranged by A. Pianelli and J. Lando without any assistance from JJE or any Finder and were collusive, not arms-length, transactions. During the relevant period, J. Pianelli worked at home as a housewife and was not a Finder.

130.    Pursuant to their scheme, A. Pianelli gave J. Lando a daily list of securities that Weiss Peck needed to borrow. J. Lando caused Janney to borrow one or more of those securities from other broker-dealers in arms-length transactions and then, pursuant to their scheme, A. Pianelli caused Weiss Peck to borrow those same securities from Janney at inferior rates. Even though Weiss Peck was thereby disadvantaged and could have obtained the securities in the market at better rates, A. Pianelli caused Weiss Peck to borrow the securities from Janney at inferior rates because he needed to guarantee Janney a hefty profit on these transactions.

Pursuant to the scheme, J. Lando used that inflated profit to cause Janney to pay a sham finder fee to JJE and kept the balance as a risk-free profit for Janney.

131.    For example, on February 18, 2004, J. Lando caused Janney to borrow 14,000 shares of Amerisource Bergen Corp. (ABC) stock from another broker-dealer at a positive rebate rate of 0.95% (*i.e.* it was an easy-to-borrow stock and the lender paid interest to Janney). Later that day, A. Pianelli caused Weiss Peck to borrow the same number of ABC shares from Janney at an inferior positive rebate rate of just 0.125%, *i.e.* unlike Janney, Weiss Peck received barely one-eighth of the better rate. Out of the 0.825% spread between what Janney received and what Janney paid Weiss Peck on the loan, J. Lando caused Janney to pay JJE a sham finder fee of 0.5% and Janney kept the remaining 0.325% as a risk-free profit. This transaction remained open until May 11, 2004, and JJE received a total of $932 in sham finder fees from Janney. Weiss Peck and Janney entered into 16 other collusive loan transactions on February 18, 2004, alone, resulting in the payment of an additional $6,902 in sham finder fees to JJE.

132.    A. Pianelli did not disclose, and in fact concealed from Weiss Peck, that he was colluding with J. Lando and causing Weiss Peck to enter into stock loan transactions that were disadvantageous to Weiss Peck for the purpose of generating sham finder fees for A. Pianelli's own benefit.

133.    J. Lando did not disclose, and in fact concealed from Janney, that J. Lando was colluding with A. Pianelli and causing Janney to pay sham finder fees to JJE for A. Pianelli's benefit. J. Lando falsely marked, and caused others at Janney to falsely mark, the order tickets for the relevant loans to reflect that JJE provided bona fide finding services.

134.    In furtherance of and to cover up the scheme, J. Pianelli falsely certified in writing to Janney that JJE was a genuine finder business and had provided finding services on the loans

for which it was paid. J. Pianelli transferred the funds that Janney paid to JJE from JJE's bank accounts to herself and A. Pianelli.

## CLAIM FOR RELIEF

### Violations of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5

135.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 134.

136.    The defendants directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in, or the means or instrumentalities of, interstate commerce, or by the use of the mails, or of the facilities of a national securities exchange, in the offer or sale and in connection with the purchase or sale of securities, knowingly or recklessly, have: (a) employed devices, schemes and artifices to defraud; (b) obtained money or property by means of, or otherwise made, untrue statements of material fact, or have omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, transactions, practices and courses of business which operated or would have operated as a fraud or deceit upon purchasers of securities and upon other persons.

137.    As part and in furtherance of the fraudulent scheme and other violative conduct described above, the defendants, directly or indirectly, singly or in concert, employed the deceptive devices and contrivances, made the misrepresentations and omitted to state the facts alleged above in paragraphs 1-11 and 57-134.

138.    The false and misleading statements and omissions made by the defendants, more fully described above in paragraphs 1-11 and 57-134, were material.

38

139.    The defendants knew, or were reckless in not knowing, that these material misrepresentations and omissions, more fully described above in paragraphs 1-11 and 57-134, were false or misleading, and the defendants otherwise acted with the requisite scienter by knowingly or recklessly engaging in one or more of the fraudulent schemes described above in paragraphs 1-11 and 57-134.

140.    By reason of the acts, statements, omissions, practices, and courses of business alleged herein, the defendants, singly or in concert, directly or indirectly, have violated, and unless enjoined will again violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

141.    By reason of the foregoing and pursuant to Section 20(e) of the Exchange Act, the defendants, singly or in concert, directly or indirectly, also aided and abetted the violations committed by those defendants with whom they schemed to defraud by knowingly providing substantial assistance to such other defendants' violations of, and unless enjoined will again aid and abet violations of, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

**PRAYER FOR RELIEF**

**WHEREFORE**, the Commission respectfully requests that this Court enter a Final Judgment:

**I.**

Permanently enjoining and restraining each of the defendants, their agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating, directly or indirectly, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

**II.**

Ordering each of the defendants to disgorge the ill-gotten gains they received from the violations alleged herein, and to pay prejudgment interest thereon.

**III.**

Ordering each of the defendants, other than R. Manfre and RAM, to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

**IV.**

Granting such other and further relief as the Court deems just and proper.

Dated: New York, New York
       September 20, 2007


David Rosenfeld (DR-8646)
Associate Regional Director
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
3 World Financial Center, Suite 400
New York, New York 10281
(212) 336-0153


Of Counsel:

  George N. Stepaniuk
  Joseph P. Dever, Jr.
  Burk Burnett
  Kenneth V. Byrne
  Karen M. Lee

41

EXHIBIT C

David Rosenfeld (DR-8646)
Associate Regional Director

Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
3 World Financial Center, Suite 400
New York, New York 10281
(212) 336-0153

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : |
| | : |
| Plaintiff, | : |
| | : |
| -against- | : Civil Action No. |
| | : |
| DARIN DEMIZIO, PETER SHERLOCK, ANTHONY LUPO, CLINTON MANAGEMENT, LTD., CRAIG DEMIZIO, CD MANAGEMENT, INC., DONATO TRAMONTOZZI, DFT CONSULTING, INC., JOSEPH MILLER, and COBBLEHILL CONSULTING, INC., | : |
| | : COMPLAINT |
| | : |
| Defendants. | : |

---

Plaintiff Securities and Exchange Commission ("Commission"), for its complaint against

defendants Darin DeMizio ("D. DeMizio"); Peter Sherlock ("Sherlock"); Anthony Lupo

("Lupo"); Clinton Management, Ltd. ("Clinton"); Donato Tramontozzi ("Tramontozzi"); DFT

Consulting, Inc. ("DFT"); Craig DeMizio ("C. DeMizio"); CD Management, Inc. ("CD

Management"); Joseph Miller ("Miller"); and Cobblehill Consulting, Inc. ("Cobblehill"), alleges

as follows:

## SUMMARY OF ALLEGATIONS

1.  This action concerns two interrelated fraudulent schemes perpetrated by six individuals and four entities involved in the securities lending industry, colloquially known as the "stock loan" business. From July 2000 through June 2006, D. DeMizio and Sherlock, two stock loan traders employed by Morgan Stanley & Co., Inc. ("Morgan Stanley"), and three other individuals, skimmed millions of dollars in stock lending profits from Morgan Stanley and a broker-dealer division of The PNC Financial Services Group Inc. ("PNC") through their illegal kickback schemes with Lupo, a stock loan "finder." Clinton, Lupo's finder firm, collected over $4 million in improper finder fees as a result of these schemes, and Lupo paid over $1 million in undisclosed kickbacks to some of the other defendants.

2.  In the first scheme, D. DeMizio and Sherlock caused Morgan Stanley to enter into thousands of unnecessary loan transactions at inferior interest rates for the purpose of artificially generating finder fees for Lupo. In exchange, Lupo paid cash kickbacks directly to Sherlock in cash and paid a total of nearly $600,000 to shell companies controlled by C. DeMizio, D. DeMizio's brother, and Tramontozzi, Sherlock's brother-in-law and a full-time pharmacist. The scheme was designed to circumvent Morgan Stanley's prohibition against payments to finders and to enrich the participants and their families at Morgan Stanley's expense.

3.  Rather than seek a lender or borrower for Morgan Stanley stock loan orders at the best available rates -- which Morgan Stanley stock loan traders could have readily done given Morgan Stanley's market power -- D. DeMizio and Sherlock caused Morgan Stanley to run orders at inferior interest rates through an intermediary brokerage firm selected by Lupo that, unlike Morgan Stanley, allowed payments to finders. The sole purpose of the loans to these "run-through" firms was to generate a finder fee to Clinton. In these transactions, the rates at which

2

Sherlock and D. DeMizio caused Morgan Stanley to lend or borrow the stock were inferior to the rates that the ultimate borrower was paying to -- or the actual source was charging -- the run-through firm. Clinton's finder fee was paid out of the profit made by the run-through firm, which in turn came out of the profit that Morgan Stanley could have otherwise earned on the transaction.

4.    In the second scheme, Miller, a finder and former stock loan trader at Morgan Stanley, paid undisclosed cash kickbacks to a stock loan trader at PNC in exchange for receiving PNC stock loan orders from the trader ("PNC Trader"). Lupo and others participated in and shared the profits from this scheme. From January 2002 to June 2004, Lupo and Miller split over $1.2 million in finder fees generated by PNC orders. Miller used some of his portion of the fees to pay cash kickbacks to the PNC Trader. Miller ended his arrangement with Lupo in May 2003, but Miller continued the kickback scheme with the PNC trader on his own until January 2005.

5.    By virtue of the foregoing conduct, each of the defendants, directly or indirectly, singly or in concert, violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R § 240.10b-5]; and defendants C. DeMizio, CD Management, Tramontozzi and DFT are also liable in the alternative, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], for aiding and abetting the violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] committed by defendants D. DeMizio, Sherlock, Lupo, and Clinton. Unless each of the defendants is permanently restrained and enjoined, they will again engage in the acts, practices,

transactions and courses of business set forth in this complaint and in acts, practices, transactions and courses of business of similar type and object.

## JURISDICTION AND VENUE

6.  The Commission brings this action pursuant to the authority conferred by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)], and seeks to restrain and enjoin the defendants permanently from engaging in the acts, practices, transactions and courses of business alleged herein. The Commission also seeks a final judgment ordering the defendants to disgorge their ill-gotten gains and pay prejudgment interest thereon, and ordering the defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act, [15 U.S.C. § 78u(d)(3)].

7.  This Court has jurisdiction over this action, and venue lies in this District, pursuant to Sections 20(d) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(d) and 77v(a)] and Sections 21(d) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d) and 78aa]. The defendants, directly and indirectly, have made use of the means or instrumentalities of, or the means or instruments of transportation or communication in, interstate commerce, or of the mails, or of the facilities of a national securities exchange, in connection with the transactions, acts, practices and courses of business alleged herein. Some of these transactions, acts, practices and courses of business occurred in the Eastern District of New York, where many of the defendants reside or transact business.

## THE DEFENDANTS

8.  **D. DeMizio**, age 41, lived in Staten Island, New York during the relevant period and now resides in Westfield, New Jersey. D. DeMizio is a stock loan trader and registered

4

representative associated with Morgan Stanley, where he supervises stock loan trading activities. He has been employed with Morgan Stanley since 1991. On July 17, 2007, D. DeMizio was placed on administrative leave. He was previously employed as a stock loan finder for a company operated by his father, Robert DeMizio.

9.      **Sherlock,** age 36, resides in East Norwich, New York. From October 1994 to June 2007, Sherlock was a stock loan trader and registered representative associated with Morgan Stanley.

10.     **Lupo,** age 62, resides in Freehold, New Jersey. During the relevant period, he purported to perform stock loan finding services through Clinton, which he formed in or about 1996. Lupo also purportedly provides tax preparation services to a limited number of individual clients.

11.     **Clinton** is a New York corporation with a business address in Brooklyn, New York. Clinton is owned and controlled by Lupo.

12.     **C. DeMizio,** age 42, resides in Colts Neck, New Jersey. He is D. DeMizio's brother. From April 2004 through August 2007, C. DeMizio was a stock loan trader at Swiss American Securities, Inc. ("SASI"). C. DeMizio previously purported to perform stock loan finder services through CD Management, which he formed in or about July 1997.

13.     **CD Management** is a New York corporation owned and controlled by C. DeMizio. Its business address in Staten Island, New York was the same address as C. DeMizio's residence during the relevant period.

14.     **Tramontozzi,** age 38, resides in Glen Head, New York. He is employed full-time as a pharmacist and is Sherlock's brother-in-law. Tramontozzi formed DFT in or about July 2004.

15.    **DFT** is a New York corporation with a business address in Brooklyn, New York. DFT is owned and controlled by Tramontozzi.

16.    **Miller**, age 34, resides in Brooklyn, New York. From December 1996 to January 2002, he was a stock loan trader at Morgan Stanley. In or about January 2002, Miller formed Cobblehill as a purported finder business.

17.    **Cobblehill** is a New York corporation with a business address in Brooklyn, New York. Cobblehill is owned and controlled by Miller.

## RELEVANT ENTITIES

18.    **Morgan Stanley** is registered with the Commission as a broker-dealer and maintains its principal place of business in New York, New York.

19.    **PNC** is registered with the Commission as a broker-dealer and maintains its principal place of business in Pittsburgh, Pennsylvania.

20.    **Paloma Securities, LLC** ("Paloma") is registered with the Commission as a broker-dealer and maintains its principal place of business in Greenwich, Connecticut.

21.    **Janney Montgomery Scott, LLC** ("Janney") is registered with the Commission as a broker-dealer and maintains its principal place of business in Philadelphia, Pennsylvania.

22.    **First Albany Capital Inc.** ("First Albany") is registered with the Commission as a broker-dealer and maintains its principal place of business in Albany, New York. First Albany closed its stock loan trading department in or about January 2003.

23.    **Van der Moolen Specialists USA, LLC** ("VDM") is registered with the Commission as a broker-dealer and maintains its principal place of business in New York, New York. VDM closed its stock loan department in or about February 2005.

6

24.     **Fortis Securities LLC** ("Fortis") is registered with the Commission as a broker-dealer and maintains its principal place of business in New York, New York.

25.     **SASI** is registered with the Commission as a broker-dealer and maintains its principal place of business in New York, New York.

26.     **Freeman Securities Company** ("Freeman") was, until late 2001, registered with the Commission as a broker-dealer and maintained its principal place of business in Jersey City, New Jersey. In 2001, Freeman changed its name to Native Nations Securities, Inc. and ceased all business operations later that year.

## THE SECURITIES LENDING BUSINESS

### Typical Stock Loan Transactions

27.     A securities loan is a collateralized, temporary exchange of securities. The collateral is usually cash or other securities. Generally, broker-dealers borrow securities to cover short sales and lend securities to gain short-term access to cash. If the security is liquid (*i.e.* readily available and thus called "easy-to-borrow"), the broker-dealer borrowing the security also receives interest for the duration of the loan on the cash collateral it makes available to the lender. The interest payment is called a "rebate." If the security is in limited supply (*i.e.* "hard-to-borrow"), the borrower generally pays interest to the lender for the right to borrow the security. This interest payment is called a "negative rebate." The rebates and negative rebates are a percentage of the total market value of the securities and are quoted as annual percentage rates. Stock loan transactions may stay open for as little as one trading day or as long as several months or even a year.

**Roles Of Securities Lending Firms**

28.    There are generally three types of securities lending firms, referred to in the industry as "retail" firms, "prime broker" firms and "conduit" firms. The retail firms, which have a large retail customer base, are primarily in the securities lending business to lend securities from their inventory, or "box," to gain short-term access to cash for financing needs. By lending easy-to-borrow securities from their box, retail firms can obtain cash at a more favorable interest rate (*i.e.* the rebate) than they could obtain from a bank or similar lending institution. When retail firms lend hard-to-borrow securities at negative rebates, they make a profit from the interest they receive. Prime broker firms typically have large institutional and hedge-fund clients, and they often need to borrow significant blocks of securities to cover their customers' short sales. Accordingly, prime broker firms generally have the greatest demand for securities. They also sometimes function the same way that retail firms do when they lend securities being held by clients that have long positions. Conduit firms typically borrow securities, generally from retail firms, and then immediately re-lend them, generally to prime broker firms. Conduit firms seek to negotiate a small spread between the rate they pay to the initial lender and the rate they receive from the ultimate borrower. The conduit firms profit on the spread between the rates.

29.    Conduit transactions of this type are not necessarily fraudulent or illegal, as there are legitimate business reasons for a borrower or lender to use a conduit firm as an intermediary. For example, two firms seeking to enter into a stock loan transaction directly may be temporarily unable to do so because one or both have exceeded their respective credit limits. Some firms may also use a conduit firm as an intermediary to maintain a certain degree of anonymity in the marketplace. However, the conduit transactions at issue in this action were arranged not for

legitimate business reasons, but to generate improper payments to Lupo, which Lupo then shared with the other defendants.

**Role And Compensation Of Finders**

30.    During the relevant period, most retail firms and prime broker firms, such as Morgan Stanley, had policies prohibiting payments to finders. PNC prohibited its stock loan traders from even communicating with finders. Many of the conduit firms, such as Paloma, First Albany, Janney and VDM, did not prohibit payments to finders and were the primary source of compensation for finders. The finder's fee would typically be negotiated by the lender and borrower as part of the terms of the loan and, like the rebate rate, expressed in basis points as a percentage of the total market value of the stock.

31.    Although the rebate rates and corresponding finder fees on any particular stock loan transaction may not be large, traders generally engage in dozens, if not hundreds, of stock loan transactions each day. The rebates and finder fees are calculated and paid on a daily basis, and the brokerage firms and finders continue to receive payments until the borrowed stock is returned or recalled. Accordingly, those loans that remain open for extended periods generate substantial profits for both brokerage firms and finders even if the rates and spreads are small.

32.    In the past, traders typically employed the services of finders to locate hard-to-borrow stock. In today's securities market, however, traders rarely need the services of finders. Technological advances and other improvements have made it easier and faster for traders to locate hard-to-borrow securities on their own. On April 29, 2005, the New York Stock Exchange issued an advisory opinion cautioning all member firms about continuing to do business with finders and stating as follows: "We have seen only limited instances where a finder is actually providing services that an effective stock loan department could not provide."

9

## THE DEFENDANTS' FRAUDULENT SCHEMES

33.    Each of the defendants played a role in one or more kickback schemes stemming from their relationship with Lupo.  Although the details differed, the purpose of each scheme was to enrich the defendants at the expense of Morgan Stanley or PNC.  The activities of the two purported finders -- Lupo and Miller -- were aimed entirely at generating fraudulent profits for themselves and the other defendants.  As a result of the schemes, Morgan Stanley and PNC were defrauded out of millions of dollars that they would have otherwise received or retained.

### Lupo's Scheme With D. DeMizio, Sherlock And Their Relatives

34.    From approximately 1998 or 1999 to June 2006, D. DeMizio and Sherlock defrauded their employer, Morgan Stanley, through an elaborate finder fee and kickback arrangement with Lupo and others.

35.    Morgan Stanley is one of the largest prime brokerage firms in the industry and has one of the largest securities lending desks.  Because of Morgan Stanley's market power, its stock loan traders generally do not need to use finders or conduit firms to fill Morgan Stanley's stock loan orders, *i.e.* locate lenders or borrowers of whatever stocks Morgan Stanley needs to borrow or lend.  Accordingly, Morgan Stanley rarely, if ever, used finders and expressly prohibited the payment of finder fees.  The scheme with Lupo was designed to circumvent this prohibition and use Morgan Stanley's stock loan portfolio to enrich Lupo, D. DeMizio, Sherlock, and certain relatives of D. DeMizio and Sherlock, at Morgan Stanley's expense.  The defendants conspired to artificially generate unnecessary finder fees on loan transactions originating with Morgan Stanley and then share those fees by means of kickback payments.

10

**Origins Of The Scheme**

36.     Lupo has had a close personal relationship with the DeMizio family for many years. He has been friends with Robert DeMizio, D. DeMizio's and C. DeMizio's father, since the time Robert DeMizio and Lupo worked together at a finder firm in the 1970s. D. DeMizio introduced Lupo to Sherlock shortly after Sherlock began working at Morgan Stanley. D. DeMizio and Sherlock met at Morgan Stanley.

37.     D. DeMizio originated the scheme to defraud Morgan Stanley. In 1998 or 1999, D. DeMizio offered to direct a large volume of Morgan Stanley stock loan orders at favorable rates to a stock loan trader at Freeman (the "Freeman Trader"). In exchange, D. DeMizio wanted the Freeman Trader to cause Freeman to pay sham finder fees to Lupo and C. DeMizio on those transactions. The Freeman Trader agreed to participate in the scheme. At the time, Freeman was a small conduit firm receiving a limited amount of stock loan business from Morgan Stanley, and D. DeMizio's scheme enabled the Freeman Trader to increase significantly Freeman's business with Morgan Stanley and overall profitability.

38.     Sherlock became aware of D. DeMizio's scheme with the Freeman Trader and, approximately one year later, entered into a similar arrangement of his own with the Freeman Trader. Like D. DeMizio, Sherlock directed Morgan Stanley stock loan orders that he was responsible for handling to Freeman at favorable rates and, in exchange, the Freeman Trader caused Freeman to pay sham finder fees to Lupo on those transactions.

39.     From 1998 or 1999 until 2001, D. DeMizio and Sherlock caused Morgan Stanley to lend securities to Freeman at rates that were favorable to Freeman and disadvantageous to Morgan Stanley. Freeman then loaned the securities to other brokerage firms at better rates and used the inflated profit to pay sham finder fees to Lupo via Clinton and, on the loans directed by

11

D. DeMizio, also to C. DeMizio via CD Management. Neither Lupo nor C. DeMizio, nor the firms they controlled, performed any services on these transactions. Lupo and C. DeMizio together received a total of over $900,000 in sham finder fees from Freeman during this period. Freeman kept the balance of the risk-free profit generated by the spread between the rates. Lupo shared his portion of the sham finder fees he received from Freeman with Sherlock by paying Sherlock monthly cash kickbacks.

40.     Freeman went out of business in the latter part of 2001. As a result, D. DeMizio, Sherlock, Lupo and C. DeMizio altered their kickback scheme. The newer incarnation of their scheme to defraud Morgan Stanley was more elaborate and extremely profitable. It involved multiple conduit firms, with the finder fees being paid to Clinton and Lupo who would then distribute portions of the fees to C. DeMizio, Sherlock and, later in the scheme, to Tramontozzi. These fraudulent loan transactions were structured and carried out as follows.

### The Fraudulent Loan Transactions

41.     Each morning, Morgan Stanley's stock loan desk received a list of stocks that Morgan Stanley and other brokerage firms needed to lend or borrow that day, known in the industry as "push" and "needs" lists. Morgan Stanley's push and needs lists came to the stock loan desk from a variety of sources within Morgan Stanley. Other firms also provided their push and needs lists to Morgan Stanley because, due to its size and business strategies, Morgan Stanley was known to be a high-volume borrower and lender of stocks. Morgan Stanley expected its traders to use, among other things, Morgan Stanley's market power and the information on both the internal and external lists to negotiate loan transactions that benefited Morgan Stanley. For example, if Morgan Stanley had stock that it wished to lend, a Morgan Stanley stock loan trader could, among other things, search the other firms' needs lists for the

12

stock or contact his counterparts at other prime brokerage or other firms to find out if they needed to borrow the stock.

42.    Instead of taking the steps described above and seeking the best available rate for Morgan Stanley, Sherlock regularly provided Morgan Stanley's daily push and needs lists to Lupo. Sherlock and Lupo then worked together to arrange unnecessary multi-step transactions for the stocks on those lists at rates that were designed to generate a hefty finders fee for Clinton rather than maximize the benefit to Morgan Stanley. D. DeMizio also provided Lupo with similar proprietary information about Morgan Stanley's daily stock loan orders for the same purpose.

43.    To effectuate the scheme, the loan transactions orchestrated by D. DeMizio, Sherlock and Lupo were structured to overcome the following hurdles:

(a)    First, because Morgan Stanley prohibited payments to finders, the transaction had to involve a firm that was authorized to pay a finder fee and would in fact pay Clinton. Lupo therefore arranged for one of three firms that, like Freeman, paid finders and with whom Clinton had a relationship to act as an intermediary, or "run through," on the transaction: First Albany, Paloma and Janney (the "Run-Through Firms").

(b)    Second, the transaction also had to involve a firm that had sufficient credit to be able to engage in frequent stock loan transactions directly with Morgan Stanley. Because the Run-Through Firms generally lacked the necessary credit to deal directly with Morgan Stanley, Lupo and Sherlock often arranged for another firm that had sufficient credit with Morgan Stanley, most often SASI, to serve as an intermediary between the Run-Through Firm and Morgan Stanley. For example, if Morgan Stanley needed to lend a stock, SASI would borrow the shares from Morgan Stanley and then re-lend the shares to one of the Run-Through Firms.

13

The Run-Through Firm would then locate and lend the shares to a brokerage firm that needed the stock to cover a short-sale or for some other legitimate purpose, and the Run-Through Firm would pay Clinton a finder fee out of the net proceeds of that loan. If Morgan Stanley needed to borrow a stock, then the process worked in reverse.

(c)     Third, Lupo and Sherlock had to ensure that the Run-Through Firm made a large enough profit on the last leg of the transaction to enable it to pay Clinton a significant finder fee. Accordingly, the intermediate loans -- in the foregoing example, from Morgan Stanley to SASI and from SASI to the Run-Through Firm -- were generally done at interest rates that were inferior to, and often well below, the rate that the end-user paid to the Run-Through Firm. Each component of the transaction occurred on the same day.

44.     Morgan Stanley suffered harm as a result of these transactions. Like Freeman before them, the Run-Through Firms, as well as the other intermediary firms, were each guaranteed a risk-free profit on their loans, because D. DeMizio and Sherlock acted contrary to Morgan Stanley's best interests. D. DeMizio and Sherlock caused Morgan Stanley to loan or borrow the stock at inferior interest rates for the purpose of creating a sufficient spread between the two end-points of the multi-step transaction to enable Clinton to be paid a finder fee and still leave some profit for the Run-Through Firm and other intermediary firm. The Run-Through Firms would not have participated had there not been a sufficient spread in their favor for them to make at least a small risk-free profit. In the example described above in paragraph 43(b), Morgan Stanley could have loaned the stock directly to the end-user firm at the same rate that the Run-Through did, or perhaps an even better rate given Morgan Stanley's market power, rather than incur the costs of running the transaction through the Run-Through Firm. D. DeMizio and

14

Sherlock knew that Morgan Stanley had virtually unlimited access to the securities lending markets and rarely needed the assistance of finders or conduit firms to locate or place securities.

45.    D. DeMizio and Sherlock did not relinquish control of the transaction once the stock left Morgan Stanley or leave it to Lupo or the Run-Through Firm to negotiate the run-through rates with the other intermediary firm on their own. Instead, D. DeMizio and Sherlock effectively dictated the loan rates on the transactions between SASI and the Run-Through Firms, and they did so for the sole purpose of ensuring the payment of a fee to Clinton. For example, Sherlock informed a stock loan trader at SASI on one or more occasions that if the spread in the rates on a given transaction was not large enough to accommodate Clinton's fee, Sherlock would not allow Morgan Stanley to participate.

46.    After Freeman's demise, Lupo ran all the Morgan Stanley orders he received from D. DeMizio and Sherlock through one of the Run-Through Firms, and Clinton received a finder fee from one of the Run-Through Firms on thousands of Morgan Stanley stock loan transactions during the relevant period. The following transaction illustrates the extent of the harm suffered by Morgan Stanley when D. DeMizio and Sherlock caused Morgan Stanley to lend or borrow the securities involved in these transactions at rates that were inferior to what the Run-Through Firms were receiving, and that D. DeMizio's and Sherlock's purpose in running Morgan Stanley's stock loan transactions through Lupo and the Run-Through Firms was to generate an inflated profit for those firms that would then be diverted to Lupo in the form of a finder fee.

47.    On October 22, 2004, Morgan Stanley loaned 60,000 shares of ICU Medical, Inc. (ICUI) stock to SASI at a negative rebate of 1.25% (*i.e.* SASI paid Morgan Stanley an interest rate of 1.25%). SASI then loaned the stock to Paloma at a slightly higher negative rebate of 1.375% (*i.e.* Paloma paid SASI an interest rate of 1.375%). Paloma, however, loaned 45,000 of

15

the ICUI shares to VDM at a much higher negative rebate of 8% -- more than six times what

Morgan Stanley received -- and paid Clinton a finder fee of 6% -- nearly five times what Morgan

Stanley received -- out of Paloma's hefty 6.625% profit. This loan was open for four days, and

Clinton's fee came to $690. By contrast, Morgan Stanley's interest payments totaled only $192.

Paloma bundled the remaining 15,000 ICUI shares with an additional 10,000 from another

source and loaned those 25,000 shares to Lazard Freres, also on October 22, at a negative rebate

of 7%. Paloma paid Clinton only a 1% fee for this portion of the transaction. The following

chart illustrates each step of this transaction:



48.    In the foregoing example, Morgan Stanley could have loaned its 60,000 shares of

ICUI directly to VDM and Lazard at the much higher rates that Paloma received. Instead,

Sherlock directed the order to Lupo, who then arranged the transactions with SASI and between

SASI and Paloma because Paloma had agreed to pay a hefty finder fee to Clinton -- which was

controlled by Lupo -- and because Lupo, pursuant to the scheme, had agreed to pay kickbacks to Sherlock and D. DeMizio by, in this instance, sharing Clinton's finder fees with Sherlock's brother-in-law, Tramontozzi.

**The Kickback Payments**

49.     The kickback payments made by Lupo took different forms and benefited D. DeMizio and Sherlock in different ways. At times, Lupo paid kickbacks directly to Sherlock by giving him cash. For example, Sherlock received cash from Lupo at Lupo's office on multiple occasions, and Sherlock made serial monthly cash deposits into his bank account ranging from a few hundred dollars to several thousand dollars. In order not to arouse suspicion at the bank, each cash deposit was less than $10,000. From October 2000 to December 2006, Sherlock made 85 separate cash deposits totaling approximately $293,000.

50.     At other times, Lupo compensated D. DeMizio and Sherlock by making kickback payments to D. DeMizio's and Sherlock's relatives, C. DeMizio and Tramontozzi, mostly via the two shell companies that C. DeMizio and Tramontozzi controlled, CD Management and DFT. Neither C. DeMizio, D. DeMizio's brother, nor Tramontozzi, Sherlock's brother-in-law, performed any services of any kind in exchange for the payments they received from Clinton, and there was no legitimate business or other purpose for the payments. When he received these payments, C. DeMizio was a purported stock loan finder but did not perform any services with respect to the transactions at issue. Tramontozzi was and remains employed full-time as a pharmacist.

51.     From November 2001 to December 2004, Lupo caused Clinton to pay a total of $581,000 to CD Management and DFT. During the same period, Tramontozzi and C. DeMizio transferred large sums from the DFT and CD Management bank accounts to their personal bank

17

accounts, and then withdrew substantial amounts of the money in cash. The payments from

Clinton to CD Management, C. DeMizio's company, stopped after January 2004, as C. DeMizio

went to work as a stock loan trader at SASI that spring.

52.    From November 2001 through January 2004, Clinton paid $378,000 to CD

Management. Clinton also paid $23,000 directly to C. DeMizio during this period. C. DeMizio

knew, at a minimum, that these payments were made pursuant to an arrangement D. DeMizio

and Sherlock had with Lupo whereby D. DeMizio and Sherlock directed Morgan Stanley stock

loan orders to Lupo for the purpose of generating a finder fee that Lupo would then share with C.

DeMizio on their behalf.

53.    During the same period in which Clinton made payments to CD Management, C.

DeMizio transferred $251,000 from the CD Management bank accounts to his personal bank

account. During the same time period, he withdrew at least $112,220 in cash from his personal

bank account. During this period, CD Management also transferred $29,350 to a company

controlled by Robert DeMizio, C. DeMizio's and D. DeMizio's father.

54.    After C. DeMizio joined SASI in April 2004, Sherlock recruited Tramontozzi to

serve as the new repository for Lupo's kickbacks. Tramontozzi, a full-time pharmacist, formed

DFT in or about July 2004. From August 2004 through December 2004 -- a mere five months --

Clinton paid DFT a total of $203,000. Tramontozzi knew, at a minimum, that these payments

were made pursuant to an arrangement that D. DeMizio and Sherlock had with Lupo whereby D.

DeMizio and Sherlock directed Morgan Stanley stock loan orders to Lupo for the purpose of

generating a finder fee that Lupo would then share with Tramontozzi on their behalf. During this

period, Tramontozzi transferred a total of $77,000 to his personal account and then withdrew a

total of $72,500 in cash from his personal account.

18

### Nondisclosure And Misrepresentations To Morgan Stanley

55.     Neither D. DeMizio nor Sherlock ever disclosed any of their dealings with Lupo described above to their supervisors or the relevant compliance personnel at Morgan Stanley. Neither D. DeMizio nor Sherlock ever disclosed that they were giving Lupo daily access to Morgan Stanley stock loan orders, that Lupo was paying them or their family members, or that they had an arrangement of any kind with Lupo. While Morgan Stanley stock loan traders were permitted to speak to finders if there was a legitimate business reason for doing so -- *i.e.* in the rare event they needed outside assistance in locating a hard-to-borrow stock -- Morgan Stanley has a strict policy prohibiting traders from retaining and paying finders or accepting payments from finders. Not only did D. DeMizio and Sherlock violate this policy, they falsely certified in written submissions required by Morgan Stanley's Code of Conduct that they had not received gifts or special favors of more than nominal value from any person in connection with their employment.

56.     Lupo would not have received the access to the Morgan Stanley stock loan orders from D. DeMizio and Sherlock described above in the absence of their kickback arrangement.

### Miller's Scheme With Lupo And The PNC Trader

57.     Miller participated in a separate, but related, kickback scheme involving Lupo and the PNC Trader. This scheme was an extension of the Morgan Stanley scheme and operated in a similar fashion.

58.     Upon leaving Morgan Stanley, Miller became a finder and paid undisclosed cash kickbacks to the PNC Trader in exchange for receiving PNC stock loan orders. Miller initially added Clinton on all the PNC orders as a purported finder and then, just as Lupo did with the Morgan Stanley orders, ran the loans through one of the Run-Through Firms that paid finder fees

19

to Clinton in connection with the Morgan Stanley scheme. Miller and Lupo split the finder fees that the Run-Through Firms paid to Clinton on these deals, and Miller paid part of his share to the PNC Trader in cash.

59.    In the fall of 2001, when Miller decided he would leave Morgan Stanley, he and Lupo agreed that Miller would become a finder and use his relationship with the PNC Trader to generate finder fees for himself and Lupo. Miller had developed a relationship with the PNC Trader while servicing the PNC account at Morgan Stanley. As part of his scheme with Lupo, Miller formed Cobblehill, his finder business, and solicited the PNC Trader's involvement in the scheme. The PNC Trader agreed to make PNC stock loan orders available to Miller in exchange for cash payments. The scheme was hatched while Miller was still at Morgan Stanley.

60.    Miller resigned from Morgan Stanley in January 2002. He thereafter called the PNC Trader on a regular, if not daily, basis and obtained from the PNC Trader a list of the securities -- usually "hard-to-borrow" stocks -- that PNC had available to lend that day. Miller then relayed the list to Lupo, who arranged for one of the Run-Through Firms to borrow the securities being loaned by PNC and then re-lend them to an end-user firm. As with the Morgan Stanley scheme, Lupo and Miller first had to arrange for another intermediary firm with the requisite credit to borrow the securities directly from PNC and then re-lend them to one of the Run-Through Firms that could pay a fee to Clinton. Lupo caused Clinton to pay half of the finder fees it received on these transactions to Cobblehill, and Lupo kept the other half.

61.    In or about May 2003, Miller ended his arrangement with Lupo, although Miller continued to receive payments from Lupo until approximately June 2004 because some of the earlier PNC loan transactions still remained open. Miller subsequently registered Cobblehill as a finder with the stock loan trading desks of at least two broker-dealer firms, VDM and Fortis.

20

Miller continued his kickback arrangement with the PNC Trader until approximately January 2005. Pursuant to their scheme, the PNC Trader caused PNC to lend stock directly to Fortis and, via a run-through firm, to VDM in exchange for kickbacks from Miller, which he paid out of the finder fees that Cobblehill received from VDM and Fortis. From approximately January 2002 to January 2005, Miller traveled from New York to Philadelphia several times a year to pay cash kickbacks to the PNC Trader ranging from a few hundred dollars to several thousand dollars at a time.

62.    Miller received a total of approximately $700,000 as a result of his kickback scheme with the PNC Trader. From January 2002 through June 2004, Clinton paid Miller, through Cobblehill, a total of over $600,000. From June 2003 to February 2005, VDM and Fortis paid Cobblehill a total of approximately $100,000 in improper finder fees in connection with PNC stock loan transactions.

63.    Miller would not have received access to PNC stock loan orders from the PNC Trader in the absence of their kickback arrangement.

64.    The PNC Trader never disclosed to PNC anything about the dealings with Miller described above. The PNC Trader did not disclose to PNC that the PNC Trader was giving Miller regular access to PNC stock loan orders, that Miller was making payments to the PNC Trader, or that the PNC Trader had an arrangement of any kind with Miller. The PNC Trader's arrangement with Miller violated, among other things, PNC's policy prohibiting PNC stock loan traders from communicating with Finders. In March 2002, the PNC Trader signed an internal compliance form representing that the PNC Trader would adhere to this policy.

21

**Total Payments To Lupo And Clinton**

65.     Through Clinton, Lupo received over $4 million in improper finder fees as a result of his kickback schemes with D. DeMizio, Sherlock and Miller. As alleged above, each transaction on which Clinton was paid a finder fee was passed through one of the Run-Through Firms, because those were the firms that allowed finder fees to be paid to Clinton during the relevant period. From August 2001 through January 2003, First Albany paid Clinton a total of approximately $900,000. After First Albany closed its stock loan trading desk in January 2003, Lupo's contact at First Albany moved to Paloma. From April 2003 to June 2006, Paloma paid Clinton a total of approximately $1.6 million. Lupo began also using Janney as a Run-Through Firm at the end of 2002. From December 2002 to January 2005, Janney paid Clinton approximately $1.2 million. In January 2005, Lupo falsely certified in writing to Janney that Clinton was a genuine finder business and had provided stock loan finding services to Janney in December 2004 for which it was due payment. In addition, as alleged above, Lupo and C. DeMizio together received a total of over $900,000 in improper finder fees from Freeman during the period preceding Freeman's demise.

## CLAIM FOR RELIEF

### Violations of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5

66.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 65.

67.     The defendants directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in, or the means or instrumentalities of, interstate commerce, or by the use of the mails, or of the facilities of a national securities exchange, in the offer or sale and in connection with the purchase or sale of securities, knowingly or recklessly,

have: (a) employed devices, schemes and artifices to defraud; (b) obtained money or property by means of, or otherwise made, untrue statements of material fact, or have omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, transactions, practices and courses of business which operated or would have operated as a fraud or deceit upon purchasers of securities and upon other persons.

68.    As part and in furtherance of the fraudulent schemes and other violative conduct described above, each of the defendants, directly or indirectly, singly or in concert, employed the deceptive devices, schemes, artifices, contrivances, acts, transactions, practices and courses of business and/or made the misrepresentations and/or omitted to state the facts alleged above in paragraphs 1-4 and 33-65.

69.    The false and misleading statements and omissions made by defendants D. DeMizio and Sherlock, more fully described above in paragraphs 1-4 and 33-65, were material.

70.    Defendants D. DeMizio and Sherlock knew, or were reckless in not knowing, that these material misrepresentations and omissions, more fully described above in paragraphs 1-4 and 33-65, were false or misleading, and all the defendants otherwise acted with the requisite scienter by knowingly or recklessly engaging in one or more of the fraudulent schemes described above in paragraphs 1-4 and 33-65.

71.    By reason of the acts, statements, omissions, practices, and courses of business alleged herein, the defendants, singly or in concert, directly or indirectly, have violated, and unless enjoined will again violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

72.    By reason of the foregoing and pursuant to Section 20(e) of the Exchange Act,

defendants C. DeMizio, CD Management, Tramontozzi and DFT, singly or in concert, directly or

indirectly, also aided and abetted the violations committed by those defendants with whom they

schemed to defraud by knowingly providing substantial assistance to such other defendants'

violations of, and unless enjoined will again aid and abet violations of, Section 10(b) of the

Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that this Court enter a Final

Judgment:

## I.

Permanently enjoining and restraining each of the defendants, their agents, servants,

employees and attorneys and all persons in active concert or participation with them who receive

actual notice of the injunction by personal service or otherwise, and each of them, from violating,

directly or indirectly, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of

the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

## II.

Ordering each of the defendants to disgorge the ill-gotten gains they received from the

violations alleged herein, and to pay prejudgment interest thereon.

## III.

Ordering each of the defendants to pay civil monetary penalties pursuant to Section 20(d)

of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. §

78u(d)(3)];

## IV.

Granting such other and further relief as the Court deems just and proper.

Dated: New York, New York
       September 20, 2007

_____
David Rosenfeld (DR-8646)
Associate Regional Director
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
3 World Financial Center, Suite 400
New York, New York 10281
(212) 336-0153

Of Counsel:

   George N. Stepaniuk
   Joseph P. Dever, Jr.
   Burk Burnett
   Kenneth V. Byrne
   Karen M. Lee

25

EXHIBIT D

Westlaw.

2007 WL 2195315 (D.D.C.)

(Cite as: 2007 WL 2195315)

For Dockets See 1:07cv00991

United States District Court, District of Columbia.
SECURITIES AND EXCHANGE COMMISSION, Plaintiff,
v.
David L. NALLY, Defendant.
No. 07CV00991.
May 31, 2007.

Complaint

Respectfully submitted, Mark A. Adler, Richard W. Grime, Charles E. Cain, Nichola
L. Timmons, Attorneys for Plaintiff, Securities and Exchange Commission, 100 F
Street, N.E., Washington, D.C. 20549-4030, Telephone: (202) 551-4402 (Adler),
Facsimile: (202) 772-9245(Adler).

Plaintiff Securities and Exchange Commission (" Commission" ) alleges:

*SUMMARY*

1. David L. Nally (" Nally" ) engaged in a fraudulent trading scheme by executing
at least 138 wash sales between various brokerage accounts that he controlled in
order to transfer funds from a traditional IRA account (" Rollover" ) to a Roth IRA
account (" Roth" ). Through this fraudulent scheme, Nally transferred approximately
$152,606.80 from his Rollover account to his Roth account. To accomplish his
fraudulent goal, Nally used thinly traded stocks, and executed his wash sales in
the less liquid after-hours market [the periods between 7:30 a.m.-9:15 a.m. and
4:15 p.m.-8:00 p.m.]. The wash sales consisted of near-simultaneous matching limit
orders to buy and sell the same securities, which were placed in two accounts Nally
controlled and were often placed at prices that were away from the existing market
price to further ensure his buy order was filled with securities from the account
in which he placed the sell order.

2. Through his fraudulent scheme, Nally sought to avoid the tax consequences of
withdrawing funds from his Rollover account and thereby violated Section 10(b) of
the Securities Exchange Act of 1934 (" Exchange Act" ) and Exchange Act Rule 10b-5.
Unless permanently enjoined, Nally will continue to engage in such acts and
practices.

3. The Commission seeks an injunction against future violations and civil monetary
penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. §§
78u(d)(3)].

*JURISDICTON*

4. This Court has jurisdiction pursuant to Sections 21(d)(1), 21(e), and 27 of the
Exchange Act [15 U.S.C. §§ 78u(d)(1), 78u(e), and 78aa].

*THE DEFENDANT*

5. David L. Nally, age 41, is a self-employed trader who resides in Ivins, Utah.

*FACTS*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2007 WL 2195315 (D.D.C.)    Page 2

(Cite as: 2007 WL 2195315)

*Wash Sales Scheme*

*Background*

6. Nally's wash sales scheme involved trades between his Rollover and Roth accounts, which were both maintained at the same broker-dealer.

7. Wash sales are transactions involving no change in beneficial ownership. Nally's sole motivation for engaging in his wash sales scheme was to transfer money from his Rollover account to his Roth account while avoiding the tax consequence of directly withdrawing funds from his Rollover account. At the time that Nally initiated his wash sales scheme, he had approximately $630,000 in his Rollover account and $4,200 in his Roth account.

8. Nally pursued his wash sales scheme from at least January 14, 2004 through November 29, 2004, conducting wash sales in at least eight different stocks and making at least 138 wash trades as part of his wash sales scheme. Through the wash trades Nally improperly shifted approximately $152,606.80.00 from his Rollover account to his Roth account.

*Wash Sales by David Nally*

9. The majority of Nally's wash sales were executed in the after-hours market, the periods between 7:30 a.m.-9:15 a.m. and 4:15 p.m.-8:00 p.m. Nally consciously chose to conduct his wash sales in the after-hours market to avoid competing market activity that could be executed against the matching limit orders he devised.

10. In order to further minimize the chance that other market participants would execute against his limit orders, Nally frequently executed wash sales at a price that was outside the existing national best bid and offer spread.

11. In order to transfer funds between the accounts, Nally would either use his Rollover account to buy a stock from his Roth account at a price above the prevailing market price or sell stock from his Rollover account to his Roth account at a price below the prevailing market price. The following is an example of Nally's trading:
• On February 5, 2004
• Nally ordered the Rollover account to SELL 140 Province Healthcare shares for $14.03
• Nally ordered the Roth account to BUY 140 Province Healthcare shares for $14.03
• These orders were executed against each other at 08:23:10.
• Nally ordered the Rollover account to BUY 140 Province Healthcare shares for $18.55
• Nally ordered the Roth account to SELL 140 Province Healthcare shares for $18.55
• These orders were executed against each other at 19:46:13.

While it appeared to the market that 280 shares traded hands in arms length transactions, in reality Nally used 140 shares of Province Healthcare to effectively transfer $632.80 (140 x $4.52) from the Rollover account to the Roth account.

12. Between February 3, 2004 and May 28, 2004, Nally executed 39 pre-arranged wash

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2007 WL 2195315 (D.D.C.)                                              Page 3
**(Cite as: 2007 WL 2195315)**

sales in Annuity and Life Re (Holdings) Ltd. These trades, totaling 180,000 shares, effectively transferred $29,495 from the Rollover account to the Roth account. On February 3, 2004, Nally executed two wash sales in Phosphate Resource Partners LP. These trades, totaling 2,000 shares, effectively transferred $800 from the Rollover account to the Roth account.

13. Between February 10, 2004 and February 25, 2004, Nally executed four wash sales in Revlon, Inc. These trades, totaling 16,000 shares, effectively transferred $6,480 from the Rollover to the Roth account. Between March 30, 2004 and May 28, 2004, Nally executed 27 wash sales in Triton PCS Holdings Inc. These trades, totaling 31,000 shares, effectively transferred $27,450 from the Rollover to the Roth account. Between February 17, 2004 and April 15, 2004, Nally executed 13 wash sales in Terra Industries. These trades, totaling 12,710 shares, effectively transferred $4,140 from the Rollover to the Roth Account. Between February 3, 2004 and May 28, 2004, Nally effectively transferred $68,997.80 from his Rollover account to his Roth account.

### Nally Knew Wash Sales Were Improper

14. Nally understood the tax implications associated with his Rollover account and his Roth account. In addition, he knew that there was an early withdrawal penalty if he withdrew funds from his Rollover account before age 59. Nally engaged in his wash sales scheme solely as a means to transfer money from his Rollover account to his Roth account to avoid the tax consequences of withdrawing funds from his Rollover account.

### CLAIM FOR RELIEF

Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5]

15. The Commission realleges and incorporates by reference paragraphs 1 through 14 above.

16. Defendant Nally, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange:
a. employed devices, schemes or artifices to defraud;
b. made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or
c. engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

17. By engaging in the conduct described above, the defendant violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5].

### PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a judgment:

I.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Permanently enjoining defendant David L. Nally from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5];

II.

Ordering defendant David L. Nally to pay a civil monetary penalty pursuant to Section **21**(**d**)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

III.

Granting such other relief as the Court may deem just and appropriate.

Dated: May 31, 2007

Respectfully submitted,

<<signature>>

Mark A. Adler

Richard W. Grime

Charles E. Cain

Nichola L. Timmons

Attorneys for Plaintiff

Securities and Exchange Commission

100 F Street, N.E.

Washington, D.C. 20549-4030

Telephone: (202) 551-4402 (Adler)

Facsimile: (202) 772-9245(Adler)

SECURITIES AND EXCHANGE COMMISSION, Plaintiff, v. David L. NALLY, Defendant. 2007 WL 2195315 (D.D.C.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT E

BRIANE NELSON MITCHELL, Cal. Bar No. 116037
Email:  mitchellbn@sec.gov
KELLY C. BOWERS, Cal. Bar No. 164007
Email:  bowersk@sec.gov
VICTORIA A. LEVIN, Cal. Bar No. 166616
Email:  levinv@sec.gov
MORGAN B. WARD DORAN, Cal. Bar No. 246107
Email:  warddoranm@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Randall R. Lee, Regional Director
Michele Wein Layne, Associate Regional Director
Andrew G. Petillon, Associate Regional Director
5670 Wilshire Boulevard, 11th Floor
Los Angeles, California 90036
Telephone: (323) 965-3998
Facsimile:  (323) 965-3908

## UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                    Plaintiff,<br><br>          vs.<br><br>VENCENT A. DONLAN,<br><br>                    Defendant,<br><br>          and<br><br>ROBIN D. COLLS DONLAN,<br><br>                    Relief Defendant. | Case No.<br><br><br>**FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |

Plaintiff Securities and Exchange Commission (the "Commission") alleges as follows:

### Jurisdiction and Venue

1.      The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1), and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 775(d)(1), and 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e), and 27 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78(d)(3)(A), 78u(e), and 78aa. Defendant Vencent A. Donlan ("Donlan") has, directly or indirectly, made use of the means or instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange, in or in connection with the transactions, acts, practices, and courses of business alleged in this Complaint.

2.      Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. §§ 77v(a), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa, because certain of the transactions, acts, practices, and courses of business constituting violations of the federal securities laws occurred within this district.

### Summary

3.      During the 2002 to 2003 time period, Donlan, while he was the stock options administrator at Wireless Facilities, Inc. ("WFI"), engaged in a fraudulent scheme by which he took more than 700,000 shares of the company's stock and stock options. Donlan directed WFI's brokerage firm and transfer agent to issue WFI stock and stock options in the name of his wife, relief defendant Robin D. Colls Donlan ("Colls"), and transfer the securities to a brokerage account held in Colls' name. Donlan created false entries in WFI's stock plan management and reporting software to hide these transactions. Donlan then sold these securities on the open market. Donlan and Colls made approximately $7.2 million through the sale and exercise of the fraudulently issued WFI securities.

4.      By engaging in the conduct described in this Complaint, defendant has violated Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and (c), and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5. The Commission seeks a permanent injunction, disgorgement with prejudgment interest, and civil

1  penalties against defendant Donlan, and disgorgement with prejudgment interest against relief

2  defendant Colls.

**Defendant**

3

4  5.  **Vencent A. Donlan**, age 44, resides in San Diego, California. Donlan was a

5  temporary employee at WFI from May to August 2002, and WFI's stock options administrator

6  from August 2002 to July 2004. Donlan's starting annual salary at WFI was $60,000, which was

7  later increased to $65,000 per year. WFI authorized the grant of 5,520 stock options to Donlan

8  during his tenure at the company. Donlan exercised 1,853 of these stock options in 2002, and

9  300 more in 2003. WFI cancelled the remainder when Donlan left the company in July 2004.

**Relief Defendant**

10

11  6.  **Robin D. Colls Donlan**, age 44, resides in San Diego, California. Colls married

12  Donlan in Nevada in March 2002. Colls has never worked for WFI, and WFI has never

13  authorized the grant of its stock or stock options to her. Nonetheless, Colls was the primary

14  account holder of a brokerage account, held jointly with Donlan, that received 728,229 shares of

15  WFI stock and stock options.

**Other Relevant Entity**

16

17  7.  **Wireless Facilities Inc.** is a Delaware corporation headquartered in San Diego,

18  California, and is a provider of outsourced engineering and network deployment services,

19  security systems engineering and integration services, and other technical services for the

20  wireless communications industry. WFI's common stock is registered pursuant to Section 12(g)

21  of the Exchange Act and is traded on the Nasdaq Stock Market.

**The Fraudulent Scheme**

22

23  A.  **Donlan Fraudulently Caused WFI to Issue Stock and Options to Colls**

24  8.  As WFI's stock options administrator, Donlan managed the process by which

25  WFI distributed stock options to its officers, directors, and employees. In particular, Donlan had

26  primary control over Equity Edge, the software program that WFI used to account for, and

27  transmit information about, its stock options. Through Equity Edge and related software, Donlan

28  created stock options grants and opened individual accounts with WFI's brokerage firm,

3

1  E*Trade Securities, so that WFI's officers, directors, and employees could access and exercise

2  those options. Donlan also used Equity Edge and related software to instruct E*Trade and WFI's

3  transfer agent, Wells Fargo Shareowner Services, to issue and transfer stock to WFI's officers,

4  directors, and employees.

5          9.      During the relevant time period, Donlan had primary responsibility for entering

6  WFI's stock options data into Equity Edge. Because he had administrative level user rights on

7  Equity Edge, Donlan was able to issue and transfer stock options on his own authority, giving

8  him effective control over WFI's options distributions.

9          10.     In June 2002, Donlan used Equity Edge to create a WFI options account with

10  E*Trade in Colls' name, but registered as a joint account (the "Joint Account"). In creating the

11  Joint Account, Donlan falsely stated on the account opening documents that Colls was a WFI

12  employee. Colls and/or Donlan later added Donlan to the Joint Account, but because Colls was

13  the primary account holder her name remained the first one listed.

14          11.     Between November 2002 and November 2003, Donlan fraudulently caused WFI to

15  issue at least 728,229 shares of its stock and stock options to Colls. Donlan effected his fraudulent

16  scheme by making false entries in WFI's Equity Edge program to create and then hide stock options

17  grants to Colls and by providing false information to WFI's brokerage firm and transfer agent.

18          12.     Donlan used two methods for fraudulently issuing the WFI stock and stock

19  options. First, Donlan sent emails from his WFI email account to E*Trade falsely stating that

20  Colls had performed cash exercises of WFI options (*i.e.*, paid WFI cash for shares of its stock)

21  and directing E*Trade to initiate the transfer of the resulting shares into the Joint Account in

22  Colls' name. Donlan fraudulently caused WFI to issue 548,229 shares of WFI stock using this

23  method, and the shares were transferred directly into the Joint Account as WFI stock. Second,

24  Donlan used Equity Edge to falsely inform E*Trade that WFI had awarded Colls stock options

25  and to request that E*Trade register them in the Joint Account in Colls' name. Donlan

26  fraudulently caused WFI to issue 180,000 stock options using this method, and E*Trade

27  registered the shares in the Joint Account as exercisable options. Donlan then faxed documents

28  to WFI's transfer agent directing it to issue the 728,229 shares of WFI stock in Colls' name and

1    to transfer the shares to E*Trade for the benefit of Colls.

2        13.    Donlan caused twenty-seven such issuances and transfers to the Joint Account

3    over a thirteen month period. WFI did not authorize the grant or issuance of any of these shares.

4        14.    Donlan hid these unauthorized transactions from WFI by manipulating the

5    company's Equity Edge program to make it look like the stock options awards were authorized. For

6    example, Donlan parked a large number of purported stock option grants in Equity Edge accounts

7    that he created in the abbreviated names of real WFI employees (e.g., "Tom" instead of

8    "Thomas"), but using Colls' social security number. Donlan later back-filled into Equity Edge

9    the names (and, at least once, the correct social security number) of WFI employees as the

10    recipients of the issued options, thereby making the grants appear to be valid.

11    **B.    Unregistered Sale of the WFI Shares**

12        15.    When the fraudulently issued WFI securities became available for trade in the

13    Joint Account, Donlan exercised the options and sold the stock on the open market. These stock

14    sales were not registered. In connection with these transactions, E*Trade sought confirmation

15    from WFI that it had authorized the award of the shares of WFI stock and stock options to Colls.

16    Donlan used his position as stock options administrator at WFI to falsely verify that the options

17    were valid and authorized by WFI.

18        16.    Donlan and/or Colls received approximately $7.2 million in net proceeds from the

19    sale and exercise of the fraudulently issued WFI securities.

20    **C.    Transfer and Use of The Proceeds**

21        17.    Between November 2002 and November 2004, Donlan and/or Colls transferred

22    all but 50¢ of the proceeds from the WFI stock sales and options exercises out of the Joint

23    Account using wire transfers, checks, and ATM transactions. A number of the wire transfers and

24    checks were directed to financial institutions, including banks, brokerages, and credit card

25    companies.

26        18.    An unknown amount of the proceeds from Donlan and/or Colls' unauthorized sale

27    and exercise of WFI's securities is still in active accounts with these financial institutions. For

28    example, Donlan currently holds approximately $1.83 million in securities and cash in an open

1   TD Ameritrade brokerage account. Donlan has recently withdrawn large sums from this

2   account; between January and April 2007, Donlan transferred approximately $540,000 out of his

3   TD Ameritrade brokerage account. Donlan also has approximately $15,000 in a Charles Schwab

4   brokerage account.

5        19.    In addition, Donlan used the proceeds from the WFI securities sales to purchase

6   real estate. In January 2004, Donlan and Colls purchased a home in San Diego, California, for

7   $942,000 in cash. In January 2007, Donlan and Colls paid $655,000 in cash for property in

8   Julian, California.

9   **First Claim for Relief**

10  **Unregistered Offer And Sale Of Securities**

11  **Violations of Sections 5(a) and 5(c) of the Securities Act**

12       20.    The Commission realleges and incorporates by reference paragraphs 1 through 19

13  above.

14       21.    Defendant, by engaging in the conduct described above, directly or indirectly,

15  made use of means or instruments of transportation or communication in interstate commerce or

16  of the mails, to offer to sell or to sell securities, or to carry or cause such securities to be carried

17  through the mails or in interstate commerce for the purpose of sale or for delivery after sale.

18       22.    No registration statement has been filed with the Commission or has been in

19  effect with respect to any of the sales alleged herein.

20       23.    By engaging in the conduct described above, the defendant violated, and unless

21  restrained and enjoined will continue to violate, Sections 5(a) and 5(c) of the Securities Act, 15

22  U.S.C. §§ 77e(a) and (c).

23  **Second Claim for Relief**

24  **Fraud In Connection With The Purchase or Sale of Securities**

25  **Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**

26       24.    The Commission realleges and incorporates by reference paragraphs 1 through 19

27  above.

28       25.    Defendant, by engaging in the conduct described above, directly or indirectly, in

6

connection with the purchase or sale of a security, by the use of means or instrumentalities of

interstate commerce, of the mails, or of the facilities of a national securities exchange, with

scienter:

        a.    employed devices, schemes, or artifices to defraud;

        b.    made untrue statements of a material fact or omitted to state a material fact

              necessary in order to make the statements made, in light of the

              circumstances under which they were made, not misleading; or

        c.    engaged in acts, practices, or courses of business which operated or would

              operate as a fraud or deceit upon other persons.

26.    By engaging in the conduct described above, defendant violated, and unless

restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. §

78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

**Prayer For Relief**

WHEREFORE, the Commission respectfully requests that the Court:

**I.**

Issue findings of fact and conclusions of law that defendant committed the alleged

violations.

**II.**

Issue a judgment, in a form consistent with Fed. R. Civ. P. 65(d), permanently enjoining

defendant, and those persons in active concert or participation with him who receive actual

notice of the judgment by personal service or otherwise, from violating Sections 5(a) and 5(c) of

the Securities Act, 15 U.S.C. §§ 77e(a) and (c), and Section 10(b) of the Exchange Act, 15

U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

**III.**

Issue, in a form consistent with Fed. R. Civ. P. 65, a temporary restraining order and

preliminary injunction freezing the assets of defendant and relief defendant and orders

prohibiting them from destroying documents; directing an accounting; and expediting discovery.

7

**IV.**

Order defendant and relief defendant to disgorge all ill-gotten gains from defendant's illegal conduct, together with prejudgment interest thereon.

**V.**

Order defendant to pay civil penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d) and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).

**VI.**

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

**VII.**

Grant such other and further relief as this Court may determine to be just and necessary.

DATED:   May 16, 2007

BRIANE NELSON MITCHELL
KELLY C. BOWERS
VICTORIA A. LEVIN
MORGAN B. WARD DORAN
Attorneys For Plaintiff
Securities and Exchange Commission

8

## PROOF OF SERVICE

I am over the age of 18 years and not a party to this action. My business address is:

[X]    U.S. SECURITIES AND EXCHANGE COMMISSION, 5670 Wilshire Boulevard, 11th Floor, Los Angeles, California 90036-3648

Telephone No. (323) 965-3998; Facsimile No. (323) 965-3908.

On May 16, 2007, I served the document entitled **FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** upon the parties to this action addressed as stated on the attached service list:

[X]    **OFFICE MAIL:** By placing in sealed envelope(s), which I placed for collection and mailing today following ordinary business practices. I am readily familiar with this agency's practice for collection and processing of correspondence for mailing; such correspondence would be deposited with the U.S. Postal Service on the same day in the ordinary course of business.

[ ]    **PERSONAL DEPOSIT IN MAIL:** By placing in sealed envelope(s), which I personally deposited with the U.S. Postal Service. Each such envelope was deposited with the U.S. Postal Service at Los Angeles, California, with first class postage thereon fully prepaid.

[ ]    **EXPRESS U.S. MAIL:** Each such envelope was deposited in a facility regularly maintained at the U.S. Postal Service for receipt of Express Mail at Los Angeles, California, with Express Mail postage paid.

[ ]    **HAND DELIVERY:** I caused to be hand delivered such envelope/document to each addressee on the attached service list.

[ ]    **FEDERAL EXPRESS:** By placing in sealed envelope(s) designated by Federal Express with delivery fees paid or provided for, which I deposited in a facility regularly maintained by Federal Express or delivered to a Federal Express courier, at Los Angeles, California.

[X]    **ELECTRONIC MAIL:** By transmitting the document by electronic mail to the electronic mail address as stated on the attached service list.

[ ]    **FAX:** By transmitting the document by facsimile transmission. The transmission was reported as complete and without error.

[X]    **(Federal)** I declare that I am employed in the office of a member of the bar of this Court, at whose direction the service was made. I declare under penalty of perjury that the foregoing is true and correct.

Date: <u>May 16, 2007</u>                    <u>/s/ Morgan Ward Doran</u>
                                             MORGAN WARD DORAN

1

**SEC v. VENCENT A. DONLAN AND ROBIN D. COLLS DONLAN**
**United States District Court - Southern District of California**
**Case No. 07-CV-00793 JAH (LSP)**
**(LA-3359)**

2

3

4

<u>SERVICE LIST</u>

5

6

Richard A. Weintraub, Esq. **(served by email and U.S. mail)**
Weintraub Dillon
10085 Carroll Canyon Raod, Suite 210
San Diego, CA 92131
Facsimile:  (858) 566-7015
Email:  rick@weintraublawgroup.com
*Attorney for Defendant Vencent A. Donlan*

7

8

9

10

David V. Hiden, Jr., Esq. **(served by email and U.S. mail)**
Hiden Rott Oertle LLP
2635 Camino del Rio South, Suite 306
San Diego, CA 92108-3729
Facsimile: (619) 296-5171
Email:  dhiden@hrollp.com
*Attorney for Relief Defendant Robin D. Colls Donlan*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT F

1  BRIANE NELSON MITCHELL, Cal. Bar No. 116037
   E-mail: mitchellbn@sec.gov
2  LORRAINE B. ECHAVARRIA, Cal. Bar No. 191860
   E-mail: echavarrial@sec.gov
3  DAVID VAN HAVERMAAT, Cal Bar No. 175761
   E-mail: vanhavermaatd@sec.gov
4  WILLIAM G. BERRY, Cal. Bar No. 206348
   E-mail: berryw@sec.gov
5
   Attorneys for Plaintiff
6  Securities and Exchange Commission
   Randall R. Lee, Regional Director
7  Michele Wein Layne, Associate Regional Director
   5670 Wilshire Boulevard, 11th Floor
8  Los Angeles, California 90036-3648
   Telephone:  (323) 965-3998
9  Facsimile:  (323) 965-3908

10

11

12                UNITED STATES DISTRICT COURT

13               CENTRAL DISTRICT OF CALIFORNIA

14                          CV-07-2144    RGK    (AGRx)

15  SECURITIES AND EXCHANGE          Case No.
16  COMMISSION,
                                     **COMPLAINT FOR VIOLATIONS**
17             Plaintiff,            **OF THE FEDERAL SECURITIES**
                                     **LAWS**
18        vs.

19  TENET HEALTHCARE
20  CORPORATION, a Nevada corporation,
    DAVID L. DENNIS, THOMAS B.
21  MACKEY, CHRISTI R. SULZBACH,
22  and RAYMOND L. MATHIASEN,

23             Defendants.

24

25

26

27

28

Plaintiff Securities and Exchange Commission (the "Commission") alleges as follows:

1.    This civil fraud case involves material misrepresentations and omissions made by defendants Tenet Healthcare Corporation ("Tenet") and four of its former senior officers, David L. Dennis ("Dennis"), Thomas B. Mackey ("Mackey"), Christi R. Sulzbach ("Sulzbach"), and Raymond L. Mathiasen ("Mathiasen") (collectively, "defendants"), in Tenet's filings with the Commission.

## I.    JURISDICTION AND VENUE

2.    This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1), and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1), and 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e), and 27 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) and 78aa. Defendants have directly or indirectly made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this Complaint.

3.    Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa, because defendants resided within this district during the relevant time period and certain of the transactions, acts, practices and courses of conduct constituting violations of the laws alleged in this Complaint occurred within this district.

## II.    SUMMARY

4.    Tenet is one of the largest publicly traded healthcare companies in the United States. From 1999 through 2002, Tenet engaged in an unsustainable strategy to improve its earnings by deliberately exploiting a loophole in Medicare's reimbursement system. During this time, Tenet never disclosed its scheme and the material impact it had on Tenet's earnings to the investing public in any of its

-2-

1    filings with the Commission and, as a result, misled its investors by creating a false

2    impression of the true reasons behind its financial performance.

3          5.     Medicare compensates hospitals for treating extraordinarily sick

4    Medicare patients with a form of reimbursement known as outlier payments.

5    Tenet management discovered that it could artificially inflate its revenue from

6    outlier payments without doing anything more than just simply increasing one of

7    the numbers used in the formula by Medicare to calculate a hospital's outlier

8    payment, namely the gross charges listed by a hospital.

9          6.     Defendant Mackey, Tenet's former chief operating officer and co-

10   president, was the principal architect of Tenet's scheme to exploit Medicare and

11   inflate Tenet's outliers.  In 1999 and under Mackey's direction, Tenet management

12   calculated the precise increase to Tenet's gross charges needed to boost its revenue

13   from outlier payments to a level that would allow Tenet to reach its earnings

14   targets.  Mackey and other members of Tenet's management then directed Tenet's

15   hospital managers to implement these aggressive gross charge increases.

16         7.     For the next three years, Mackey continued to oversee aggressive

17   gross charge increases by Tenet.  Tenet's outlier revenue more than tripled by 2002

18   and accounted for over 40% of Tenet's earnings per share in fiscal year 2002, as

19   Tenet's earnings goals were surpassed year after year.

20         8.     As Tenet's general counsel and chief compliance officer, defendant

21   Sulzbach knew, or was reckless in not knowing, about the strategy to aggressively

22   increase gross charges in order to inflate Tenet's outlier revenues.  As early as

23   1999, Mackey's subordinates and other Tenet managers and employees

24   approached Sulzbach with questions and concerns regarding the legality of

25   implementing gross charge increases that triggered outlier payments.  By 2002,

26   Sulzbach had requested, received, and discussed data showing that Tenet's outlier

27   payments were a significant portion of its Medicare revenue.

28         9.     Defendant Mathiasen was Tenet's chief accounting officer and was

-3-

1  responsible for Tenet's books and records and for preparing Tenet's annual report.

2  Mathiasen repeatedly received information reflecting the significant impact

3  Tenet's strategy to aggressively increases its gross charge was having on its outlier

4  revenue. He knew, or was reckless in not knowing, that such a strategy was having

5  a material impact on Tenet's earnings and that it was not sustainable, yet he signed

6  Tenet's misleading filings. Mathiasen also oversaw the creation of inappropriate

7  general reserves at Tenet totaling approximately $107 million by the end of fiscal

8  year 2002. These inappropriate reserves resulted in material misstatements to

9  Tenet's financial statements for fiscal years 2000 through 2004.

10      10.    As Tenet's chief financial officer, defendant Dennis certified Tenet's

11  misleading filings even though he knew, or was reckless in not knowing that such

12  filings were misleading because they omitted material information regarding

13  Tenet's unsustainable scheme to increase gross charges in order to boost its outlier

14  revenue and thereby improve its earnings.

15      11.    Tenet's scheme likely would have remained a secret from the

16  investing public but for the research of an analyst from the investment banking

17  firm of UBS Warburg. In or around October 2002, the analyst discovered Tenet's

18  exploitation of Medicare and published a report suggesting that Tenet's financial

19  success was likely fueled by its manipulation of Medicare outliers. Tenet's stock

20  price immediately dropped about 14% on the news.

21      12.    Within about nine days following the UBS Warburg analyst's report,

22  Mackey was asked to retire and Dennis resigned. Tenet's stock price plummeted

23  as much as 46%. In total, Tenet's shareholders lost more than $11 billion in

24  market capitalization after the outlier scheme was disclosed.

25      13.    Dennis, Mackey, Sulzbach, and Mathiasen were substantially

26  involved in preparing, reviewing and approving of Tenet's public reports with the

27  Commission, including the Form 10-Q for Tenet's third quarter ending February

28  28, 2002 ("2002 Third Quarter Form 10-Q"), the Form 10-K for Tenet's fiscal year

-4-

1   ended May 31, 2002 ("Tenet's 2002 Form 10-K"), and the Form 10-Q for Tenet's

2   first quarter ending August 30, 2002 ("Tenet's 2003 First Quarter Form 10-Q").

3         14.    Each of these filings omitted material information necessary to make

4   the statements made not misleading, such as information regarding Tenet's

5   unsustainable strategy to aggressively increase its gross charges and the impact that

6   strategy had on Tenet's Medicare outlier revenue, its overall revenues, income,

7   financial condition, and results of operation.

8         15.    Defendants knew, or were reckless in not knowing, that these filings

9   were misleading because they knew material information regarding Tenet's

10  unsustainable strategy to increase gross charge to inflate its Medicare outlier

11  revenue was not disclosed in the filings.

12        16.    Also, in June 2002, Tenet filed a prospectus supplement in connection

13  with a $400 million debt offering. The prospectus supplement incorporated

14  Tenet's 2001 fiscal year-end filing, as well as all subsequent quarterly filings in

15  fiscal year 2002. These filings also omitted material information regarding Tenet's

16  gross charge increases and their impact on Tenet's Medicare outlier revenue,

17  financial condition, and results of operation, thereby rendering the prospectus

18  misleading.

19        17.    Dennis, Mackey, Sulzbach, and Mathiasen were substantially

20  involved in the preparation, review and approval of the filings incorporated in the

21  June 2002 prospectus supplement and each of them knew, or was reckless in not

22  knowing, that these filings were misleading.

23        18.    Mackey and others in Tenet's management participated and made

24  statements regarding Tenet's financial performance and operations in earnings

25  calls and presentations made by Tenet to Wall Street analysts and investors.

26  During these earnings calls and presentations, Mackey and others in Tenet's

27  management misled the investing public by failing to reveal material information

28  regarding Tenet's gross charge increases and their impact on Tenet's Medicare

1  outlier revenue.

2      19.    Accordingly, Tenet violated Section 17(a) of the Securities Act and

3  Sections 10(b), 13(a), and 13(b)(2)(A) of the Exchange Act and Rules 10b-5, 12b-

4  20, 13a-1, and 13a-13 thereunder.

5      20.    Dennis, Mackey, Sulzbach, and Mathiasen violated Section 17(a) of

6  the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5

7  thereunder, and aided and abetted Tenet's violations of Section 13(a) of the

8  Exchange Act and Rules 12b-20, 13a-1, and 13a-13 thereunder.

9      21.    Mathiasen also violated Rule 13b2-1 under the Exchange Act and

10  aided and abetted Tenet's violations of Section 13(b)(2)(A) of the Exchange Act.

11  **III.   DEFENDANTS**

12      22.    Tenet Healthcare Corporation is a Nevada corporation with its

13  principal executive offices in Dallas, Texas.  From 1999 through 2002, Tenet

14  maintained its principal executive offices in Santa Barbara, California and its

15  common stock was registered with the Commission pursuant to Section 12(b) of

16  the Exchange Act and listed on the New York and Pacific Stock Exchanges.  From

17  at least 1999 through at least November 2002, Tenet's fiscal year ended on May

18  31st of each calendar year.

19      23.    Defendant David L. Dennis is a resident of Los Angeles, California.

20  Dennis was the chief financial officer and co-president of Tenet from February

21  2000 until November 2002.

22      24.    Defendant Thomas B. Mackey is a resident of Keswick, Virginia.

23  Mackey was the chief operating officer and co-president of Tenet from January

24  1999 until November 2002.  From 1999 through 2002, Mackey was a resident of

25  Montecito, California.

26      25.    Defendant Christi R. Sulzbach is a resident of Santa Barbara,

27  California.  Sulzbach joined Tenet in 1983 as an assistant general counsel and

28  served as the chief compliance officer, executive vice president, and general

-6-

1  counsel of Tenet from February 1999 until September 2003.  Sulzbach has been
2  licensed with the California State Bar since 1980.

3      26.    Defendant Raymond L. Mathiasen is a resident of Los Angeles,
4  California.  Mathiasen was the chief accounting officer of Tenet from March 1996
5  until November 2002.  Mathiasen retired from Tenet in April 2004.  Mathiasen
6  joined Tenet (then known as National Medical Enterprises) in 1985 as a vice
7  president in its accounting department.  Mathiasen has been licensed as a CPA in
8  California since 1969.  His license is currently inactive.

9  **IV.    TENET'S PRIOR HISTORY**

10     27.    Tenet was formerly known as National Medical Enterprises ("NME").
11 In or around July 1994, NME consented to the entry of a permanent injunction
12 against future violations of the antifraud and reporting provisions of the federal
13 securities laws, following a complaint filed by the Commission in federal district
14 court alleging improper and fraudulent revenue recognition practices by NME in
15 its psychiatric and substance abuse treatment facilities.

16     28.    At about the same time, NME also entered into a settlement
17 agreement with the United States Department of Justice ( "DOJ") and the
18 Department of Health and Human Services ("HHS") related to civil and criminal
19 charges against NME in connection with its improper psychiatric billing practice.

20     29.    As part of NME's settlement agreement with DOJ and HHS, NME
21 agreed to pay a then record $379 million (including a $33 million criminal fine)
22 and to enter into a five-year "Corporate Integrity Agreement," which required,
23 among other things, that NME implement a corporate integrity program and retain
24 an independent third party to audit its billing practices.

25     30.    NME's Corporate Integrity Agreement expired on June 13, 1999, at
26 approximately the same time that Tenet first began to implement the outlier
27 scheme.

28     31.    Sulzbach was primarily responsible for overseeing Tenet's

-7-

1  compliance with the provisions of the Corporate Integrity Agreement.

2  **V.    DEFENDANTS' FRAUDULENT CONDUCT**

3      **A.    Background: Tenet's Financial Struggles In 1999**

4      32.    Tenet was struggling financially in 1999.  By May 31, 1999 (the end

5  of its fiscal year), Tenet's year-end filings showed a drop in its earnings per share

6  to about $1.65 from about $1.73 the previous year.  Tenet was also experiencing

7  "anemic" cash flow by 1999.  Tenet management pointed to the Balanced Budget

8  Act, passed by Congress in 1997, which had dramatically reduced Medicare

9  reimbursement, as a cause of Tenet's financial problems.

10     33.    In or around June 1999, Mackey (who had just been appointed as the

11 chief operating officer and co-president) and others in Tenet management decided

12 that Tenet must "reestablish[] credibility" with investors and industry analysts.

13 Mackey and others in Tenet's management agreed to set an earnings per share

14 target of $1.95 to $2.00 for fiscal year 2000.  This target represented an almost

15 20% increase from 1999.

16     34.    Mackey, along with other members of Tenet management, concluded

17 that in order to reach the target they had set for fiscal year 2000, Tenet needed to

18 aggressively increase its gross charges.  Mackey understood that increasing gross

19 charges would result in an increase in Tenet's Medicare outlier payments.

20     35.    In the healthcare industry, gross charges are the listed retail prices for

21 a hospital's services, but gross charges are not the same as prices.  In other words,

22 gross charges typically do not reflect what the hospital ultimately gets paid for its

23 services.  In fact, the majority of hospital reimbursement consists of fixed fee

24 payments and is not impacted by the hospital's gross charges.  In general, private

25 insurance companies pay for hospital services based on prices negotiated between

26 the insurance company and a hospital.  In the Medicare context, the substantial

27 majority of reimbursement consists of fixed fee payments set by the Center for

28 Medicare & Medicaid Services ("CMMS"), the agency responsible for

administering the Medicare program. Such payments are generally not impacted by the gross charges of a hospital.

36.    There are two significant components of hospital revenue that are impacted by gross charge increases: Medicare outlier payments and private insurer stop loss payments.

37.    Medicare outlier payments are supplemental payments to hospitals that are designed to compensate hospitals for treating extraordinarily sick Medicare patients. Literally, such patients are considered statistical "outliers" in the Medicare outlier formulation because, when treating these patients, hospitals typically incur treatment costs exceeding the fixed fee payment determined by Medicare.

38.    The Medicare formula used from at least 1999 through November 2002 to calculate outlier payments included a hospital's gross charges in determining the reimbursement paid to hospitals for providing treatment to Medicare patients.

**B.    The Loophole in the Medicare Outlier Formula**

39.    From at least 1999 through November 2002, the Medicare outlier calculation contained multiple steps, including thresholds designed to prevent increases in gross charges from artificially inflating the calculated outlier payment. However, Mackey and others in Tenet management identified a loophole in the outlier calculus that, in practice, allowed arbitrary increases in gross charges to cause substantial increases to the calculated outlier payment.

40.    The loophole in the Medicare outlier calculus involved at least two components: the cost-to-charge ratio and the statewide average ratio

**1.    The Cost-to-Charge Ratio**

41.    The cost-to-charge ratio was intended to offset increases in gross charges so that the computed outlier amount could not be inflated by arbitrary increases to gross charges. Mackey, along with others, recognized the cost-to-

-9-

1  charge ratio could nonetheless be exploited to increase Medicare earnings.

2      42.   From at least 1999 through November 2002, the cost-to-charge ratio

3  was calculated as a hospital's average costs for a certain period divided by the

4  hospital's average gross charges for the same period. To calculate outliers,

5  Medicare began with the gross charge set by a hospital for each procedure.

6  Medicare paid a fraction of the gross charges after reducing them by applying the

7  cost-to-charge ratio. A higher cost-to-charge ratio resulted in a higher computed

8  fraction of the gross charge being paid, and so a higher outlier payment.

9      43.   From at least 1999 through November 2002, Medicare fiscal

10 intermediaries calculated the cost-to-charge ratios for hospitals using charge and

11 cost data from a hospital's most recent audited cost report. Medicare required

12 hospitals to submit cost reports on an annual basis and the cost reports were

13 audited by a fiscal intermediary. Yet, the audits of cost reports submitted by

14 hospitals from 1999 through 2002 typically lagged approximately two to four years

15 behind. In other words, in 2002, the fiscal intermediaries were generally auditing

16 hospital cost reports from fiscal years 1998 through 2000 to calculate the cost-to-

17 charge ratios.

18     44.   Mackey, and others in Tenet management, realized that Medicare

19 often used outdated cost-to-charge ratios. As a result, Tenet hospitals could drive

20 up their gross charges without recognizing a corresponding immediate adjustment

21 to their cost-to-charge ratio.

22         **2.    The Statewide Average Ratio**

23     45.   Mackey and others in Tenet management also identified that the

24 statewide average ratio could be exploited to increase outlier revenue. The

25 statewide average ratio consisted of the average cost-to-charge ratio for hospitals in

26 a particular state.

27     46.   From at least 1999 through November 2002, Medicare regulations

28 provided that if a hospital's cost-to-charge ratio fell below a certain pre-determined

-10-

1  amount, then the statewide average ratio would be used in the outlier calculation
2  instead of the cost-to-charge ratio.

3      47.    Mackey and others in Tenet management realized that increasing a
4  hospital's gross charges could drive the cost-to-charge ratio below the pre-
5  determined number so that the higher statewide average ratio would be used in the
6  Medicare outlier formula instead.  Tenet management also recognized that from at
7  least 1999 through November 2002, the statewide average ratio for many Tenet
8  hospitals was generally higher than the cost-to-charge ratio calculated by Medicare
9  for those hospitals.

10     48.    Mackey and others in Tenet management understood that hospitals
11 received even higher outlier payments when the statewide average ratio was
12 applied rather than the cost-to-charge ratio.

13     49.    Accordingly, Mackey and others in Tenet management determined
14 that Tenet could artificially inflate its outlier revenue by increasing its gross
15 charges and exploiting the Medicare outlier formula with respect to the application
16 of the cost-to-charge ratio and the statewide average ratio.

17 **C.    The Direct Impact of Additional Medicare Outlier Payments on**
18 **Tenet's Financial Performance**

19     50.    Mackey, and others in Tenet management, also recognized that any
20 additional outlier revenue resulted in a direct increase to earnings per share from
21 operations for Tenet.  In other words, Mackey knew that the additional outlier
22 revenue generated by gross charge increases went straight to Tenet's bottom line.

23     51.    Additional outlier revenue directly impacted Tenet's earnings for at
24 least two reasons.  First, hospital patient care is primarily a fixed cost business.
25 Facility and equipment costs are not significantly affected by the volume of
26 patients.  For example, hospitals must maintain minimum staffing levels regardless
27 of patient volume or the level of care required.   Accordingly, any incremental
28 increase in revenue has a disproportionate impact on income.  Second, Tenet was

1　legally required to treat the Medicare patients that prompted reimbursement

2　through outlier payments.  As a result, even without outlier payments, Tenet would

3　have incurred the same costs to treat those Medicare patients.  Thus, any additional

4　outlier revenue generated by increases in gross charges resulted in Tenet receiving

5　more money for the same level of service without incurring additional costs.

6　Mackey was fully aware of this impact when he and Tenet management set the

7　new earnings target for fiscal year 2000.

8　　　**D.**　　**The Scheme:  Exploit Medicare To Reach Earnings Targets**

9　　　52.　　After setting the new earnings target for fiscal year 2000, Tenet

10　management prepared an analysis estimating the impact of different gross charge

11　increases on Tenet's earnings per share, ranging from a 5% increase in gross

12　charges to a 25% increase (in increments of 5%).  The purpose of the analysis was

13　to determine how much to increase gross charges during the fiscal year 2000

14　budget process to reach the earnings target set for the year.  The report analyzed

15　the impact of gross charge increases on the only two areas that would be impacted:

16　Medicare outlier payments and stop loss payments.

17　　　53.　　Tenet's analysis concluded that increasing Tenet's gross charges by

18　15% at two of its three divisions would generate the additional income necessary

19　for Tenet to reach the $2.00 earnings target set for fiscal year 2000.

20　　　54.　　As a result, Mackey ordered a 15% gross charge increase for two of

21　Tenet's three operating divisions (in addition to an 8% increase already proposed

22　for all Tenet hospitals).  In or around June 1999, Tenet hospitals formally

23　implemented the additional 15% gross charge increase.

24　　　55.　　From about June 1999 to October 2002, and under Mackey's

25　direction, Tenet hospitals continued to increase gross charges in order to exploit

26　Medicare and inflate outlier payments to meet earnings targets.

27　　　56.　　During the budget process for fiscal year 2001 through fiscal year

28　2003, Mackey instructed Tenet operations managers to prepare reports calculating

-12-

the impact of a 1% gross charge increase on outlier reimbursements for each hospital.  Tenet managers used these analyses, referred to within Tenet as the "infamous 1-percent rate increase schedule," to determine the level of gross charge increases necessary to meet Tenet's earnings targets.

57.    In addition, Tenet hospitals implemented unbudgeted gross charge increases (i.e., gross charge increases on top of the increases authorized in the budget process).  These unbudgeted increases were also made under Mackey's supervision.  Tenet's hospitals drove up their gross charges by an average of approximately 75% from 1999 to 2002.

58.    Tenet's focus on driving substantial earnings growth through gross charge increases created an atmosphere in which increasing gross charges became a central strategy of the company.

**E.    The Disconnect Between Tenet's Aggressive Gross Charges and Its Costs**

59.    Tenet's budgeted and unbudgeted gross charge increases did not relate to its actual costs.  Consequently, Tenet's gross charges grew to arbitrarily high levels.

60.    For example, as June 2002, the Tenet hospital in Redding, California charged approximately $240 for a green sterile towel that cost only about 74 cents, approximately $455 for one gram of antibiotics that cost about $4.24, and approximately $2,700 for 100 milliliters of a plasma solution that cost about $31.93.

61.    From 1999 to 2002, Tenet's gross revenues (a calculation of revenues based on the assumption that payers paid gross charges) increased by 118% whereas its actual costs only increased by 16.5%.

62.    For the most part, the Medicare patients treated by Tenet from 1999 to 2002 were not sicker and did not require additional services compared to the Medicare patients that Tenet historically had treated.  Thus, the resultant growth in

outliers was driven primarily by the strategy to increase gross charges. As such, the increase in Tenet's outlier revenue meant that Tenet was receiving more money for the same level of service simply by increasing its gross charges.

**F.    The Result:  Tenet Surpasses Earnings Targets With Inflated Outliers**

63.    Tenet's multi-year strategy of aggressively raising gross charges resulted in a growth in its revenue from outlier payments. In particular, Tenet's outlier revenue grew from about $231 million in fiscal year 1999 to about $758 million in fiscal year 2002.

64.    As Tenet management admitted in December 2002, Tenet's outlier growth from fiscal year 1999 through fiscal year 2002 accounted for over 54% of its cumulative growth in earnings per share from operations. Tenet management also admitted that Tenet's outlier revenue constituted approximately 28% of its earnings per share from operations in fiscal year 1999 when Tenet's Medicare outlier revenue was approximately $231 million. By fiscal year 2002, Tenet's outlier revenue topped $758 million and represented approximately 41% of its earnings per share from operations.

65.    Tenet's fiscal year 2002 outlier ratio also significantly exceeded a target established by CMMS for the nationwide outlier ratio. CMMS had set the nationwide outlier ratio at 5% to 6%. Indeed, Tenet's outlier payments as a percentage of overall Medicare inpatient revenue, known as an outlier ratio, tripled in four years to exceed 21% in fiscal year 2002. Tenet's fiscal year 2002 outlier ratio was also far more than the 4% to 5% average outlier ratio of its publicly traded competitors in the same period.

66.    Tenet could not continue its aggressive increases in gross charges indefinitely, particularly in the face of such Medicare limits to the nationwide outlier ratio, which Tenet had surpassed by 2002. As a result, Tenet's strategy to aggressively increase its gross charges to inflate its outlier revenue, which was

1    having a material impact on its earnings by at least 2002, was not sustainable.

2        **G.**    **Tenet Employees Raise Concerns Regarding the Legality of the**
3                **Scheme**

4        67.    In or around June 1999, some Tenet managers raised concerns to
5    Sulzbach and others in Tenet management regarding the legality of implementing
6    gross charge increases to trigger additional outlier payments.

7        68.    In response, Sulzbach spoke to the head of Tenet's government
8    programs department. After that conversation, she understood that increasing
9    Tenet's gross charges resulted in increased outlier payments to Tenet. Sulzbach
10    then drafted a memo to Mackey and others stating that the critical issue to her
11    analysis was the intent behind the gross charge increases. Sulzbach concluded that
12    the 15% gross charge increase was defensible because, in part, the increase was
13    based on what she understood to be legitimate business objectives.

14        69.    In or around January 2001, Sulzbach was again confronted with
15    concerns about the legality of the outlier scheme and the resultant growth in outlier
16    payments. A number of Tenet managers expressed these concerns to her and
17    informed her that the strategy of increasing gross charges had resulted in a
18    significant increase in outlier payments and outliers being paid for treatments that
19    previously had not generated outlier payments.

20        70.    In or around March 2001, Sulzbach was informed that Medicare's
21    Office of the Inspector General had, in its annual work plan, noted to Tenet that it
22    would "examine the financial impact of outlier Medicare payments."

23        71.    In or around January 2002, mid-level managers at Tenet raised
24    concerns to Sulzbach again about the growth in outlier payments caused by Tenet's
25    increasing gross charges.

26        72.    In or around January or February 2002, Sulzbach met with a manager
27    in Tenet's government programs department to discuss Tenet's outlier payments
28    and was given a binder of outlier data summarizing the outlier ratio received by

1  Tenet's hospitals individually and collectively. According to the data, the outlier
2  ratio for Tenet as a whole was about 26.9% for the fiscal year to date and that ratio
3  had substantially increased since fiscal year 2000, when it was about 12.9%. The
4  binder of data provided to Sulzbach also showed that Tenet hospitals' outlier ratio
5  significantly exceeded the outlier ratios for competing hospitals during the same
6  period. In addition, the outlier data given to Sulzbach showed that Tenet's total
7  outlier payments had substantially increased since fiscal year 2000. The manager
8  explained the spreadsheets, information, and data contained in the binder to
9  Sulzbach. Sulzbach kept the binder and labeled it attorney-client privileged.

10      73.    The Office of Inspector General ("OIG") for HHS annually prepares a
11  work plan for HHS's major entities and programs, including CMMS and Medicare.
12  The annual OIG work plan sets forth various projects to be addressed during the
13  fiscal year, including audits of Medicare.

14      74.    In or around January or February 2002, Tenet's internal audit
15  department began a review of outlier payments received by Tenet because outlier
16  payments continued to be listed as part of the annual OIG work plan. When
17  Sulzbach learned of the internal audit report, she instructed Tenet's head of internal
18  audit to send the report directly to her. Sulzbach's call was unusual and surprising
19  to Tenet's head of internal audit because Sulzbach rarely, if ever, had initiated a
20  call to him before. After receiving the internal audit report, Sulzbach labeled it as
21  a privileged attorney-client communication. The internal audit report described
22  Tenet's large outlier ratio and listed the outlier ratios and payments for each of the
23  Tenet hospitals. Sulzbach instructed that this report be sent to her and it was kept
24  in her office. No one else received a copy of this report. The front page of the
25  internal audit report stated that "[t]he average Tenet hospital [of the over 100
26  hospitals audited] received outlier payments of approximately 29% of the total
27  payments received in 2001." The report further stated that "[a]pproximately 65%
28  of Tenet hospitals received outlier payments in excess [*sic*] 10% of the total

1  payments in 2001." The second page of the internal audit report indicated that, in

2  2001, eight of the over 100 Tenet hospitals audited received a ratio of outlier

3  payments to total payments in excess of 50%, and four hospitals received a ratio of

4  outlier payments to total payments in excess of 60%.

5      75.    On or about July 16, 2002, Sulzbach met with Tenet employees who

6  tracked government reimbursement and who also expressed concerns about

7  Tenet's growth in outliers. In connection with that meeting, Sulzbach received an

8  e-mail with questions from the concerned employees for her to address, including

9  the following:

10      ▪   "[C]learly as the result of our pricing practices/increases, our

11          Hospitals are often receiving Outlier payments for many patients that

12          are typical or usual and not atypical. Is this legal or do we in fact have

13          a practice that is violating provisions of the Medicare Law?"

14      ▪   "[Outlier] reimbursement ... clearly seems out-of-line from what

15          Medicare intended in terms of reimbursement fund levels for a

16          hospital to receive, and the intent of the Outlier payment provisions. Is

17          this result in conformance with Medicare's reimbursement rules

18          and/or regulations?"

19      ▪   "Has Tenet's pricing practices and more specifically the resulting

20          outcome and/or intention of increased Outliers payments, been

21          presented to and reviewed/approved by Tenet's Board of Directors

22          [or] any other collective group of Tenet Senior Managers?"

23  **VI.    TENET'S PUBLIC FILINGS**

24      76.    Tenet reported its financial results in quarterly reports on its Form 10-

25  Q and in year-end annual reports on its Form 10-K filed with the Commission, as

26  well as through earnings and press releases and conference calls with analysts and

27  investors.

28      77.    From at least 1999 through at least November 2002, Tenet's formal

-17-

1  annual report was incorporated into its annual Form 10-K filings.  The annual

2  report by Tenet included the audited financial statements of Tenet and the required

3  Management's Discussion and Analysis of Financial Condition and Results of

4  Operations (commonly referred to as the "MD&A").

5        78.    The MD&A is intended to give the investing public an opportunity to

6  look at the company through the eyes of management by providing both a short

7  and long-term analysis of the business of the company and a narrative explanation

8  of the financial statements.

9        79.    Pursuant to 17 C.F.R. § 229.303, Tenet and its senior officers were

10  required to discuss, among other things, the following items in Tenet's MD&A:

11          •    significant components of revenues . . . that . . . should be

12              described in order to understand the registrant's results of

13              operations;

14          •    any known trends . . . that have had or that the registrant

15              reasonably expects will have a material favorable or unfavorable

16              impact on . . . revenues or income from continuing operations;

17              and

18          •    to the extent that the financial statements disclose material

19              increases in . . . revenues, provide a narrative discussion of the

20              extent to which such increases are attributable to increases in

21              prices . . . .

22        80.    Tenet and its senior officers also had a duty to disclose any trend,

23  demand, commitment, event or uncertainty, of which its senior officers presently

24  knew, or were reckless in not presently knowing, and which was reasonably likely

25  to have material effects on Tenet's financial condition or results of operation.

26  **VII.   DEFENDANTS' SUBSTANTIAL PARTICIPATION IN MAKING**

27        **TENET'S PUBLIC FILINGS**

28        81.    Dennis, Mackey, Sulzbach, and Mathiasen substantially participated

1   in and were intricately involved in preparing, reviewing, and filing Tenet's public

2   reports with the Commission, including but not limited to Tenet's 2002 Form 10-K

3   and Tenet's 2003 First Quarter Form 10-Q.

4       **A.**   **Dennis' Review, Approval, and Certification of Tenet's Filings**

5       82.   While Dennis was chief financial officer of Tenet, he received draft

6   copies of the Form 10-K and Form 10-Q filings to review substantively before they

7   were filed to ensure they were accurate and that they fairly presented, in all

8   material respects, Tenet's financial condition and results of its operations.  After

9   his substantive review, Dennis also signed the filed versions of Tenet's 2002 Form

10  10-K and 2003 First Quarter Form 10-Q Form 10-Q.

11      83.   In addition, pursuant to 18 U.S.C. § 1350, Dennis certified the

12  accuracy of Tenet's 2002 Form 10-K (and incorporated annual report) by signing

13  the following statement:

14      *I, David L. Dennis, the Vice Chairman, Chief Corporate Officer and Chief*

15      *Financial Officer in the Office of the President of Tenet Healthcare*

16      *Corporation, certify that (i) the Annual Report on Form 10−K for the fiscal*

17      *year ended May 31, 2002 (the "Form 10−K"), filed with the Securities and*

18      *Exchange Commission on August 14, 2002, fully complies with the*

19      *requirements of Section 13(a) or 15(d) of the Securities Exchange Act of*

20      *1934 and (ii) the information contained in the Form 10−K fairly presents, in*

21      *all material respects, the financial condition and results of operations of*

22      *Tenet Healthcare Corporation.*

23      84.   Dennis also certified the accuracy of Tenet's 2003 First Quarter Form

24  10-Q under Section 302 of the Sarbanes-Oxley Act (15 U.S.C. §7241) by signing

25  the following statement:

26      *I, David L. Dennis, Vice Chairman, Chief Corporate Officer and Chief*

27      *Financial Officer in the Office of the President of Tenet Healthcare*

28      *Corporation ("Tenet"), certify that:*

1         *1.*     *I have reviewed this quarterly report on Form 10—Q of Tenet;*

2         *2.*     *Based on my knowledge, this quarterly report does not contain*

3                  *any untrue statement of a material fact or omit to state a*

4                  *material fact necessary to make the statements made, in light of*

5                  *the circumstances under which such statements were made, not*

6                  *misleading with respect to the period covered by this quarterly*

7                  *report;*

8         *3.*     *Based on my knowledge, the financial statements, and other*

9                  *financial information included in this quarterly report, fairly*

10                 *present in all material respects the financial condition, results*

11                 *of operations and cash flows of the registrant as of, and for, the*

12                 *periods presented in this quarterly report . . .*

13     **B.**     **Mackey's Participation In Tenet's Filings**

14       85.     While Mackey was chief operating officer and co-president of Tenet,

15 he received draft copies of the Form 10-K and Form 10-Q filings to review before

16 they were filed in order to ensure they were accurate and that they fairly presented,

17 in all material respects, Tenet's financial condition and its results of operations.

18       86.     Mathiasen, who had the primary responsibility for preparing Tenet's

19 annual report, relied on Mackey's review of the operational aspects of Tenet's

20 Form 10-K and 10-Q filings.

21     **C.**     **Sulzbach's Participation In Tenet's Filings**

22       87.     While Sulzbach was general counsel of Tenet, she had supervisory

23 responsibility for drafting Tenet's Form 10-K. Two attorneys reporting directly to

24 her were responsible for collecting the information for and drafted much of the text

25 in the Form 10-K.

26       88.     Sulzbach received draft copies of the Form 10-K to review

27 substantively before it was filed to ensure it was accurate and fairly presented, in

28 all material respects, Tenet's financial condition and results of its operations.

89.    Sulzbach also received draft copies of the Forms 10-Q from Mathiasen and the company's finance team to review substantively before they were filed in order to ensure they were accurate.

90.    During Sulzbach's review of the draft fiscal year 2001 Form 10-K, Sulzbach raised a substantive issue with respect to one of its paragraphs that discussed outliers. She wrote a note in the margin asking whether Tenet should "quantify the percentage of [Tenet] hospitals that received . . . outliers." She wrote this note next to the paragraph in the Form 10-K that stated, "Congress has mandated [CMMS's predecessor] to reduce Outlier Payments such that they account for between five and six percent of total [Medicare inpatient] payments..."

91.    After Sulzbach wrote that note in the draft 2001 Form 10-K, another Tenet attorney, who reported to Sulzbach, asked the head of Tenet's government programs via e-mail, "Can we quantify how important the Outlier Payments are to some of our hospitals?" The head of Tenet's government programs responded, in an e-mail (on which Sulzbach was not copied), "We do not want to get into the issue of how much we gain or lose in the 10K [*sic*]."

**D.    Mathiasen's Review, Approval, and Signing of the Filings**

92.    While Mathiasen was Tenet's chief accounting officer, he had primary responsibility for preparing Tenet's annual report, which was incorporated by reference into the Form 10-K.

93.    Tenet accountants reporting to Mathiasen drafted the MD&A, the financial statements, and other portions of Tenet's Form 10-K. Mathiasen reviewed drafts of the Form 10-K and annual report and signed the filed version of the Form 10-K.

94.    Mathiasen also had primary responsibility for preparing each of the Forms 10-Q filed by Tenet. Mathiasen's staff drafted the Forms 10-Q in their entirety and Mathiasen signed the filed versions.

95.    Mathiasen signed the filed versions of Tenet's 2002 Form 10-K and

-21-

1 | 2003 First Quarter Form 10-Q.

2 |      **E.**    **Sub-Certifications of the Filings by Defendants Mackey,**

3 |          **Mathiasen, and Sulzbach**

4 |      96.    Because of proposed new requirements set forth in the Sarbanes-

5 | Oxley Act of 2002 requiring Tenet's chief executive officer and chief financial

6 | officer to certify the accuracy of Tenet's filings, Tenet formalized its process for

7 | reviewing its Forms 10-K and 10-Q, starting with Tenet's 2002 Form 10-K, and

8 | created a disclosure committee.  The disclosure committee consisted of Tenet's

9 | senior management, including Dennis, Mackey, Sulzbach, and Mathiasen.

10 |      97.    An assistant general counsel who reported directly to Sulzbach

11 | formulated and drafted the rules and procedures of Tenet's disclosure committee.

12 |         **1.**    **Tenet's 2002 Form 10-K**

13 |      98.    On or about July 22, 2002, Tenet's disclosure committee (including

14 | Dennis, Mackey, Sulzbach, and Mathiasen) met to discuss Tenet's 2002 Form 10-

15 | K.  The purpose of the meeting was for the committee members to certify the

16 | accuracy of Tenet's filing, both orally and in writing, to Tenet's chief executive

17 | officer and to Dennis so each of them could certify the Form 10-K.

18 |      99.    The members of Tenet's disclosure committee were told that the

19 | meeting was part of the "foundation necessary for [Tenet's chief executive officer

20 | and chief financial officer] to deliver the certifications required by the

21 | [Commission]."

22 |      100.  For the meeting, Sulzbach's subordinate prepared a list of questions

23 | for committee members to answer, including whether "investors [had] received all

24 | information essential to their understanding [of] Tenet's financial performance and

25 | results of operations[.]"

26 |      101.  During the meeting, all members of the committee, including Mackey,

27 | Sulzbach, and Mathiasen, attested to their substantive review of the filing and

28 | provided oral assurances to Tenet's chief executive officer and to Dennis that

1  Tenet's 2002 Form 10-K was accurate and not misleading and did not omit any

2  material information of which they were aware.

3    102.  During the meeting, Dennis, Mackey, Sulzbach, and Mathiasen did

4  not raise any questions or concerns about Tenet's gross charge increases, their

5  impact on Tenet's outlier revenue or on Tenet's earnings, the sustainability of

6  Tenet's outlier revenue, or the need to disclose such information.

7    103.  On or about August 14, 2002, Mackey, Sulzbach, and Mathiasen also

8  signed written certifications, often referred to as sub-certifications, that confirmed

9  their verbal representations during the disclosure committee meeting attesting that

10  Tenet's 2002 Form 10-K was accurate, not misleading, and did not omit any

11  material information. The sub-certifications signed by Mackey, Sulzbach, and

12  Mathiasen stated, among other things, that "[t]he information contained in the

13  Form 10-K fairly presents, in all material respects, the financial condition and

14  results of operations of Tenet Healthcare Corporation."

15    104.  The sub-certifications signed by Mackey, Sulzbach, and Mathiasen

16  further stated that:

17    *[N]o covered report [including Tenet's 2002 Form 10-K] omitted to state a*

18    *material fact necessary to make the statements in the covered report, in light*

19    *of the circumstances under which they were made, not misleading as of the*

20    *end of the period covered by such report . . .*

21    105.  Based, in part, on the sub-certifications and oral assurances provided

22  by the disclosure committee members, including Mackey, Sulzbach, and

23  Mathiasen, Tenet's chief executive officer and Dennis certified the accuracy of

24  Tenet's 2002 Form 10-K, which incorporated its annual report and MD&A.

25      **2.    Tenet's 2003 First Quarter Form 10-Q**

26    106.  On or about October 8, 2002, Tenet's disclosure committee met to

27  discuss Tenet's 2003 First Quarter Form 10-Q. The purpose of the meeting was

28  for the committee members, including Mackey, Sulzbach, and Mathiasen, to attest

1    to the accuracy of Tenet's filing, both orally and in writing, to Tenet's chief

2    executive officer and Dennis so they could certify the Form 10-Q pursuant to the

3    requirements of the Sarbanes-Oxley Act.

4         107.   During the disclosure committee meeting on or about October 8,

5    2002, Mackey, Sulzbach, and Mathiasen again confirmed that they had

6    substantively reviewed the filing.  Each of them also orally assured Tenet's chief

7    executive officer and Dennis that Tenet's 2003 First Quarter Form 10-Q was

8    accurate, not misleading, and did not omit any material information.

9         108.   During the meeting, Dennis, Mackey, Sulzbach, and Mathiasen did

10    not raise any questions or concerns about Tenet's gross charge increases, their

11    impact on Tenet's outlier revenue or on Tenet's earnings, the sustainability of

12    Tenet's outlier revenue, or the need to disclose such information.

13         109.   On or about October 11, 2002, Mackey, Sulzbach, and Mathiasen also

14    signed written sub-certifications verifying that the information included in Tenet's

15    2003 First Quarter Form 10-Q "fairly present[s] in all material respects the

16    financial condition, results of operations and cash flows" of Tenet.

17         110.   The sub-certifications signed by Mackey, Sulzbach, and Mathiasen

18    also stated that:

19       *Based on my knowledge, the Form 10-Q does not contain any untrue*

20       *statement of a material fact or omit to state a material fact necessary to*

21       *make the statements made, in light of the circumstances under which such*

22       *statements were made, not misleading with respect to the period covered by*

23       *this quarterly report . . .*

24         111.   Based, in part, on these sub-certifications and oral assurances

25    provided by the disclosure committee members, including Mackey, Sulzbach, and

26    Mathiasen, Tenet's chief executive officer and Dennis each certified the accuracy

27    of Tenet's 2003 First Quarter Form 10-Q.  Such certifications were made pursuant

28    to Rule 13a-14 of the Exchange Act and were filed in conjunction with Tenet's

1  2003 First Quarter Form 10-Q.

2  **VIII.  TENET'S MISLEADING PUBLIC FILINGS**

3        112.   Tenet's 2002 Third Quarter Form 10-Q, 2002 Form 10-K, and 2003

4  First Quarter Form 10-Q were misleading because they misrepresented and omitted

5  material information about Tenet's increases in gross charges, the impact on its

6  outlier revenue and its earnings growth.

7        A.     **Mackey Viewed The Outlier Scheme As A Secret Competitive**

8               **Advantage**

9        113.   Tenet's scheme of exploiting Medicare with aggressive gross charge

10  increases allowed Tenet to mitigate against changes in Medicare regulations that

11  unfavorably impacted Medicare reimbursement for the healthcare industry.

12  Mackey fully appreciated the significance of keeping such a successful strategy

13  secret and he did not want to share the scheme, which he considered to be a critical

14  advantage over Tenet's competitors.

15        114.   Certain Tenet officers found it difficult to explain the company's

16  growth in earnings without disclosing Tenet's aggressive gross charges increases

17  and resultant outlier revenues.  For example, when Tenet's head of the investor

18  relations department was tasked with crafting a public explanation of Tenet's

19  growth, he commented in an email to Mackey's second-in-command dated on or

20  about June 15, 2000, that "it is getting tougher to explain these [revenue] trends

21  without mentioning price increases."  By "price," Tenet's head of the investor

22  relations department was referring to, at least in part, Tenet's gross charges.

23        115.   In every quarter from fiscal year 2000 through the first quarter of

24  fiscal year 2003, the growth in outlier payments was a significant -- but

25  undisclosed -- component of Tenet's earnings.  For the thirteen quarters from fiscal

26  year 2000 through the first quarter of fiscal year 2003, none of Tenet's public

27  filings or statements disclosed Tenet's significant growth in outlier revenues.

28  //

**B.**    **Tenet Did Not Disclose The Outlier Scheme and Its Results in Fiscal Year 2002**

116.    Tenet's Forms 10-Q filed with the Commission for the first, second, and third quarters of fiscal year 2002 failed to disclose the growth in Tenet's outlier revenue caused by its unsustainable strategy to aggressively increase gross charges.

117.    On or about April 12, 2002, Tenet filed its Form 10-Q for the third quarter of fiscal year 2002, which was signed by Dennis and Mathiasen. Tenet's Form 10-Q for the third quarter fiscal year 2002 identified a number of factors as driving the financial performance of the company, such as unexplained one-time contract changes, growth in higher acuity services, general changes in the Medicare laws (which impacted the whole industry), and improved pricing from renegotiations with private, non-government payers. The quarterly filing did not discuss outlier payments or gross charges increases.

118.    Tenet made misleading statements in telephonic conference calls with Wall Street analysts covering Tenet in fiscal year 2002. Tenet's senior officers, including Mackey, never revealed any information about Tenet's increased gross charges and the impact on its outlier revenue.

119.    For example, on or about April 2, 2002, Tenet held an analysts' call in advance of filing Tenet's 2002 Third Quarter Form 10-Q. Mackey participated in the call and made public statements about Tenet's financial performance and results of operations during the call. Rather than disclose information about the outlier scheme and Tenet's inflated outlier revenue for the quarter, Mackey highlighted a growth in admissions of baby boomer patients in Tenet hospitals. Moreover, in a question and answer session during the same call, Mackey also discussed negotiated price increases and a shift in business from sub-acute services to acute services. Mackey, however, said nothing regarding outliers or increases in gross charges.

120.    Tenet also held an analysts' call on or about July 11, 2002 in advance of the filing of Tenet's 2002 Form 10-K to discuss the fiscal year end results. During this call, Tenet representatives continued to highlight purported trends and strategies without discussing the growth in outlier payments or the increase in Tenet's gross charges.  Tenet representatives discussed a number of different strategies unrelated to the outlier strategy or the resultant growth in outlier revenues.  In fact, during the July 11, 2002 call, Mackey described a purported shift in treating sicker patients and improved negotiations with insurance companies as reasons for Tenet's financial success during the year.  Mackey and other Tenet representatives failed to disclose that Tenet had engaged in a deliberate and unsustainable strategy to aggressively increase its gross charges since at least the start of fiscal year 2000 or that outlier revenue had grown approximately 227% as a result of this strategy.

C.    <u>Tenet's 2002 Third Quarter Form 10-Q Was Misleading</u>

121.    Tenet filed its 2002 Third Quarter Form 10-Q with the Commission on or about April 15, 2002.  The filing identified a number of factors as driving the financial performance of the company (such as unexplained one-time contract changes, growth in higher acuity services, general changes in the Medicare laws (which impacted the whole industry), and improved pricing from renegotiations with private, non-government payers).  The quarterly filing did not discuss outlier payments or gross charges increases.

122.    Tenet's 2002 Third Quarter Form 10-Q was misleading because it omitted material information necessary to make the statements made not misleading, such as information regarding Tenet's unsustainable strategy to aggressively increase its gross charges and the impact that strategy had on Tenet's Medicare outlier revenue, its overall revenues, income, financial condition, and results of operation.

//

-27-

### D.    Tenet's 2002 Form 10-K Was Misleading

123.    Tenet filed its 2002 Form 10-K with the Commission on or about August 14, 2002. By the end of Tenet's 2002 fiscal year, Tenet's outlier revenue had grown to about $758 million. This growth in Tenet's outlier revenue accounted for over 54% of its growth in earnings per share from operations. Tenet's total outlier revenue represented approximately 41% of Tenet's earnings per share from operations.

124.    Tenet's 2002 Form 10-K did not disclose Tenet's unsustainable strategy to increases its gross charges from 1999 to 2002, the resultant growth in outlier revenue during the same time period, and the material impact of outliers on earnings per share from operations. Rather than disclose Tenet's inflated outlier revenue, Tenet's aggressive gross charge increases, or the material impact of outlier revenue on Tenet's earnings, Tenet's 2002 Form 10-K attributed the company's financial successes to various factors other than its outlier revenue.

125.    A letter to shareholders incorporated into Tenet's 2002 Form 10-K noted that "[f]iscal 2002 was a terrific year for Tenet" and that "[t]he energy we unleashed three and a half years ago through our intense focus on improving and growing our company continued to drive Tenet's financial and operational performance to record levels." The letter, however, never identified Tenet's strategy to exploit the Medicare outlier system by increasing its gross charges or the significant impact that strategy had on its earnings.

126.    Tenet's 2002 Form 10-K was also misleading in connection with its references to outliers:

> Congress has mandated [CMMS] to reduce Outlier Payments such that they account for between five and six percent of total [Medicare inpatient] payments. In order to bring expected Outlier Payments within this mandate, [CMMS] has proposed substantially raising the cost threshold used to determine the cases for which a hospital will receive Outlier Payments. The

-28-

1 | *proposed change in the cost threshold will substantially reduce total Outlier*
2 | *Payments by reducing (a) the number of cases that qualify for Outlier*
3 | *Payments and (b) the amount of Outlier Payments for cases that continue to*
4 | *qualify.*
5 | This portion of the Form 10-K was misleading because it did not disclose Tenet's
6 | deliberate increases of gross charges to boost its outlier revenue, thereby
7 | counteracting the intent of, and the efforts by, Medicare to decrease outlier
8 | payments nationwide.

9 |     127.   This portion was also misleading because it failed to state that Tenet's
10 | outlier revenue grew significantly during a three-year period despite Medicare's
11 | efforts to decrease outlier payments.  Tenet's outlier payments grew 34% in fiscal
12 | year 2002 (227% over three years).

13 |     128.   Tenet's references to outliers in its 2002 Form 10-K were also
14 | misleading because they failed to disclose that Tenet's outlier ratio exceeded 21%
15 | by fiscal year 2002, thereby significantly exceeding the 5% to 6% CMMS target
16 | identified in the filing.

17 |     129.   Later, in the same section of Tenet's 2002 Form 10-K, Tenet stated:
18 | *The Company does not expect the implementation of CMMS' proposed*
19 | *change to significantly impact the Company's business, financial position or*
20 | *results of operations.*
21 | This statement was also misleading, in that it failed to disclose that the true reason
22 | Tenet did not expect CMMS' proposed changes to significantly impact Tenet's
23 | results was its undisclosed aggressive gross charge increases, which counteracted
24 | the effect of CMMS's efforts to reduce outlier payments.

25 |     130.   In Tenet's 2002 annual report, which was incorporated into Tenet's
26 | 2002 Form 10-K, Tenet stated in the MD&A that:
27 | *As a result of the Balanced Budget Refinement Act, the Company began to*
28 | *receive improved Medicare payments on October 1, 2000.  This trend*

1       *continues with the implementation of the new Medicare, Medicaid and*

2       *SCHIP Benefits Improvement and Protection Act of 2000, which became*

3       *effective in April 2001.*

4  Although this language discussed improved Medicare reimbursement, it was

5  misleading because it failed to note or explain that a significant portion of Tenet's

6  increased Medicare reimbursement came from increased outlier payments.

7       131.   The next paragraph of the MD&A in Tenet's 2002 Form 10-K stated

8  that:

9       *The pricing environment for managed care and other nongovernment payors*

10      *also has improved and the Company expects this trend will continue*

11      *throughout the next fiscal year as it renegotiates and renews contracts with*

12      *improved terms.*

13 This language was misleading because Tenet failed to disclose that it had been

14 increasing its gross charges with the intent to increase outlier reimbursement.  This

15 statement was also misleading because the phrase "managed care and other

16 nongovernment payors" excluded government reimbursement and thereby failed to

17 address the impact of Tenet's increases in gross charges on its outlier revenue.

18      132.   The significant growth in Tenet's outlier revenue from 1999 to 2002

19 represented a trend that was likely to have material effects on Tenet's revenue,

20 income, financial condition, and results of operation.  Yet, Tenet's 2002 Form 10-

21 K did not disclose this material trend.

22      133.   Tenet's inflated outlier revenue was also a significant component of

23 its revenue by at least fiscal year-end 2002.  Accordingly, disclosure of such

24 information was necessary in order for an investor to understand Tenet's results of

25 operations.  Yet, Tenet's 2002 Form 10-K did not disclose this material

26 information.

27      134.   Tenet's 2002 Form 10-K also disclosed material increases in revenues

28 for the corresponding periods, but failed to discuss the extent to which such

1  increases were attributable to increases in Tenet's gross charges.

2      135.  Tenet's 2002 Form 10-K also failed to disclose that its strategy of

3  aggressively increasing its gross charges, which resulted in inflated outlier

4  revenue, was not sustainable.

5      **E.**    **Tenet's 2003 First Quarter Form 10-Q Was Also Misleading**

6      136.  Tenet filed its 2003 First Quarter Form 10-Q with the Commission on

7  or about October 11, 2002.  As with its previous filings, Tenet's 2003 First Quarter

8  Form 10-Q did not disclose its inflated outlier revenue or its aggressive gross

9  charge increases when it discussed the company's results for the first quarter of

10  2003.

11      137.  Tenet received about $247 million in outlier payments for the first

12  quarter of its fiscal year 2003.  Outlier revenue for the first quarter of fiscal year

13  2003 increased by approximately 30% from the first quarter of fiscal year 2002.  It

14  also increased by more than five times from the corresponding quarter in fiscal

15  year 1999, before Tenet began pursuing the strategy to aggressively increase gross

16  charges.

17      138.  Tenet's 2003 First Quarter Form 10-Q announced that its earnings per

18  share from operations grew by about 39%, yet Tenet failed to disclose that outlier

19  payments accounted for about 44% of Tenet's earnings per share from operations.

20  It also omitted any discussion of the growth in outlier payments or that such

21  growth was almost exclusively driven by Tenet's strategy to increase gross

22  charges.

23  **IX.**    **DEFENDANTS KNEW, OR WERE RECKLESS IN NOT KNOWING,**

24      **THAT TENET'S FILINGS WERE MISLEADING**

25      139.  Dennis, Mackey, Sulzbach, and Mathiasen knew, or were reckless in

26  not knowing, that Tenet's public filings were misleading.  As officers and

27  managers of the company, their knowledge and conduct are imputed to Tenet.

28  //

-31-

A.    **Dennis Knew, Or Was Reckless In Not Knowing, That Tenet's**
      **Filings Were Misleading**

140.   Dennis understood that Tenet's hospitals were aggressively raising gross charges and that outlier payments were a significant component of Tenet's earnings.

141.   Throughout 2001, Dennis was informed through e-mail by Tenet's divisional managers that aggressive gross charge increases caused significant growth in outlier revenue and improved the financial performance of Tenet's hospitals.

142.   Dennis understood that the divisions had implemented various unbudgeted gross charge increases because he decided that Tenet's western division needed to reduce gross charges by 10% in fiscal year 2001.

143.   Dennis also understood that increases in gross charges impacted outlier reimbursement.  As part of the budget process, Dennis reviewed budget assumptions directing hospitals to quantify the impact of gross charge increases on outlier revenue.  Furthermore, on multiple occasions, senior officers at Tenet's western division informed Dennis that gross charges impacted the level of outlier reimbursement.

144.   In February 2002, Dennis met with Mathiasen, Mackey, Sulzbach, and Tenet's chief executive officer for approximately twenty to thirty minutes and discussed, among other things, the company's outlier revenue.

145.   On or about March 12, 2002, Dennis attended a dinner presentation for Tenet's board of directors, at which Mackey discussed Tenet's gross charge strategy.

146.   Dennis also had received an email from Mathiasen approximately one week before the March 12, 2002 board dinner meeting stating that "[a] significant amount of our revenue now comes from Medicare outlier and stop loss payments."

147.   In May 2002, Dennis, along with Mathiasen and Mackey, participated

-32-

1    in discussions about the unprecedented 60% increase that Medicare proposed for a
2    threshold in the outlier calculation. Tenet's government reimbursement
3    department calculated that the change in the threshold would result in an
4    approximate $162 million reduction of Tenet's outlier reimbursement. Dennis also
5    received data showing the impact of the increase in the threshold.

6        148.   About five days after the filing of Tenet's 2002 Form 10-K, Mackey
7    ordered changes to Tenet's fiscal year 2003 budget based, in part, on the increase
8    of the outlier threshold. Dennis received copies of this instruction by Mackey.

9        149.   Dennis knew, or was reckless in not knowing, that Tenet's 2002 Form
10    10-K and Tenet's 2003 First Quarter Form 10-Q were misleading because they
11    omitted material information necessary to make the statements made not
12    misleading, such as information regarding Tenet's unsustainable strategy to
13    aggressively increase its gross charges and the impact that strategy had on Tenet's
14    Medicare outlier revenue, its overall revenues, income, financial condition, and
15    results of operation.

16    **B.**    **Mackey Knew, Or Was Reckless In Not Knowing, That Tenet's**
17        **Filings Were Misleading**

18        150.   Mackey was the architect of the scheme to boost outlier revenue in
19    order to reach earnings targets by making aggressive and arbitrary gross charge
20    increases in order to exploit the Medicare outlier payment system.

21        151.   Mackey directed and supervised the analysis used to calculate the
22    specific increase in gross charges needed to inflate Tenet's outlier revenue enough
23    to reach earnings targets. Mackey also had Tenet track the amount of outlier
24    revenue that it was receiving.

25        152.   During the budget process for fiscal year 2001, Mackey requested and
26    received a detailed explanation of the formula that Medicare used for calculating
27    outlier payments.

28        153.   Mackey instructed government reimbursement employees to try to

-33-

maintain Medicare's application of the statewide average ratio to the calculation of outlier payments for certain Tenet hospitals because the application of the statewide average created even larger outlier payments for those hospitals from Tenet's increases in gross charges. In fact, the only benefit to Tenet from certain hospitals having Medicare apply the statewide average ratio to their outlier calculation was to increase the level of outlier reimbursement.

154.  Mackey possessed information identifying the growth in outliers as a significant factor in Tenet's financial growth.  In or around December 2001, Tenet's senior management directed mid-level managers to quantify the drivers of Tenet's revenue growth. Managers for two of the three divisions (the western and central-northeast divisions) identified the significant growth in outlier payments, and their analyses were provided to Mackey.  As part of the effort, the employees tracking government reimbursement also identified the substantial growth in outlier revenue.

155.  In early 2002, Consejo de Latinos Unidos ("Consejo"), an organization representing uninsured Latino patients, filed a lawsuit against Tenet alleging that Tenet's gross charges increases had a discriminatory impact on uninsured, low-income Latino patients.  The Consejo lawsuit prompted one of Tenet's board members to ask about Tenet's billing practices during a company retreat in or around January 2002.  In response, Mackey prepared a presentation for the board on Tenet's strategies with respect to gross charges and their impact.

156.  On or about March 12, 2002, Mackey presented information regarding gross charge increases and Medicare outlier payments at a dinner attended by most of Tenet's board members and various senior officers at Tenet. Mackey's notes and presentation materials explained that (i) increasing gross charges impacted only stop loss payments, the uninsured, and Medicare outlier payments, (ii) outlier payments were expected to be around $750 million in fiscal year 2002, and (iii) gross charges had increased over 75% in the previous three years.

-34-

1  157.  Mackey knew, or was reckless in not knowing, that Tenet's 2002

2  Form 10-K and Tenet's 2003 First Quarter Form 10-Q were misleading because

3  they omitted material information necessary to make the statements made not

4  misleading, such as information regarding Tenet's unsustainable strategy to

5  aggressively increase its gross charges and the impact that strategy had on Tenet's

6  Medicare outlier revenue, its overall revenues, income, financial condition, and

7  results of operation.

8  **C.    Sulzbach Knew, Or Was Reckless In Not Knowing, That Tenet's**

9  **Filings Were Misleading**

10  158.  Almost immediately following the implementation of Tenet's scheme

11  to boost outlier revenues with aggressive and arbitrary gross charge increases,

12  Sulzbach began to receive questions from Tenet employees expressing concern

13  over the legality of the scheme.  In the course of addressing and responding to such

14  concerns, Sulzbach was provided with significant data reflecting the extraordinary

15  outliers payments that Tenet received as a result of its scheme.

16  159.  In addition, Sulzbach obtained substantial information describing how

17  the Medicare outlier formula worked and how gross charge increases would boost

18  outlier payments.

19  160.  In January or February 2002, Sulzbach received a binder of

20  information tracking outlier reimbursement for Tenet and comparing that to outlier

21  reimbursement received by other hospital companies.  The comparison revealed

22  that Tenet had an outlier ratio of about 26.9% for the fiscal year to date,

23  significantly exceeding the outlier ratios of other hospitals.  The information

24  contained in the binder also showed that Tenet's total outlier payments had

25  dramatically increased since fiscal year 2000.  After receiving the binder, Sulzbach

26  labeled it attorney-client privileged.

27  161.  Also in January or February 2002, Sulzbach learned of an internal

28  audit report reviewing Tenet's outlier payments.  After learning about the internal

-35-

1  audit report, Sulzbach called the head of internal audit and instructed him to send

2  the report directly to her. Sulzbach also kept this report in her office and labeled it

3  as an privileged attorney-client communication.

4      162.   Moreover, Sulzbach attended the March 12, 2002 dinner presentation

5  at which Mackey discussed Tenet's gross charge strategy.

6      163.   After the dinner, Sulzbach collected notes and materials that Mackey

7  used during his presentation. She kept Mackey's notes and presentation materials

8  and claimed that they were privileged attorney-client communications. These

9  notes and materials discussed, among other things, that outlier payments were

10 expected to be around $750 million in fiscal year 2002 and that gross charges had

11 increased more than 75% over the previous three years.

12      164.   When Sulzbach received the information described in Paragraphs 158

13 through 163 above, she knew that Congress had directed CMMS (or its

14 predecessor, HCFA) to limit outlier payments to hospitals, including Tenet's

15 hospitals, to equal between 5% and 6% of total Medicare inpatient payments. She

16 also knew, or was reckless in not knowing, that Tenet's ratio of outlier payments to

17 total Medicare payments far exceeded 5% to 6%. Indeed, she had information that

18 Tenet's outlier ratio was 26.9% for fiscal year 2002 up through February 2002.

19      165.   Sulzbach, however, never revealed or discussed any of this material

20 information during the disclosure committee meetings in which she participated,

21 nor did she cause any of it to be disclosed in Tenet's filings.

22      166.   Sulzbach knew, or was reckless in not knowing, that Tenet's 2002

23 Form 10-K and Tenet's 2003 First Quarter Form 10-Q were misleading because

24 they omitted material information necessary to make the statements made not

25 misleading, such as information regarding Tenet's unsustainable strategy to

26 aggressively increase its gross charges and the impact that strategy had on Tenet's

27 Medicare outlier revenue, its overall revenues, income, financial condition, and

28 results of operation.

**D.  Mathiasen Knew, Or Was Reckless In Not Knowing, That Tenet's Filings Were Misleading**

167.  Mathiasen received information demonstrating that Tenet's performance was caused by growing outliers that, in turn, were driven by aggressive gross charge increases.

168.  During Tenet's fiscal year 2000 budget process, Mathiasen received an analysis demonstrating that a 15% gross charge increase improved Tenet's outlier revenue.  Mathiasen wrote, in a memorandum to Tenet's controller, that the analysis showed "how [Tenet] 'could' get to $2.00 per share."

169.  The head of Tenet's government programs department gave Mathiasen periodic reports noting that outliers were "outstripping" the budget, meaning exceeding budgeted expectations.

170.  Mathiasen wrote, in an e-mail to Dennis during the fiscal year 2001 budget process, with respect to outlier reimbursement, "I believe we'll still do better than the budgeted amount for FY 2001.  We always do!!"

171.  On or about March 1, 2002, Mathiasen and Dennis received an e-mail from the head of investor relations about resistance from insurance companies to the constantly increasing gross charges.  Mathiasen replied that "[a] significant amount of our revenue now comes from Medicare outlier and stop loss payments."

172.  On March 8, 2002, Mathiasen received a report showing that Tenet's outlier payments through January 2002 exceeded $475 million.   In response, he commented, "Interesting!  By the end of the year we should blow through the budgets [i.e., the outlier budget] by more than $150 million."

173.  Mathiasen also attended the board dinner presentation on or about March 12, 2002, during which Mackey discussed Tenet's gross charge strategy. In fact, Mathiasen assisted in preparing materials that Mackey used for the dinner presentation.  Also, a few hours before the March 12, 2002 dinner, Mathiasen spoke with Tenet's outside auditor, who asked Mathiasen whether or not Tenet had

-37-

1  given any thought to disclosing the amount of stop loss payments in its public

2  filings. Mathiasen understood the question to address outlier payments at least in

3  part because stop loss payments and outlier payments were both impacted by

4  increasing gross charges.   Mathiasen dismissed the auditor's suggestion and gave

5  no further thought to disclosing these two revenue components.

6       174.   Mathiasen knew, or was reckless in not knowing that Tenet's 2002

7  Form 10-K and Tenet's 2003 First Quarter Form 10-Q were misleading because

8  they omitted material information necessary to make the statements made not

9  misleading, such as information regarding Tenet's unsustainable strategy from

10  1999 to 2002 to aggressively increase its gross charges and the impact that strategy

11  had on Tenet's Medicare outlier revenue, its overall revenues, income, financial

12  condition, and results of operation.

13  **X.    TENET'S MISLEADING FILINGS IN CONNECTION WITH A**

14  **DEBT OFFERING IN JUNE 2002**

15       175.   On or about June 25, 2002, Tenet made a $400 million debt offering

16  pursuant to a registration statement filed with the Commission on or about

17  December 6, 2001.

18       176.   On or about June 21, 2002, Tenet filed a supplement to the prospectus

19  in connection with the June 25, 2002 debt offering ("Tenet's June 21, 2002

20  Prospectus Supplement"). Tenet's June 21, 2002 Prospectus Supplement

21  incorporated the Tenet's Form 10-K filing for fiscal year ending May 31, 2001

22  ("Tenet's 2001 Form 10-K") and all subsequent Forms 10-Q filings by Tenet,

23  including Tenet's 2002 Third Quarter Form 10-Q.

24       177.   Tenet's June 21, 2002 Prospectus Supplement, which incorporated

25  Tenet's 2001 Form 10-K and all subsequent Forms 10-Q, including its 2002 Third

26  Quarter Form 10-Q, was also misleading because it failed to disclose material

27  information regarding Tenet's gross charge increases and their impact on Tenet's

28  Medicare outlier revenue, its overall revenues, income, financial condition, or

-38-

1  results of operation.

2  178. Dennis, Mackey, Sulzbach, and Mathiasen substantially participated

3  and were intricately involved in the preparation and filing of reports incorporated

4  by reference in Tenet's June 21, 2002 Prospectus Supplement, including but not

5  limited to Tenet's 2001 Form 10-K and 2002 Third Quarter Form 10-Q.

6  179. As Tenet's chief financial officer, Dennis received draft copies of

7  filings incorporated by reference in Tenet's June 21, 2002 Prospectus Supplement,

8  including but not limited to Tenet's 2001 Form 10-K and 2002 Third Quarter Form

9  10-Q, for him to review substantively before they were filed. After his substantive

10  review, Dennis also signed the filed versions of these filings.

11  180. As Tenet's chief operating officer, Mackey also received draft copies

12  of filings incorporated by reference in Tenet's June 21, 2002 Prospectus

13  Supplement, including but not limited to Tenet's 2001 Form 10-K and 2002 Third

14  Quarter Form 10-Q, for him to review substantively before they were filed.

15  Mathiasen relied on Mackey's substantive review of the operational aspects of

16  these filings.

17  181. As Tenet's general counsel, Sulzbach also received draft copies of

18  filings incorporated by reference in Tenet's June 21, 2002 Prospectus Supplement,

19  including but not limited to Tenet's 2001 Form 10-K and 2002 Third Quarter Form

20  10-Q, for her to review substantively before they were filed. She wrote comments

21  during her review of the draft 2001 Form 10-K related to Tenet's discussion of

22  outlier payments.

23  182. As Tenet's chief accounting officer, Mathiasen also received draft

24  copies of filings incorporated by reference in Tenet's June 21, 2002 Prospectus

25  Supplement, including but not limited to Tenet's 2001 Form 10-K and 2002 Third

26  Quarter Form 10-Q, for him to review substantively before they were filed. After

27  his substantive review, Mathiasen also signed the filed versions of these filings.

28  183. Dennis, Mackey, Sulzbach, and Mathiasen knew, or were reckless in

-39-

1  not knowing, that reports incorporated by reference in Tenet's June 21, 2002

2  Prospectus Supplement were misleading because they omitted material information

3  necessary to make the statements made not misleading, such as information

4  regarding Tenet's unsustainable strategy from 1999 to 2002 to aggressively

5  increase its gross charges and the impact that strategy had on Tenet's Medicare

6  outlier revenue, its overall revenues, income, financial condition, and results of

7  operation.

8  **XI.    DEFENDANTS MACKEY, SULZBACH, AND TENET BENEFITED**

9  **FROM THE FRAUD**

10  184.    In fiscal year 2002, Mackey was paid a base salary of approximately

11  $725,000.  In addition, Mackey received a bonus of approximately $2,182,250 for

12  fiscal year 2002.  In total, Mackey was paid about $2,907,250 in fiscal year 2002.

13  185.    In fiscal year 2002, Sulzbach was paid a base salary of approximately

14  $426,500.  In addition, Sulzbach received a bonus of approximately $951,700 for

15  fiscal year 2002.  In total, Sulzbach was paid about $1,378,200 in fiscal year 2002.

16  186.    In fiscal year 2002, Dennis and Mathiasen also received bonuses in

17  addition to their base salaries.

18  187.    At least in part, the bonuses received by Dennis, Mackey, Sulzbach,

19  and Mathiasen in fiscal year 2002 were discretionary and tied to Tenet's annual

20  earnings growth through a complex formula impacted by the portion of earnings

21  derived from Tenet's inflated outlier revenue.

22  188.    On or about October 4, 2002, Mackey exercised options to purchase

23  Tenet stock and then sold approximately 277,500 shares of Tenet stock for a profit

24  of almost $9,920,625.  By doing so, Mackey capitalized on Tenet's high stock

25  price, which was inflated, in part, due to Tenet's successful scheme to exploit the

26  Medicare outlier system in order to reach certain earnings targets.

27  189.    Tenet also benefited from the fraud described herein.  Tenet's filings

28  misled the investing public about the principal drivers behind Tenet's strong

financial performance from at least 2001 through 2002.

190.    Tenet took advantage of this misperception by offering $3 billion worth of debt throughout fiscal year 2002, including a $400 million debt offering on or about June 25, 2002.  Tenet saved a significant amount in borrowing costs because the investing market did not know about the impact of outlier payments on Tenet's financial performance.

## XII.    THE UBS WARBURG ANALYST'S REPORT

191.    On October 28, 2002, a UBS Warburg industry analyst published a report on Tenet, which hypothesized that Tenet's earnings growth appeared to have been driven by a dramatic increase in Medicare outlier payments.

192.    The UBS Warburg industry analyst report was the first public indication of Tenet's outlier scheme and the company's significant reliance on Medicare outlier payments.  After the UBS Warburg industry analyst issued his report on or about October 28, 2002, Tenet's stock dropped approximately 14% (from about $49.31 to about $42.50 per share).  This drop represented an approximate $3.3 billion loss in market capitalization for Tenet's stock.

193.    On October 29, 2002, the UBS Warburg analyst issued another report addressing Tenet's outlier payments, as well as the company's initial press release responding to his previous report, in which Tenet pointed to a number of other factors besides gross charges (such its strategy to develop high-acuity services) as reasons for growth in its outlier revenue.

194.    After the UBS Warburg industry analyst issued his second report on or about October 29, 2002, Tenet's stock again dropped to about $39.25 per share.  This drop represented an approximate $1.6 billion loss in market capitalization for Tenet's stock.

195.    On November 7, 2002, Tenet management held a conference call with analysts to address, in part, the company's outlier revenue and the UBS Warburg analyst's reports.  Shortly before the conference call on or about November 7,

-41-

1  2002, Tenet announced that Mackey had retired and Dennis had resigned.  In fact,

2  Tenet's former chief executive officer had asked Mackey to retire and Dennis to

3  resign.

4      196.  During the November 7, 2002 conference call, Tenet management

5  disclosed for the first time its multi-year strategy of aggressively raising gross

6  charges and the resulting significant growth in Tenet's outlier revenue from about

7  $350 million in fiscal year 2000 to about $758 million in fiscal year 2002.  During

8  the call, certain analysts stated they felt misled by Tenet's prior filings.

9      197.  During the November 7, 2002 conference call, Tenet management

10  also admitted that the operational strategies that it had previously cited as the

11  reason for its outstanding earnings growth were not the only reasons for Tenet's

12  financial success during the prior at least three fiscal years.  Tenet's former chief

13  executive officer further admitted during the call that Tenet's exploitation of the

14  statewide average ratio, as part of its strategy to aggressively increase gross

15  charges, "was the main driver of the outlier growth."

16      198.  After the conference call on November 7, 2002, the price of Tenet's

17  stock dropped approximately 46% in twenty-four hours and closed at about $14.90

18  per share on or about November 8, 2002.  This drop represented an approximate

19  $6.4 billion loss in market capitalization for Tenet's stock.

20      199.  In total, the public revelations concerning Tenet's outlier payments

21  from October 28, 2002 to November 7, 2002 resulted in an approximate $11.3

22  billion loss in market capitalization for Tenet's stock.

23      200.  In a bulletin to its employees on or about November 15, 2002, Tenet

24  admitted it had implemented a strategy to aggressively increase gross charges that

25  "resulted in far higher-than-average Medicare payments."  Tenet also admitted that

26  its scheme "put [the company] on a course that was not sustainable."

27      201.  In or around December 2002, Tenet's senior management further

28  admitted that its strategy to aggressively increase gross charges "resulted in

-42-

1    disproportionately large outlier payments to Tenet."

2    **XIII. TENET'S RESERVES FRAUD**

3        202.   In part as a result of its outlier scheme, Tenet received enough income

4    to set aside funds in improper general reserves. Tenet divisional management,

5    with the approval of Mathiasen, created general reserves that totaled approximately

6    $107 million by the end of Tenet's fiscal year 2002. As a result of these improper

7    reserves, Tenet filed financial statements that were not in accordance with

8    Generally Accepted Accounting Principles ("GAAP") and included material

9    misstatements with respect to its net income or loss from operations, pre-tax

10   income, net income, earnings per share, and certain balance sheet accounts.

11       **A.    Tenet's Four Improper Contractual Allowance General Reserves**

12       203.   Mathiasen knew about, authorized, and controlled at least four

13   improper general reserves that related to Tenet's contractual allowances.

14       204.   In the hospital industry, contractual allowances are used to calculate a

15   hospital's net revenue. A hospital's net revenue is the amount that it has received

16   or is owed for the services it has provided. A hospital could calculate its net

17   revenue based on the terms of its contracts with insurance companies or on the

18   terms of Medicare reimbursement.

19       205.   The general ledgers at many Tenet hospitals did not typically book

20   just the net revenue. Instead, the general ledgers typically contained two types of

21   accounts that could be used to calculate the net revenue number. Those account

22   types were gross revenue accounts and contractual allowance accounts.

23       206.   A Tenet hospital's gross revenue was based on the gross charges it

24   attributed to its services. In general, gross revenue did not represent the actual

25   amount paid, or expected to be paid, to the hospitals. Therefore, Tenet had to

26   make some adjustment (i.e., the contractual allowance) to the gross revenue

27   amount to properly report its net revenue.

28       207.   Tenet calculated its net revenue by deducting contractual allowances

1  from its gross revenues.  Although contractual allowances were largely automated

2  calculations, Tenet also had manual calculations performed by Tenet's accounting

3  personnel and applied to its contractual allowances.  It was through this manual

4  adjustment of contractual allowance reserve amounts that Mathiasen was able to

5  authorize and control the use of at least four improper general reserves to manage

6  Tenet's earnings.

7                    **1.    The Caremark Settlement Reserve**

8        208.    Caremark was an insurance company that entered into bankruptcy in

9  1999.  When personnel in Tenet's western division learned of Caremark's

10  impending bankruptcy, Mathiasen authorized the establishment of an approximate

11  $12 million reserve principally based on the outstanding account receivable

12  amount owed by Caremark (the "Caremark Settlement Reserve").

13        209.    Near the end of fiscal year 2000, Tenet resolved its claims for the

14  amounts owed by Caremark.  At that time, Mathiasen received an e-mail from the

15  head of the western division stating, "While my preference is to take this windfall

16  in FY 01, we have options depending upon the company's needs for the balance of

17  FY 00.  Ray [Mathiasen], please advise as you know throughout the final months

18  of FY 00."

19        210.    Even though the Caremark Settlement Reserve was no longer needed,

20  Mathiasen did not permit the reversal of the reserve until the summer of 2002,

21  when he ordered that the reserve be reversed ratably over the year.  Mathiasen

22  wanted the Caremark Settlement Reserve reversed ratably so that undoing the

23  reserve did not distort financial results.

24        211.    Under GAAP, Statement of Financial Accounting Standards No. 5

25  ("FAS 5") permits the recording of a reserve only if it is probable that a loss has

26  been incurred at the time of the statement date and only if the loss itself can be

27  reasonably estimated.  After Tenet resolved its claims against Caremark, there was

28  no longer any chance that a loss would occur, and thus, the FAS 5 criteria were not

-44-

1    met. Accordingly, Tenet's restated results for fiscal year 2000 (the year that the

2    reserve should have been reversed) and for the Transitional Period (the period

3    during which the reserve was improperly reversed) include adjustments to certain

4    income statement and balance sheet accounts in order to properly account for this

5    reserve.

6         212.   Mathiasen was not aware of documentation identifying any specific

7    exposures or, as required by FAS 5, any probable losses, to permit the recording of

8    the Caremark Settlement Reserve.

9         213.   Mathiasen was also not aware of any analysis of a reasonable estimate

10   of the purported exposures to justify recording of the Caremark Settlement

11   Reserve. Such undefined, unquantified exposures could not have satisfied the

12   requirements of FAS 5 for the recording of the Caremark Settlement Reserve.

13              **2.    The Western Division General Reserve**

14        214.   Senior officers of Tenet's western division created a $16 million

15   improper general reserve, which was unrelated to any known exposures, in the first

16   two months of fiscal year 2002 (the "Western Division General Reserve").

17   Mathiasen learned about and took control of this general reserve by the end of the

18   first quarter of fiscal year 2002.

19        215.   Mathiasen knew that the Western Division General Reserve did not

20   relate to any known loss contingency but instead had been created by senior

21   officers of Tenet's western division to smooth out future earnings.

22        216.   Throughout fiscal year 2002, Mathiasen authorized the western

23   division to take into income portions of the Western Division General Reserve.

24        217.   At the end of fiscal year 2002, the balance of the western division

25   reserve was about $10 million and contributed to material misstatements in Tenet's

26   filings with respect to certain income statement and balance sheet accounts.

27              **3.    The Recoupment Reserve**

28        218.   In or about January 2001, Mathiasen authorized the creation of an

-45-

1  improper general reserve at various Texas region hospitals (the "Recoupment

2  Reserve").

3      219.  Senior managers in Tenet's Texas region requested the Recoupment

4  Reserve in case insurance companies sought to recoup payments they had made

5  without having received the contractually required formal notice of gross charge

6  increases.  Mathiasen authorized it without requesting any information about the

7  likelihood of these claims occurring, or about the likelihood that these claims

8  would succeed.  In fact, Texas regional personnel had never received any such

9  demands from insurance companies and had obtained legal opinions describing the

10  probable success of these claims as unlikely.

11      220.  In early 2002, managers at Tenet's Texas region informed Mathiasen

12  that they did not think that the Recoupment Reserve, which had grown to over $30

13  million, was needed as no one had made a recoupment claim.  Mathiasen decided

14  that about $20 million of the Recoupment Reserve would be reversed over the

15  upcoming fiscal year 2003.  At the end of fiscal year 2002, the Recoupment

16  Reserve totaled about $36 million.

17      221.  Because the Recoupment Reserve did not meet the FAS 5 criteria,

18  Tenet restated its Form 10-K filings for fiscal years 2001 through 2003 to include

19  adjustments to certain income statement and balance sheet accounts in Tenet's

20  filings in order to unwind this improper reserve.

21  **4.    The Medicare Outpatient Reserve**

22      222.  At the end of fiscal year 2002, Tenet's government department (which

23  reported to Mathiasen) created an improper general reserve related to Medicare

24  outpatient reimbursement (the "Medicare Outpatient Reserve").   At the time,

25  Mathiasen and the government department believed that the Medicare Outpatient

26  Reserve totaled approximately $56 million.

27      223.  During the fiscal year 2002 audit, Tenet's outside auditors determined

28  that the Medicare Outpatient Reserve was unnecessary and intended to recommend

-46-

1    an audit adjustment for the full amount.

2        224.   After discussions between Tenet's outside auditors and Tenet's

3    accounting personnel, including Mathiasen, Tenet agreed to adjust its fiscal year

4    2002 results to reverse $20 million of the Medicare Outpatient Reserve and to

5    ratably reverse the remaining $36 million in fiscal year 2003. Tenet's outside

6    auditors then concluded that the $36 million portion of the Medicare Outpatient

7    Reserve was immaterial and simply listed it in its summary of unadjusted

8    differences.

9        225.   Tenet and outside auditors made a mistake in calculating the

10   unadjusted amount of the Medicare Outpatient Reserve. The unadjusted amount of

11   the Medicare Outpatient Reserve was approximately $49 million, not $36 million,

12   by the time of the fiscal year 2002 audit, as Tenet's outside auditors and Mathiasen

13   had mistakenly believed. As a result, the Medicare Outpatient Reserve also

14   contributed to material misstatements in Tenet's filings with respect to certain

15   income statement and balance sheet accounts.

16   **B.    Tenet's Restatements**

17       226.   At the close of fiscal year 2002, the Caremark Settlement Reserve,

18   Western Division General Reserve, the Recoupment Reserve, and the Medicare

19   Outpatient Reserve totaled over $107 million ($12 million, $10 million, $36

20   million, and $49 million respectively), or $66 million after taxes.

21       227.   Combined and after taxes, the total amount of these four improper

22   general reserves were equivalent to 8.2% of Tenet's net income for fiscal year

23   2002.

24       228.   Mathiasen never informed Tenet's outside auditors that he was

25   maintaining the additional improper contractual allowance reserves. Based on how

26   Tenet's outside auditors had treated the Medicare Outpatient Reserve, Mathiasen

27   knew or recklessly disregarded that Tenet's outside auditors might view the total

28   balances of these accounts as material and require adjustments to Tenet's financial

-47-

1  statements.

2      229.  On or about January 19, 2006, Tenet announced that it would restate

3  its financial statements for fiscal years 2000 through 2004 to properly account for

4  these four improper general reserves.  In particular, Tenet restated its filings on

5  Form 10-K filed with the Commission for fiscal years 2000 through 2002, the

6  seven-month transitional period ending on December 31, 2002 (the "Transitional

7  Period"), and fiscal years 2003 through 2004.

8      230.  Through the improper general reserves maintained and authorized by

9  Mathiasen, Tenet understated its net income in fiscal years 2000 through 2002,

10  overstated its net income in the Transitional Period, and understated its net loss

11  fiscal year 2003 and 2004 as described in the table below:

| Fiscal Year | Restated Net Income (Loss) Due to Improper Reserves (in millions) | Amount That Net Income Was Restated Due To Improper Reserves (in millions) | Percentage Change in Restatement |
|---|---|---|---|
| 2000 | $ 327 | $ 9 | + 2.8% |
| 2001 | $ 676 | $ 7 | + 1.0% |
| 2002 | $ 813 | $ 42 | + 5.2% |
| Transitional Period | $ 453 | ($43) | - 9.5% |
| 2003 | ($ 1,564) | ($ 14) | + 1.9% |
| 2004 | ($ 2,806) | ($ 1) | + 0.04% |

25  Mathiasen reviewed, signed, and approved each of Tenet's original filings with the

26  Commission that contained the misstated financial statements (except the filing for

27  fiscal year 2004).

28  //

-48-

## FIRST CLAIM FOR RELIEF

### FRAUD IN THE OFFER OR SALE OF SECURITIES

#### Violations of Section 17(a) of the Securities Act

#### (as to all defendants)

231. The Commission realleges and incorporates by reference ¶¶ 1 through 230 above.

232. Defendants, and each of them, by engaging in the conduct described above, directly or indirectly, in the offer or sale of securities by the use of means or instruments of transportation or communication in interstate commerce or by the use of the mails:

    a.    with scienter, employed devices, schemes, or artifices to defraud;

    b.    obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

    c.    engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

233. By engaging in the conduct described above, defendants violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

//
//
//
//
//
//

## SECOND CLAIM FOR RELIEF

### FRAUD IN CONNECTION WITH THE

### PURCHASE OR SALE OF SECURITIES

### Violations of Section 10(b) of the Exchange Act

### and Rule 10b-5 thereunder

### (as to all defendants)

234.  The Commission realleges and incorporates by reference ¶¶ 1 through 230 above.

235.  Defendants, and each of them, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, with scienter:

    a.    employed devices, schemes, or artifices to defraud;

    b.    made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

    c.    engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

236.  By engaging in the conduct described above, defendants violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

//

//

//

//

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### THIRD CLAIM FOR RELIEF

### VIOLATIONS OF COMMISSION PERIODIC

### REPORTING REQUIREMENTS

**Violations of Section 13(a) of the Exchange Act,**

**and Rules 12b-20, 13a-1, and 13a-13 thereunder**

**(as to all defendants)**

237.   The Commission realleges and incorporates by reference ¶¶ 1 through 230 above.

238.   Defendant Tenet violated Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13 thereunder, by filing with the Commission a materially false and misleading annual report on Form 10-K for the fiscal years ended May 31, 2002 and a materially false and misleading quarterly report on Form 10-Q for the quarter ended August 31, 2002.

239.   Defendants Dennis, Mackey, Sulzbach, and Mathiasen knowingly provided substantial assistance to Tenet's violation of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13 thereunder.

240.   By engaging in the conduct described above and pursuant to Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e), defendants Dennis, Mackey, Sulzbach, and Mathiasen aided and abetted defendant Tenet's violations, and unless restrained and enjoined will continue to aid and abet violations, of Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and Rules 12b-20, 13a-1, and 13a-13 thereunder, 17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13.

### FOURTH CLAIM FOR RELIEF

### RECORD KEEPING VIOLATIONS

**Violations of Section 13(b)(2)(A) of the Exchange Act**

**and Violations of Rule 13b2-1 thereunder**

**(against defendants Tenet and Mathiasen)**

241.   The Commission realleges and incorporates by reference ¶¶ 1 through

1    230 above.

2        242.  Defendant Tenet violated Section 13(b)(2)(A) of the Exchange Act by

3    failing to make or keep books, records and accounts that in reasonable detail

4    accurately and fairly reflected its transactions and disposition of its assets.

5        243.  Defendant Mathiasen knowingly provided substantial assistance to

6    Tenet's violation of Section 13(b)(2)(A) of the Exchange Act.

7        244.  By engaging in the conduct described above and pursuant to Section

8    20(e) of the Exchange Act, 15 U.S.C. § 78t(c), defendant Mathiasen aided and

9    abetted defendant Tenet's violations, and unless restrained and enjoined will

10   continue to aid and abet violations, of Section 13(b)(2)(A) of the Exchange Act, 15

11   U.S.C. § 78m(b)(2)(A).

12       245.  By engaging in the conduct described above, defendant Mathiasen

13   violated Exchange Act Rule 13b2-1 by, directly or indirectly, falsifying or causing

14   to be falsified Tenet's books, records, and accounts subject to Section 13(b)(2)(A)

15   of the Exchange Act.  Unless restrained and enjoined, defendant Mathiasen will

16   continue to violate Rule 13b2-1, 17 C.F.R. § 240.13b2-1.

17                              **PRAYER FOR RELIEF**

18       WHEREFORE, the Commission respectfully requests that the Court:

19       (a)    Issue findings of fact and conclusions of law that defendants

20   committed the violations alleged and charged herein.

21       (b)    Issue judgments, in a form consistent with Fed. R. Civ. P. 65(d),

22   permanently enjoining defendant Tenet and its officers, agents, servants,

23   employees, attorneys, and those persons in active concert or participation with

24   them, who receive actual notice of the order by personal service or otherwise, and

25   each of them, from violating Section 17(a) of the Securities Act, and Sections

26   10(b), 13(a), and 13(b)(2)(A) of the Exchange Act and Rules 10b-5, 12b-20, 13a-1,

27   and 13a-13 thereunder.

28       (c)    Issue judgments, in a form consistent with Fed. R. Civ. P. 65(d),

1   permanently enjoining each of defendants Dennis, Mackey, and Sulzbach and their

2   agents, servants, employees, attorneys, and those persons in active concert or

3   participation with them, who receive actual notice of the order by personal service

4   or otherwise, from violating Section 17(a) of the Securities Act, and Sections 10(b)

5   and 13(a) of the Exchange Act, and Rules 10b-5, 12b-20, 13a-1, and 13a-13

6   thereunder.

7        (d)    Issue judgments, in a form consistent with Fed. R. Civ. P. 65(d),

8   permanently enjoining defendant Mathiasen and his agents, servants, employees,

9   attorneys, and those persons in active concert or participation with  them, who

10   receive actual notice of the order by personal service or otherwise, from violating

11   Section 17(a) of the Securities Act, and Sections 10(b), 13(a), and 13(b)(2)(A) of

12   the Exchange Act and Rules 10b-5, 12b-20, 13a-1, 13a-13, and 13b2-1 thereunder.

13        (e)    Enter an order, pursuant to Section 20(e) of the Securities Act, 15

14   U.S.C. § 77t(e), and/or Section 21(d)(2) of the Exchange Act, 15 U.S.C.

15   § 78u(d)(2), prohibiting defendants Mackey, Sulzbach, and Mathiasen from acting

16   as an officer or director of any issuer that has a class of securities registered

17   pursuant to Section 12 of the Exchange Act, 15 U.S.C. § 78*l*, or that is required to

18   file reports pursuant to Section 15(d) of the Exchange Act, 15 U.S.C. § 78o(d).

19        (f)    Order defendants to disgorge all ill-gotten gains from their illegal

20   conduct, together with prejudgment interest thereon.

21        (g)    Order defendants to pay civil penalties under Section 20(d) of the

22   Securities Act, 15 U.S.C. § 77t(d), and/or Section 21(d)(3) of the Exchange Act, 15

23   U.S.C. § 78u(d)(3).

24        (h)    Order defendants to provide an accounting of their ill-gotten gains.

25        (i)    Retain jurisdiction of this action in accordance with the principles of

26   equity and the Federal Rules of Civil Procedure in order to implement and carry

27   out the terms of all orders and decrees that may be entered, or to entertain any

28   suitable application or motion for additional relief within the jurisdiction of this

1  Court.

2    (j)    Grant such other and further relief as this Court may determine to be

3  just and necessary.

4

5  DATED:  April 2, 2007                          Respectfully submitted,

6

7  _____

8  BRIANE NELSON MITCHELL
   LORRAINE B. ECHAVARRIA
9  DAVID VAN HAVERMAAT
   WILLIAM G. BERRY
10  Attorneys for Plaintiff
   Securities and Exchange Commission

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28