UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————

|  |  |  |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | 07 Civ. 3814 (CM) |
| | : | ECF Case |
| MICHAEL W. CROW, DUNCAN CAPITAL LLC, | : | |
| DUNCAN CAPITAL GROUP LLC, ROBERT | : | |
| DAVID FUCHS, and ROBERT MACGREGOR, | : | |
| | : | |
| Defendants, | : | |
| | : | |
| and | : | |
| | : | |
| TREVOR CROW, SANTAL HOLDINGS LLC, | : | |
| M.W. CROW FAMILY LP, CROW 2001 | : | |
| CHILDREN'S TRUST FBO MICHELLE LEE | : | |
| CROW, CROW 2001 CHILDREN'S TRUST FBO | : | |
| SPENCER MICHAEL CROW, CROW 2001 | : | |
| CHILDREN'S TRUST FBO DUNCAN CROW, and | : | |
| CROW 2001 CHILDREN'S TRUST FBO OLIVIA | : | |
| TREVOR CROW, | : | |
| | : | |
| Relief Defendants. | : | |

———————————————————————

## JOINT PROPOSED PRE-TRIAL ORDER

The parties having conferred among themselves and with the Court pursuant to Fed. R. Civ. P. 16, the following statements, directions and agreements are adopted as the Pretrial Order herein.

### I. NATURE OF THE CASE

Plaintiff Securities and Exchange Commission (the "Commission") alleges that defendants Michael W. Crow, Duncan Capital LLC ("Duncan Capital"), Duncan Capital Group LLC ("Duncan Capital Group") and Robert David Fuchs violated several provisions of the broker-dealer registration and reporting requirements of the Securities Exchange Act of 1934.[1]

_____

[1] Defendant Robert MacGregor settled with the Commission. On April 11, 2008, the Court entered a final judgment against MacGregor, which permanently enjoins him from violating the

The Commission alleges that, from the fall of 2003 through at least December 2004 (the "Relevant Period"), defendant Crow – who was previously enjoined by a Federal District Court and sanctioned by the Commission – unlawfully acted as an unregistered principal of defendant Duncan Capital, a registered broker-dealer. The Commission alleges that Crow exercised de facto control over Duncan Capital's operations and received the vast majority of its profits. The Commission further alleges that Duncan Capital's regulatory filings with the Commission falsely omitted to state both Crow's control of the firm and his prior regulatory history.

The Commission alleges that defendant Fuchs – Duncan Capital's owner and nominal president – made the false regulatory filings on behalf of Duncan Capital, and that Fuchs further acquiesced in and facilitated defendant Crow's undisclosed control of Duncan Capital by, among other things, transferring Duncan Capital's profits to entities Crow controlled (including defendant Duncan Capital Group, an unregistered Crow-controlled entity), and to the relief defendants.

The Commission alleges that Defendant Duncan Capital failed to register both settled defendant Robert MacGregor (Duncan Capital's senior managing director in charge of private placements) and Crow with the appropriate regulatory authority, with the knowledge and substantial assistance of Crow and Fuchs.

Based on this alleged conduct, the Commission charges defendant Duncan Capital with violations of: (1) Sections 15(b)(1) and 15(b)(7) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78o(b)(1) and (7), and Rules 15b3-1 and 15b7-1 thereunder, 17 C.F.R. §§ 240.15b3-1 and 15b7-1; and (2) Section 17(a) of the Exchange Act, 15 U.S.C. § 78q(a), and Rule 17a-3(a)(12) thereunder, 17 C.F.R. § 240.17a-3(a)(12). The Commission charges defendant Duncan Capital Group with violations of Section 15(a) of the Exchange Act, 15 U.S.C. § 78o(a). Pursuant to Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e), the Commission charges defendants Crow and Fuchs as aiders and abettors of Duncan Capital's violations of Sections 15(b)(1) and 15(b)(7) of the Exchange Act and Rules 15b3-1 and 15b7-1 thereunder, and of Duncan Capital Group's alleged violations of Section 15(a) of the Exchange Act, and further charges Fuchs as an aider and abettor of Duncan Capital's alleged violations of Section 17(a) of the Exchange Act and Rule 17a-3(a)(12) thereunder.

The Commission seeks from each of the defendants a final judgment (1) permanently enjoining them from future violations of the securities laws and regulations at issue, (2) disgorgement of their ill-gotten gains, and (3) civil money penalties. The Complaint also seeks disgorgement of ill-gotten gains from each of the relief defendants, Crow- and Fuchs-controlled entities and Crow's wife, to whom the Commission alleges defendants funneled illegal brokerage firm revenues.[2]

---

provisions of the securities laws that the Commission charged him with violating and orders him to pay disgorgement of $480,563 and a civil penalty of $60,000.

[2] The Commission staff is in the process of recommending to the Commission that it voluntarily dismiss its claims against the following relief defendants: Crow 2001 Children's Trust FBO

Defendants and relief defendants deny plaintiff's allegations and seek dismissal of all claims.

## II. JURY/NON-JURY

None of the parties has demanded a jury. The parties estimate a twelve-day bench trial.[3]

## III. STIPULATED FACTS

The parties are continuing to work together to agree upon additional stipulations.

## IV. PARTIES' CONTENTIONS

The pleadings are deemed amended to embrace the following, and only the following, contentions of the parties:

### A.    Plaintiff's Proposed Findings of Fact and Conclusions of Law

### Plaintiff's Proposed Findings of Fact

I.    *Background – Defendants and Related Entities*

1.    Defendant Michael Crow, age 48, is a resident of Fairfield, Connecticut. Crow currently provides financial advisory services to numerous companies, in some of which he has a substantial financial interest, including a company whose shares trade on the Over-the-Counter Bulletin Board. (Anticipated testimony of Michael Crow)

2.    In 1998, the United States District Court for the Southern District of California entered a consent judgment against Crow that enjoins him from violating the antifraud provisions of the federal securities laws and bars him from serving as an officer or director of a public company. SEC v. Michael W. Crow, et al., CV-96-1661 S (CGA) (S.D. Cal. Apr. 20, 1998) ("SEC v. Crow I"). (Ex. 300)[4]

---

Michelle Lee Crow; Crow 2001 Children's Trust FBO Spencer Michael Crow; Crow 2001 Children's Trust FBO Duncan Crow; and Crow 2001 Children's Trust FBO Olivia Trevor Crow.

[3] The parties have assumed for the purposes of this estimate that the Court does not intend to have the parties play videotaped depositions, or read deposition transcripts, during the trial and that each witness who is not in the control of the party calling him/her will provide live testimony on direct examination, rather than witness statements. Defendants request that videotaped depositions be played or transcripts be read at appropriate times to preserve the flow of case presentation.

[4] The abbreviations "Ex." and "Exs." refer to the Commission's trial exhibits. Many of the individual fact contentions herein find support in numerous Commission exhibits, many of which the Commission cites herein. To the extent a particular fact contention is supported by additional Commission trial exhibits listed in this Joint Pretrial Order, but not specifically cited in support

3.      In its complaint in SEC v. Crow I, the Commission alleged that Crow, then president and chairman of Wilshire Technologies, Inc. ("Wilshire"), caused Wilshire to (i) overstate its earnings through various fraudulent accounting schemes; (ii) issue materially misleading press releases; and (iii) file materially misleading reports with the Commission. The complaint further alleged that Crow engaged in insider trading, thus avoiding losses of approximately $1.2 million, by trading Wilshire stock while in possession of material non-public information concerning the accuracy of Wilshire's financial statements. (Ex. 303)

4.      Also in 1998, following the entry of the district court injunction against him, the Commission issued an order, on consent, denying Crow the privilege of appearing or practicing before the Commission as an accountant. Michael Crow, Exchange Act Release No. 39902 (Apr. 22, 1998). (Ex. 302)

5.      In 2002, Crow founded an entity then called "Duncan Capital LLC," for which Crow served as president and chief executive officer. On or about February 26, 2004, Crow changed the name of that entity to "Duncan Capital Group LLC." The Commission will use the name "Duncan Capital Group" hereinafter to refer to the entity that Crow originally named "Duncan Capital LLC" in 2002 and subsequently named "Duncan Capital Group LLC." (Anticipated testimony of Michael Crow, Dan Purjes, David Fuchs; Exs. 388, 390, 305)

6.      Duncan Capital Group, which Crow named after his son Duncan, is an entity organized under Delaware law, with its principal place of business in New York, New York. Since its inception, Duncan Capital Group has been wholly-owned by relief defendant M.W. Crow Family LP, except from November 2003 through August 2004, when an additional entity held a minority interest. During all relevant times, Duncan Capital Group's primary business was to provide financial advisory services to small cap companies, including assisting such companies to raise capital through "PIPE" and other securities offerings.[5] At times from 2003 through 2005, Duncan Capital Group, while unregistered, also served as a placement agent or broker on certain securities transactions. Duncan Capital Group currently has no operations, but maintains certain assets acquired during the period October 2003 through December 2004 (the "Relevant Period") in accounts controlled by Crow. At all times, Crow controlled the operations and management of Duncan Capital Group. At all times, Duncan Capital Group was not registered with the Commission. (Anticipated Testimony of Michael Crow, Dan Purjes, David Fuchs, Robert MacGregor; Exs. 388, 390, 391)

---

of these proposed findings of fact, the Commission respectfully reserves the right to offer any such additional exhibits at trial in further support of its fact contentions.

[5] "PIPE" stands for "private investment in public equity." A "PIPE" offering of securities is a form of financing typically used by securities issuers when more traditional avenues of financing are not available. Securities in these offerings are typically issued at a significant discount from the market price of the company's unrestricted stock. PIPE investors receive restricted securities, which are usually accompanied by an agreement by the issuer to register the shares for resale within a specified time. (Anticipated testimony of Michael Crow, Dan Purjes, David Fuchs, Robert MacGregor)

7.      Defendant Robert David Fuchs, age 58, is a resident of New Rochelle, New York. (Anticipated testimony of David Fuchs)

8.      At all times, relief defendant Santal Holdings LLC ("Santal") has been a Delaware corporation with its principal place of business in New York, New York. Since October 17, 2003, Fuchs has been the sole and 100% owner of Santal, and Santal has never had any employees. (Anticipated testimony of David Fuchs and Dan Purjes; Exs. 693, 694)

9.      On October 31, 2002, Fuchs caused Santal to acquire a registered broker-dealer called "Rockwood, Inc." (Anticipated testimony of David Fuchs and Dan Purjes; Exs. 218, 307)

10.     In or about March 2004, defendants Crow and Fuchs caused a new entity to be created called "Duncan Capital LLC," the old "Duncan Capital LLC" having previously changed its name to "Duncan Capital Group LLC." (Anticipated testimony of Michael Crow and David Fuchs; Exs. 304, 305)

11.     On or about March 30, 2004, Rockwood, Inc. merged with the newly-created "Duncan Capital LLC," and the merged entity was named, and known thereafter as, "Duncan Capital LLC." Prior to the merger, the newly-formed Duncan Capital LLC had no operations, employees, or business purpose, and its sole purpose was to merge with Rockwood, Inc. and to continue Rockwood, Inc.'s broker-dealer business under the new name "Duncan Capital LLC." The Commission will use the name "Duncan Capital" hereinafter to refer to the registered broker-dealer originally known as "Rockwood, Inc." that later merged with the newly-formed "Duncan Capital LLC." (Anticipated testimony of David Fuchs, Dan Purjes, and Michael Crow; Exs. 304, 307)

12.     At all times, Duncan Capital has had its principal place of business in New York, New York. Throughout the Relevant Period and until June 13, 2005, Duncan Capital was a broker-dealer registered with the Commission. During that time period, its sole business was to assist small cap companies in raising capital through securities offerings. (Anticipated testimony of David Fuchs, Dan Purjes, and Michael Crow; Exs. 307, 347)

13.     During the Relevant Period, Fuchs was the sole owner of Duncan Capital (through his wholly-owned entity, Santal), as well as Duncan Capital's nominal president, registered financial and operations principal ("FINOP"), and sole registered principal. (Testimony of David Fuchs; Exs. 307, 377)

14.     As a registered broker-dealer, Duncan Capital served as a designated placement agent for the securities offerings for which it provided services. Duncan Capital identified investors for the securities offerings, and communicated with both investors and issuers regarding the terms of the offerings. Duncan Capital received a placement agent fee from the issuer based on the amount raised in the particular offering. (Anticipated testimony of Robert Fuchs, Robert MacGregor, David Skriloff, Dan Purjes, and Michael Crow; Exs. 361, 378 – 382, 384 – 385)

15.    During at least the Relevant Period, although not a registered principal of Duncan Capital, Crow controlled virtually every significant aspect of Duncan Capital's operations and received the vast majority of its profits. Crow was the de facto head of Duncan Capital, and all Duncan Capital employees (including Fuchs) reported to Crow, either directly or indirectly, and treated Crow as the head of Duncan Capital. Duncan Capital and its employees also created the appearance to outsiders that Crow was the head of Duncan Capital. (See citations to fact contention 23(a)–(o) below)

16.    Settled defendant Robert MacGregor, age 41, is a resident of Venice, California. During the Relevant Period, MacGregor resided in New York and was a senior employee of Duncan Capital, second only to Michael Crow. MacGregor and Fuchs were co-equals in the Duncan Capital management hierarchy, directly under Crow. (Anticipated testimony of Robert MacGregor, David Skriloff, and David Fuchs)

17.    Relief defendants Crow 2001 Children's Trust FBO Michelle Lee Crow; Crow 2001 Children's Trust FBO Spencer Michael Crow; Crow 2001 Children's Trust FBO Duncan Crow; and Crow 2001 Children's Trust FBO Olivia Trevor Crow (the "Crow Children's Trusts") are trusts that Crow established in the names of each of his four children. (Anticipated testimony of Michael Crow; Ex. 394)

18.    Crow and his wife determined who would act as trustee of the Crow Children's Trusts. In approximately 2003, Crow's brother, Kevin Crow, became trustee of the Crow Children's Trusts. (Anticipated testimony of Michael Crow)

19.    During the Relevant Period, other than receiving funds and paying taxes, the Crow Children's Trusts engaged in no business activity. (Anticipated testimony of Michael Crow)

20.    Relief defendant M.W. Crow Family LP is a limited partnership that Crow and his wife founded in 2001. Organized under California law, the partnership's registered business address is in Encinitas, California. Crow has served as a general partner of the partnership since its inception and controls the partnership. The limited partners of the M.W. Crow Family LP are Crow's wife (relief defendant Trevor Crow) and the Crow Children's Trusts. (Anticipated testimony of Michael Crow; Exs. 308, 309, 310)

21.    During the Relevant Period, the M.W. Crow Family LP had no employees, except to the extent Michael Crow was an employee. (Anticipated testimony of Michael Crow)

22.    As general partner of the M.W. Crow Family LP, Crow, and only Crow, manages investments of the partnership's assets, which is the sole business activity of the partnership. (Anticipated testimony of Michael Crow)

II.    *Crow Controlled Duncan Capital*

23.    Examples of Crow's control of Duncan Capital and its operations during the Relevant Period include the following:

a.  Crow actively participated in the management and business of Duncan Capital by, among other things, identifying potential PIPE and other securities issuers, determining, and assisting in determining, which transactions Duncan Capital would pursue, negotiating the substantive terms of securities offerings with issuers and investors, and allocating the compensation received from securities offerings (see citations for paragraphs 24-33 below and additional Exs. 166, 181-183, 191, 193-196);

b.  Duncan Capital's employees apprised Crow of all Duncan Capital brokerage transactions (including all PIPE transactions), and Crow reviewed and approved all such transactions (anticipated testimony of David Skriloff, Robert MacGregor, David Fuchs, and Michael Crow; Exs. 89-94, 104, 162, 167);

c.  Crow personally received, either directly or through entities that he controlled, the vast majority of Duncan Capital's profits (anticipated testimony of Michael Crow, David Fuchs, Robert Yingling, Robert MacGregor, David Skriloff; Exs. 123-125, 133, 139-142, 154, 173, 174, 234, 235, 400-485);

d.  Crow hired Duncan Capital employees, including senior Duncan Capital employee David Skriloff, and had the authority to fire Duncan Capital employees as well (anticipated testimony of David Skriloff, Robert MacGregor, Robert Yingling; Exs. 87, 163);

e.  Crow determined the compensation of significant Duncan Capital employees (anticipated testimony of David Skriloff, Robert MacGregor, and Michael Crow; Exs. 95, 142, 161, 173, 174, 200);

f.  Crow determined vacation, benefits, and leave policy for Duncan Capital employees and authorized individual employees to take time off (anticipated testimony of David Skriloff, Robert MacGregor, Michael Crow, and Robert Yingling; Exs. 121, 122, 164, 165, 201);

g.  Fuchs, the nominal head of Duncan Capital, and at least two other senior employees of Duncan Capital (Robert MacGregor and David Skriloff), reported directly to Michael Crow (anticipated testimony of Robert MacGregor, David Skriloff, Robert Yingling, Jennifer O'Shea);

h.  Crow, Fuchs, and others created the appearance to securities investors and issuers, and other third parties, both through words and actions, that Crow headed and controlled Duncan Capital (anticipated testimony of David Fuchs, Robert MacGregor, David Skriloff, Michael Crow, Joseph Gil, Brian Ladin, Carl Wolf, Jennifer O'Shea, Eugene Grin; Exs. 4, 88, 99, 112, 123, 128, 129, 155, 156, 158, 159, 188);

i.  Duncan Capital and Duncan Capital Group shared the same office space, Michael Crow had the largest single office in that office space, and Michael Crow determined the office's dress code for all persons who worked there (anticipated testimony of Robert Yingling, David Skriloff, Robert MacGregor, David Fuchs, Michael Crow, Dan Purjes, Jennifer O'Shea; Exs. 96, 215);

j.  Duncan Capital and Duncan Capital Group also shared phone and fax numbers, maintained a single, joint website, and distributed marketing material indicating that Duncan Capital was part of Duncan Capital Group (anticipated testimony of David Fuchs, Michael Crow, Robert MacGregor, David Skriloff; Exs. 88, 99);

k.  A single individual acted as the General Counsel at both Duncan Capital and Duncan Capital Group, and two successive individuals acted as Chief Financial Officer/bookkeeper at both Duncan Capital and Duncan Capital Group, and all of those individuals reported directly and exclusively to Michael Crow (anticipated testimony of Robert MacGregor, David Fuchs, Robert Yingling, Michael Crow, David Skriloff, Dan Purjes; Exs. 181-183, 188-191, 193-196, 315);

l.  Against the advice of counsel to Duncan Capital (advice known to Crow) not to use the same name for Duncan Capital Group and the registered broker-dealer associated with it, and against the like wishes of Fuchs (and Crow's business partner at Duncan Capital Group, Dan Purjes), Crow insisted on calling Rockwood, Inc. "Duncan Capital LLC," after Rockwood, Inc. merged with Duncan Capital LLC in March 2004, and Fuchs acquiesced in Crow's use of that name (anticipated testimony of Dan Purjes, David Fuchs, Michael Crow, Lawrence Nusbaum, Martin Kaplan; Exs. 113, 227, 239-245, 312);

m.  During the Relevant Period, against the advice of counsel to Duncan Capital (advice known to Crow), Duncan Capital was affiliated with Duncan Capital Group (see citations to preceding sub-paragraph);

n.  From at least the beginning of 2004 until at least December 2004, Duncan Capital paid the entire rent for space used by both Duncan Capital and Duncan Capital Group, all overhead expenses for both entities, and the full salaries and benefits of all shared employees, as well as the salaries and benefits of employees who worked exclusively for Duncan Capital Group (anticipated testimony of David Fuchs, Robert Yingling, Michael Crow, and Timothy Nealon; Ex. 468); and

o.     On numerous occasions during the Relevant Period, Duncan Capital also
paid business and personal travel expenses for Crow (anticipated
testimony of Timothy Nealon; Exs. 552, 652, 659).

III.    *Crow Acted as a Broker*

24.     During at least the Relevant Period, Crow personally acted as an unregistered
broker on a number of securities transactions involving Duncan Capital and/or Duncan Capital
Group, and Crow generally oversaw Duncan Capital's brokerage activities. (Anticipated
testimony of David Fuchs, Robert MacGregor, David Skriloff, Michael Crow, Brian Ladin,
Joseph Gil, Carl Wolf, Eugene Grin; Exs. 4-6, 21-31, 33, 37, 60-81, 89-94, 104, 105, 115-120,
127, 130-141, 143-148, 150-153, 156, 162, 168-172, 175-178)

25.     During the Relevant Period, Duncan Capital acted as broker on numerous
securities transactions, including numerous PIPE transactions. Duncan Capital engaged solely in
securities brokerage activities during that time period. (See citations to preceding paragraph and
additional anticipated testimony of Dan Purjes and Exs. 361, 378-382, 384-385, 414-428)

26.     As compensation for its brokerage activities, Duncan Capital received substantial
commissions, typically from the issuers of the securities, in the form of cash,  stock, and stock
warrants. During the Relevant Period, Duncan Capital's sole revenue was commissions from its
brokerage activities. (Anticipated testimony of David Fuchs, Robert Yingling, Michael Crow,
David Skriloff, Dan Purjes; Exs. 149, 361, 378-382, 384-385, 400-484)

27.     During the Relevant Period, Duncan Capital was placement agent for
approximately twenty securities offerings, in which it raised over $100 million for the issuers.
Duncan Capital received millions of dollars in cash compensation for these transactions, plus
warrants to purchase hundreds of thousands of shares of issuer stock at discounted prices.
(Anticipated testimony of David Fuchs, Michael Crow, and Timothy Nealon; Exs. 361, 378-382,
384-385, 400-484, 704-708)

28.     Beginning in or about October 2003, by oral agreement between Crow and Fuchs,
Duncan Capital Group was to receive at least 50% of all profits of Duncan Capital. (Anticipated
testimony of David Fuchs and Michael Crow)

29.     Examples of the Duncan Capital and/or Duncan Capital Group securities
transactions in which Crow personally and directly participated as an unregistered broker include
the following:

a.     October 29, 2003 $3 million INYX private placement of securities
(anticipated testimony of Michael Crow, Patrick Regan; Exs. 83-86, 170,
171);

b.     December 9, 2003 $2.2 million Dyntek, Inc. ("Dyntek") stock issuance
(anticipated testimony of Robert MacGregor, Michael Crow; Exs. 60, 130,
131, 133, 172);

c.  January 29, 2004 $3.5 million Dyntek convertible debt issuance (anticipated testimony of Eugene Grin, Robert MacGregor, Michael Crow; Exs. 60-62, 134-141, 176, 179);

d.  January 29, 2004 $4 million Media Bay debt issuance (anticipated testimony of Robert MacGregor, Carl Wolf, Eugene Grin, Michael Crow; Exs. 21, 23, 27, 28, 33);

e.  April 27, 2004 $6.3 million Dyntek stock issuance (anticipated testimony of Michael Crow; Exs. 30, 60, 68, 116, 117, 146, 175);

f.  May 3, 2004 $2.5 million Dyntek convertible debt issuance (anticipated testimony of Michael Crow; Exs. 60, 68, 147, 150); and

g.  February 10, 2005 $7.7 million Dyntek stock and stock warrant issuance (anticipated testimony of Michael Crow; Exs. 60, 177, 178).

30.     During at least the Relevant Period, either directly or through Duncan Capital Group or M.W. Crow Family LP, Crow received at least $910,225 in cash from Duncan Capital, which constituted approximately 83% of Duncan Capital's total profits for that period. Crow received that cash as brokerage commissions from Duncan Capital. (Anticipated testimony of Michael Crow, David Fuchs, Timothy Nealon; Exs. 400-485, 704-708)

31.     During the Relevant Period, in addition to the cash described in the preceding paragraph, Crow received, either directly or through Duncan Capital Group or M.W. Crow Family LP, at least $623,815 in cash and stock directly from at least one of the issuers of stock involved in securities transactions for which Duncan Capital acted as broker. (Anticipated testimony of Michael Crow, David Fuchs, Timothy Nealon; Exs. 400-485)

32.     During the Relevant Period, Crow received, either directly or through Duncan Capital Group, the Crow Children's Trusts, or M.W. Crow Family LP, issuer warrants to purchase hundreds of thousands of shares of issuer stock at discounted prices. Crow received those warrants as commissions and fees for brokerage services provided to the stock issuers. Crow and/or Duncan Capital Group received such warrants with a total approximate value of $780,626. M.W. Crow Family LP received additional such warrants with a total approximate value of $2,430,965. Crow received approximately 50% of all warrants paid by issuers as placement agent or brokerage commissions for transactions involving Duncan Capital as broker. Duncan Capital and others received the remainder of those warrants. (Anticipated testimony of Michael Crow, David Fuchs, Timothy Nealon; Exs. 400-485)

33.     Fuchs and Crow structured the payment of Duncan Capital's placement agent compensation to conceal Crow's receipt of the compensation. The cash portion of the placement agent fees from the PIPE offerings was generally funneled by Fuchs to Duncan Capital Group through relief defendant Santal Holdings. Thus, on six occasions between April and December 2004, Fuchs directed the transfer of amounts ranging from $50,000 to $300,000 from Duncan Capital to Santal Holdings, and then promptly transferred the same amount, or nearly the same

amount, from Santal Holdings to Duncan Capital Group. On occasion, the path of the placement agent fees from Duncan Capital to a Crow-controlled entity was even more circuitous. Fuchs also caused Santal Holdings to transfer at least $86,000 of these funds to M.W. Crow Family LP. (Anticipated testimony of David Fuchs, Michael Crow, Robert Yingling, and Timothy Nealon; Exs. 197-199, 400-485; 716)

34.    During the Relevant Period, either directly or through Santal, Fuchs received at least $105,771 in cash from Duncan Capital, which constituted approximately 10% of Duncan Capital's total profits for that period. Fuchs and/or Santal received that cash as brokerage commissions from Duncan Capital. In addition, during the relevant period, Fuchs received total salary payments of approximately $311,984. (Anticipated testimony of Michael Crow, David Fuchs, Timothy Nealon; Exs. 400-485, 704-708)

35.    In addition to the cash described above, Fuchs and/or Duncan Capital received stock as brokerage commissions from the issuers involved in securities transactions for which Duncan Capital acted as broker. This stock had an approximate value of $130,877. (Anticipated testimony of David Fuchs and Timothy Nealon; Exs. 400-485)

36.    During the Relevant Period, Fuchs additionally received, either directly or through Duncan Capital, issuer warrants to purchase hundreds of thousands of shares of issuer stock at discounted prices. Fuchs and/or Duncan Capital received those warrants as commissions and fees for brokerage services provided to the stock issuers. During the Relevant Period, Fuchs received such warrants with a total approximate value of $1,404,873. (Anticipated testimony of David Fuchs, Michael Crow, Robert Yingling, Timothy Nealon; Exs. 400-485)

IV.    *Crow and Fuchs Failed To Disclose to the Commission Crow's Control of Duncan Capital and Crow's Regulatory History*

37.    As a registered broker-dealer, Duncan Capital periodically filed with the Commission "Forms BD" (and amendments thereto), which are available to the general public, and which required Duncan Capital to disclose, among other things:

a.    the names of Duncan Capital's officers and directors "and individuals with similar status or functions";

b.    whether or not any such officers or directors (or similarly functioning persons) were "control persons" of Duncan Capital;

c.    the name of any other person who directly or indirectly controlled the management or policies of Duncan Capital, through agreement or otherwise;

d.    the name of "any corporation or other organization engaged in the securities or investment advisory business" that, directly or indirectly, either controlled Duncan Capital or was "under common control" with Duncan Capital;

e.     whether in the prior ten years any "domestic court" had enjoined Duncan Capital, or any "control affiliate" of Duncan Capital, in connection with an investment-related activity; and

f.     whether the Commission had ever entered an order against Duncan Capital, or any "control affiliate" of Duncan Capital, in connection with investment-related activity.

(Anticipated testimony of David Fuchs, Michael Crow; Exs. 307, 342).

38.     During the Relevant Period, Crow was a "control person" of Duncan Capital as that term is used and defined on the Commission's Forms BD. (See citations to paragraph 23 above and additional Exs. 126, 342)

39.     From March 1, 2004 through January 19, 2005, David Fuchs filed six amendments to the Forms BD on behalf of Duncan Capital (the "Forms BD"). None of the Forms BD identified Crow or provided any information regarding Crow. (Anticipated testimony of David Fuchs; Exs. 126, 307)

40.     The Forms BD did not disclose Crow's control of Duncan Capital's management or policies, or Crow's de facto role as an officer or director of Duncan Capital (or otherwise identify Crow) (Exs. 126, 307)

41.     The Forms BD also failed to disclose (1) the 1998 court order enjoining Crow from violating the antifraud provisions of the securities laws and barring him from acting as an officer or director of a public company; and (2) the 1998 Commission order denying Crow the privilege of appearing or practicing before the Commission as an accountant. (Exs. 126, 307)

42.     In the Forms BD, Fuchs falsely represented that he alone controlled Duncan Capital, notwithstanding that Fuchs knew that Crow controlled Duncan Capital. Fuchs falsely failed to disclose in the Forms BD (i) that Crow was a de facto officer or director of Duncan Capital; (ii) that Crow was a person who directly or indirectly controlled the management or policies of Duncan Capital; (iii) that Duncan Capital Group was a "corporation or other organization" that, directly or indirectly, either controlled Duncan Capital or was "under common control" with Duncan Capital; and (iv) Crow's disciplinary history (in response to questions requiring disclosure of such information with respect to "control affiliates"). (Exs. 126, 307, 342)

43.     Crow knew that Duncan Capital's filings with the Commission did not disclose his affiliation with Duncan Capital, and knew that, because of his control of Duncan Capital, he should have been identified in those filings. (See citations to paragraph 23 above and additional anticipated testimony of Martin Kaplan and Ex. 311)

12

44.    Based upon advice of Counsel that Crow received, and otherwise, Crow knew that he was not permitted to exercise control over Duncan Capital or its operations without also being registered as an individual associated with Duncan Capital and disclosed as such in Duncan Capital's filings with the Commission. (See citations to paragraph 23 above and anticipated testimony of Michael Crow and Martin Kaplan)

45.    Crow intentionally used Duncan Capital as a front for his and DC Group's brokerage activities. (See citations above).

V.    *Crow and MacGregor Acted as Unregistered Brokers*

46.    During the Relevant Period, Duncan Capital was a member of the National Association of Securities Dealers ("NASD"). (Anticipated testimony of David Fuchs; Exs. 156, 307)

47.    During the Relevant Period, Crow and MacGregor were associated with Duncan Capital. (Anticipated testimony of Michael Crow, David Fuchs, Robert MacGregor, David Skriloff, Jennifer O'Shea, and citations to paragraphs 23-33 above)

48.    Duncan Capital never registered Crow and MacGregor with the NASD as associated persons of Duncan Capital. (Anticipated testimony of David Fuchs and Robert MacGregor)

49.    Fuchs's responsibilities included registering associated persons of Duncan Capital with the NASD and complying with other regulatory requirements. (Anticipated testimony of David Fuchs, Michael Crow, Robert MacGregor)

50.    Fuchs was aware that neither Crow nor MacGregor was registered with the NASD as a representative of Duncan Capital, and that neither had passed the requisite qualification examinations to effect any transaction in, or induce the purchase or sale of, any security. (Anticipated testimony of David Fuchs, Robert MacGregor, Michael Crow; Ex. 166)

51.    Fuchs was aware that, in light of Crow and MacGregor's brokerage activities on behalf of Duncan Capital, each was required to pass certain qualification examinations and to be registered with the NASD. (Anticipated testimony of David Fuchs, Robert MacGregor, Michael Crow; Ex. 166)

52.    Crow knew he was not registered with the NASD, and that he had not passed the requisite qualification examinations, while he was effecting or involved in effecting transactions in securities. Crow knew that he needed to be registered with the NASD, and to pass such examinations, in order to conduct such activities. (Anticipated testimony of David Fuchs, Robert MacGregor, Michael Crow, Martin Kaplan; Ex. 166)

53.    Duncan Capital never made or kept current a questionnaire or application for employment executed by Crow and MacGregor. (Anticipated testimony of David Fuchs)

54.     Fuchs's responsibilities included making and keeping current a questionnaire or application for employment for each associated person of Duncan Capital, including Crow and MacGregor. (Anticipated testimony of David Fuchs)

55.     Fuchs knew that Duncan Capital was required to make and keep a questionnaire or application for employment for Crow and MacGregor. Fuchs failed to do so and knew that Duncan Capital failed to do so.

## VI.     *Duncan Capital Group Acted as an Unregistered Broker*

56.     Duncan Capital Group acted as a broker without being registered with the Commission. Crow made virtually no distinction between Duncal Capital Group and Duncan Capital to issuers or investors when effecting securities transactions. Furthermore, as described above, Duncan Capital Group received much of the compensation for the PIPE offerings for which Duncan Capital served as the placement agent. (See citations to paragraphs 23-33 above)

57.     As set forth in paragraph 33 above, Fuchs caused large portions of Duncan Capital's placement agent fees to be transferred to Duncan Capital Group, while Fuchs knew that Duncan Capital Group was not, but should have been, registered as a broker-dealer. (See citations to paragraph 33 above)

58.     Crow knew that Duncan Capital Group was "effect[ing] ... transactions in" or "induc[ing] or attempt[ing] to induce the purchase or sale of[ ] any security" while it was not registered with the Commission as a broker-dealer. As the president and chief executive officer of Duncan Capital Group, Crow was responsible for registering Duncan Capital Group with the Commission as a broker-dealer, yet Crow failed to do so. (See citations to paragraphs 23-33 above)

59.     For example, Duncan Capital Group served as a broker on at least one 2003 private placement involving INYX and certain securities transactions involving Dyntek in 2005. (See citations to paragraphs 29a and 29g above and additional Ex. 379)

## VII.     *The Relief Defendants Received Some of Defendants' Ill-Gotten Gains*

60.     During the Relevant Period, Crow arranged for the transfer of placement agent compensation (in the form of cash, stock and/or warrants) he had received from Duncan Capital, or directly from issuers in connection with his securities brokerage activities, to six of the seven relief defendants – specifically, Trevor Crow, M.W. Crow Family LP and the Crow Children's Trusts. These transfers were made to the relief defendants without consideration. (Anticipated testimony of Michael Crow, Timothy Nealon; Ex. 400-485)

61.     Crow and/or Duncan Capital Group transferred or caused to be transferred at least $30,000 in cash to Trevor Crow. (Anticipated testimony of Michael Crow, Timothy Nealon; Ex. 400-485)

62.    Crow and/or Duncan Capital Group transferred or caused to be transferred to M.W. Crow Family LP cash in the amount of $86,728, stock worth at least $19,804 and warrants worth approximately $2,430,965, all of which were broker-dealer commissions. (Anticipated testimony of Michael Crow, Timothy Nealon; Exs. 400-485)

63.    Duncan Capital Group transferred Grant Ventures, Inc. stock worth at least $233,000 to each of the Crow Children's Trusts. (Anticipated testimony of Michael Crow, Timothy Nealon; Exs. 400-485)

64.    As of the end of the Relevant Period, Santal and/or Fuchs had received $105,771 in broker-dealer commissions transferred by Duncan Capital.

## Plaintiff's Proposed Conclusions of Law

I.    *Violations of Exchange Act Section 15(b)(1) and Rule 15b3-1*

1.    Section 15(b)(1) of the Securities and Exchange Act of 1934 ("Exchange Act"), and Rule 15b3-1 thereunder, require a registered broker-dealer to file with the Commission a document called Form BD. 15 U.S.C. § 78o(b)(1); 17 C.F.R. § 240.15b3-1.

2.    Form BD requires a broker-dealer to disclose, among other things (a) the names of the broker-dealer's officers and directors "and individuals with similar status or functions"; (b) whether or not any such officers or directors (or similarly functioning persons) are "control persons" of the broker-dealer; (c) the name of any other person who directly or indirectly controls the management or policies of the broker-dealer, through agreement or otherwise; (d) the name of "any corporation or other organization engaged in the securities or investment advisory business" that, directly or indirectly, either controls the broker-dealer or is "under common control" with the broker-dealer;
(e) whether in the past ten years any "domestic court" has enjoined the firm, or any "control affiliate" of the broker-dealer, in connection with an investment-related activity; and (f) whether the Commission has ever entered an order against the firm, or any "control affiliate" of the broker-dealer, in connection with investment-related activity.

3.    Defendant Duncan Capital violated Section 15(b)(1) of the Exchange Act, and Rule 15b3-1 thereunder, by failing to disclose in the numerous Forms BD, including amendments filed on Form BD, the firm filed with the Commission during the Relevant Period defendant Crow's (a) relationship to, and control of, Duncan Capital; (b) prior district court injunction and Commission order against him; and (c) common control of Duncan Capital and Duncan Capital Group.

4.    Exchange Act Section 20(e) provides that "any person that knowingly provides substantial assistance to another person in violation of a provision of [the Exchange Act], shall be deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided." 15 U.S.C. § 78t(e).

5.    Defendant Fuchs knowingly provided substantial assistance to defendant Duncan Capital's violations of Section 15(b)(1) of the Exchange Act and Rule 15b3-1 thereunder by knowingly filing false Forms BD, including amendments filed on Form BD, with the Commission that failed to disclose Crow's control of Duncan Capital, the prior injunction and Commission order against Crow, and Crow's common control of Duncan Capital and Duncan Capital Group.

6.    Defendant Fuchs thus violated Exchange Act Section 15(b)(1), and Rule 15b3-1 thereunder.

7.    Defendant Crow knowingly provided substantial assistance to defendant Duncan Capital's violations of Section 15(b)(1) of the Exchange Act and Rule 15b3-1 thereunder by knowingly controlling Duncan Capital, knowing that such control was prohibited without disclosure to the Commission, and knowing that Duncan Capital's Forms BD failed to disclose Crow's control of Duncan Capital and the prior injunction and Commission order against Crow.

8.    Defendant Crow thus violated Exchange Act Section 15(b)(1), and Rule 15b3-1 thereunder.

II.    *Violations of Exchange Act Section 15(b)(7) and Rule 15b7-1*

9.    Exchange Act Section 15(b)(7), and Rule 15b7-1 thereunder, prohibit a registered broker-dealer from "effect[ing] any transaction in, or induc[ing] the purchase or sale of, any security" unless any natural person associated with the broker-dealer who effects or is involved in effecting any such transaction is registered with or approved by any national securities exchange or national securities association of which the broker-dealer is a member.  15 U.S.C. § 78o(b)(7); 17 C.F.R. § 240.15b7-1.

10.    Exchange Act Section 3(a)(18) defines the term "associated person of a broker or dealer" to include "any partner, officer, director, or branch manager of such broker or dealer (or any person occupying a similar status or performing similar functions), any person directly or indirectly controlling, controlled by, or under common control with such broker or dealer, or any employee of such broker or dealer, except … any person associated with a broker or dealer whose functions are solely clerical or ministerial."  15 U.S.C. § 78c(a)(18).

11.    Defendants Crow and MacGregor were associated persons of the broker dealer Duncan Capital for Exchange Act purposes.

12.    Defendant Duncan Capital failed to register Crow and MacGregor as associated persons of Duncan Capital, and failed to ensure that they passed the requisite qualification examinations, while Crow and MacGregor were associated with Duncan Capital and were effecting, or involved in effecting, transactions in securities.

13.    Defendant Duncan Capital thus violated Exchange Act Section 15(b)(7)  and Rule 15b7-1 thereunder.

14.    Defendant Crow knowingly provided substantial assistance to Duncan Capital's violations of Exchange Act Section 15(b)(7) and Rule 15b7-1 thereunder, by (a) knowing that he was not registered with the NASD, and that he had not passed the requisite qualification examinations, while he was effecting or involved in effecting transactions in securities; and (b) knowing that he needed to be registered with the NASD, and to have passed such examinations, in order to conduct such activities.

15.    Pursuant to Exchange Act Section 20(e), Crow thus violated Exchange Act Section 15(b)(7) and Rule 15b7-1 thereunder.

16.    Defendant Fuchs knowingly provided substantial assistance to Duncan Capital's violations of Exchange Act Section 15(b)(7) and Rule 15b7-1 thereunder, by failing to cause the registration of defendants Crow and MacGregor with the NASD, and to ensure that they passed the requisite qualification examinations. Fuchs knew that Crow and MacGregor were conducting securities brokerage activities on behalf of Duncan Capital, were therefore required to be registered with the NASD and to have passed the requisite qualification examinations, and that they were not so registered and had not passed such examinations.

17.    Pursuant to Exchange Act Section 20(e), Fuchs thus violated Exchange Act Section 15(b)(7) and Rule 15b7-1 thereunder.

III.    *Violations of Exchange Act Section 15(a)*

18.    Exchange Act Section 15(a)(1) requires a "broker" to be registered with the Commission in order "to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security" while making use of the mails or any means or instrumentality of interstate commerce. 15 U.S.C. § 78o(a)(1).

19.    Exchange Act Section 3(a)(4) defines a "broker" as any person, other than a bank, "engaged in the business of effecting transactions in securities for the account of others." 15 U.S.C. § 78c(a)(4).

20.    During the Relevant Period, defendant Duncan Capital Group acted as a broker within the meaning of Section 3(a)(4) of the Exchange Act, 15 U.S.C. § 78c(a)(4), and made use of the mails or the means or instrumentalities of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or sale of, securities (other than an exempted security or commercial paper, bankers' acceptances, or commercial bills) without being registered with the Commission in accordance with Exchange Act Section 15(b), 15 U.S.C. § 78o(b).

21.    Defendant Duncan Capital Group thus violated Exchange Act Section 15(a).

22.    Defendant Crow knowingly provided substantial assistance to Duncan Capital Group's violations of Exchange Act Section 15(a) by knowingly permitting and directing Duncan Capital Group to effect transactions in, or induce or attempt to induce the purchase or sale of, securities, while Duncan Capital Group was not registered with the Commission as a broker-dealer. As the president and chief executive officer of Duncan Capital Group, Crow was

responsible for registering Duncan Capital Group with the Commission as a broker-dealer, yet Crow failed to do so.

23.    Pursuant to Exchange Act Section 20(e), defendant Crow thus violated Exchange Act Section 15(a).

24.    Defendant Fuchs knowingly provided substantial assistance to Duncan Capital Group's violations of Exchange Act Section 15(a) by knowingly causing large portions of Duncan Capital's placement agent fees to be transferred to Duncan Capital Group, while Fuchs knew that Duncan Capital Group was not, but should have been, registered as a broker-dealer.

25.    Pursuant to Exchange Act Section 20(e), defendant Fuchs thus violated Exchange Act Section 15(a).

IV.    *Violations of Exchange Act Section 17(a) and Rule 17a-3(a)(12)*

26.    Exchange Act Section 17(a) and Rule 17a-3(a)(12) thereunder require registered brokers and dealers to make and keep current a questionnaire or application for employment executed by each associated person of the broker-dealer. 15 U.S.C. § 78q(a); 17 C.F.R. § 240.17a-3(a)(12).

27.    Duncan Capital violated Exchange Act Section 17(a) and Rule 17a-3(a)(12) thereunder by failing to make and keep either a questionnaire or application for employment for Crow and MacGregor, despite the fact that defendants Crow and MacGregor were both "associated persons" of Duncan Capital (as that term is used in 17 C.F.R. § 240.17a-3(a)(12)).

28.    Defendant Fuchs knew that defendants Crow and MacGregor were each "associated persons" of Duncan Capital and that Duncan Capital failed to make and keep either a questionnaire or application for employment for Crow and MacGregor, as required by Exchange Act Section 17(a) and Rule 17a-3(a)(12) thereunder. Defendant Fuchs thus knowingly provided substantial assistance to Duncan Capital's violations of Exchange Act Section 17(a) and Rule 17a-3(a)(12) thereunder.

29.    Thus, pursuant to Exchange Act Section 20(e), Fuchs violated Exchange Act Section 17(a) and Rule 17a-3(a)(12) thereunder.

V.    *Relief*

30.    For defendants' violations of the Exchange Act Sections and Rules described above, the Commission is entitled to the following relief.

A.    <u>Disgorgement</u>

31.    The "primary purpose of disgorgement as a remedy for violation of the securities laws is to deprive violators of their ill-gotten gains, thereby effectuating the deterrence objectives of those laws." <u>SEC v. First Jersey Secs., Inc.</u>, 101 F.3d 1450, 1474 (2d Cir. 1996).

32.     Thus, disgorgement of a defendant's ill-gotten gains is an appropriate remedy to deter both fraud and non-fraud violations of the federal securities laws. See, e.g., id.; SEC v. Martino, 255 F.Supp.2d 268 (S.D.N.Y. 2003) (Court ordered defendant to disgorge millions of dollars in brokerage commissions obtained in violation of Exchange Act Section 15(a) and a prior Commission bar, even in the absence of a fraud claims concerning those commissions); SEC v. Alpha Telcom, Inc., 187 F.Supp.2d 1250, 1262-63 (D. Ore. 2002) (ordering disgorgement where defendant profited from unregistered sale of securities); SEC v. Friendly Power Co., LLC, 49 F.Supp.2d 1363, 1372-73 (S.D. Fla. 1999) (same). Indeed, to do otherwise would potentially leave the Court without an effective deterrence for non-fraud violations of the federal securities laws, as the violator could simply view other available relief (e.g., a civil money penalty) as merely a sustainable cost of doing business illegally.

33.     A district court has broad discretion not only in determining whether or not to order disgorgement but also in calculating the amount to be disgorged. First Jersey, 101 F.3d at 1474-75.

34.     The Commission is not required to establish with certainty the amount to be disgorged; rather the Commission's burden is to come forward with a "reasonable approximation of profits causally connected to the violation." SEC v. First Jersey Securities, Inc., 890 F. Supp. 1185, 1211 (S.D.N.Y. 1995), rev'd on other grounds, 101 F.3d 1450 (2d Cir. 1996), cert. denied, 522 U.S. 812 (1997); SEC v. First City Fin. Corp., 890 F.2d 1215, 1231 (D.C. Cir. 1989). Once the Commission has reasonably calculated disgorgement, the burden shifts to the defendants to come forward with evidence that the requested disgorgement is not a "reasonable approximation" of unjust enrichment. First City, 890 F.2d at 1232.

35.     In addition, the Commission generally is entitled to prejudgment interest on any disgorgement amount awarded. The decision whether to grant prejudgment interest, and the appropriate interest rate, are matters confided to the district court's broad discretion. First Jersey, 101 F.3d at 1476. In deciding whether an award of prejudgment interest is warranted, a court should consider (i) the need to fully compensate the wronged party for actual damages suffered, (ii) fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court. Id. In an enforcement action brought by a regulatory agency, the remedial purpose of the statute takes on special importance:

> When the SEC itself orders disgorgement, which as discussed above is designed to strip a wrongdoer of its unlawful gains, the interest rate it imposes is generally the IRS underpayment rate . . . That rate reflects what it would have cost to borrow the money from the government and therefore reasonably approximates one of the benefits the defendant derived from its fraud.

Id. (internal citations omitted)

36.     The Court concludes that, as a result of Crow's repeated violations of Exchange Act Sections 15(a), 15(b)(7) (and Rule 15b7-1 thereunder), and 15(b)(7) (and Rule 15b7-1

thereunder) and Duncan Capital Group's repeated violations of Section 15(a) of the Exchange Act, described above, Crow, either directly or through Duncan Capital Group or M.W. Crow Family LP, improperly received a total of $5,484,185 in illegal brokerage fees and commissions. That amount comprises $1,420,225 in cash payments; $3,211,591 in warrants to purchase shares of stock of the issuers involved in the transactions at issue; $113,816 in stock received from those issuers; $725,120 in salary, benefits and overhead paid by Duncan Capital for Duncan Capital Group's portion of salaries, benefits and overhead; and $13,434 for Crow's travel expenses and the travel expenses of several Duncan Capital Group employees paid by Duncan Capital. Accordingly, the Court orders Crow and Duncan Capital Group, jointly and severally, to pay the Commission $5,484,185 in disgorgement of those ill-gotten gains. The Court further orders Crow and Duncan Capital Group not to exercise any such warrants that they have not already exercised.

37.    In addition, the Commission is entitled to pre-judgment interest on the disgorgement amount awarded against Crow and Duncan Capital Group (described in the preceding paragraph), in the additional amount of $_____, and the Court orders Crow and Duncan Capital Group, jointly and severally, to pay that additional amount.

38.    The Court concludes that, as a result of Fuchs's repeated violations of Exchange Act Sections 15(a), 15(b)(7) (and Rule 15b7-1 thereunder), 15(b)(7) (and Rule 15b7-1 thereunder), and 17(a) (and Rule 17a-3(a)(12) thereunder) described above, Fuchs, either directly or through Duncan Capital or Santal, improperly received a total of $1,953,505 in illegal brokerage fees and commissions. That amount comprises $105,771 in illegal cash payments; $311,984 in salary; $1,404,873 in warrants to purchase shares of stock of the issuers involved in the transactions at issue; and $130,877 in stock received from those issuers. Accordingly, the Court orders Fuchs and Duncan Capital, jointly and severally, to pay the Commission $1,953,505 in disgorgement of those ill-gotten gains. The Court further orders Fuchs and Duncan Capital not to exercise any such warrants that they have not already exercised.

39.    In addition, the Court orders Fuchs and Duncan Capital, jointly and severally, to pay pre-judgment interest on the disgorgement amount awarded against them (described in the preceding paragraph), in the additional amount of $_____.

40.    The Commission further is entitled to an award of disgorgement (and prejudgment interest thereon) against the relief defendants, to the extent such defendants received any of the ill-gotten gains described in the paragraphs above, or any additional ill-gotten gains. "Federal courts may order equitable relief against a person who is not accused of wrongdoing in a securities enforcement action where that person: (1) has received ill-gotten funds; and (2) does not have a legitimate claim to those funds." SEC v. Cavanagh, 155 F.3d 129, 136 (2d Cir. 1998) (upholding freeze of proceeds of stock sale deposited into account of primary defendant's wife where stock sold in violation of Section 5 of Securities Act); SEC v. DCI Telecommunications, Inc., 122 F. Supp. 2d 495, 502 (S.D.N.Y. 2000) (complaint states a claim against relief defendant where wife of primary defendant unjustly enriched through transfer to her of assets obtained as result of primary defendant's alleged unlawful conduct because she did not provide value for the assets and had no just claim to them).

41.    The Court concludes that M.W. Crow Family LP received $2,537,498 in illegal brokerage commissions. That amount comprises $86,729 in illegal cash payments; $2,430,965 in warrants to purchase shares of stock of the issuers involved in the transactions at issue; and $19,804 in stock received from one of those issuers. The Court concludes that, given Crow's securities law violations that resulted in M.W. Crow Family LP's receipt of those funds and Crow's control of M.W. Crow Family LP, M.W. Crow Family LP does not have a legitimate claim to any portion of these funds. Accordingly, the Court orders M.W. Crow Family LP to pay to the Commission $2,537,498, plus prejudgment interest in the additional amount of $ _____.

42.    The Court concludes that Santal received $105,771 in illegal cash brokerage commissions. The Court further concludes that, given Fuchs's securities law violations that resulted in Santal's receipt of these funds, and Fuchs' 100% control of Santal, Santal does not have a legitimate claim to these funds. Accordingly, the Court orders Santal to pay to the Commission $105,771, plus prejudgment interest in the additional amount of $ _____.

43.    The Court further concludes that Michael Crow's wife, relief defendant Trevor Crow, has no legitimate claim to the $30,000 in cash that she received, as it constitutes illegal Duncan Capital commissions. Accordingly, the Court orders Trevor Crow to disgorge to the Commission that $30,000, plus prejudgment interest in the additional amount of $ _____.

44.    For the same reasons, the Court orders relief defendants the Crow Children's Trusts each to disgorge to the Commission the proceeds from the stock they received (worth at least $233,000), described above, plus pre-judgment interest in the additional amount of $ _____.

        B.    Civil Money Penalty

45.    The Exchange Act authorizes the Court to order civil money penalties for the violations at issue. See 15 U.S.C. § 78u(d)(3); SEC v. Palmisano, 135 F.3d 860, 865 (2d Cir. 1998).

46.    The Exchange Act provides three separate "tiers" of potential penalties, which increase depending upon the seriousness of the violation. Id. The Exchange Act further states that the amount of the penalty shall be determined by the Court "in light of the facts and circumstances." Id. For second-tier penalties, the statute provides that the amount of the penalty for a natural person shall not exceed the greater of $60,000 per violation, or the gross amount of pecuniary gain to that person. 15 U.S.C. § 78u(d)(3)(B)(ii). Second-tier penalties require a showing that the violations at issue involved "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement."

47.    Defendant Crow deliberately disregarded the Exchange Act's broker-dealer reporting and registration requirements at issue in this case. Against the advice of counsel known to Crow, Crow acted as an undisclosed principal of Duncan Capital, personally acted as an unregistered securities broker, and caused and permitted Duncan Capital Group to act as an unregistered securities broker, knowing full well that these actions were in violation of the

federal securities laws and regulations. Furthermore, Crow blatantly and knowingly repeatedly violated the securities laws for over a year, solely for the purpose of his personal pecuniary gain. For these reasons, the Court finds it appropriate to issue a civil monetary penalty against Crow in the amount of $ _____.

48.     Defendant Fuchs likewise deliberately disregarded the Exchange Act reporting and registration requirements at issue. For example, Fuchs personally caused Duncan Capital to file several false Forms BD with the Commission, blatantly neglecting to list Michael Crow as a principal or controlling person of Duncan Capital, and failing to disclose Crow's regulatory history. Furthermore, Fuchs deliberately and knowingly permitted Crow and MacGregor to act as associated persons of Duncan Capital without being registered as such. For these reasons, the Court likewise finds it appropriate to award a second-tier civil money penalty against defendant Fuchs in the amount of $ _____.

49.     For the same reasons, and because Crow controlled Duncan Capital and Duncan Capital Group (and Fuchs was the nominal president of Duncan Capital), the Court likewise imposes against Duncan Capital a civil penalty in the amount of $ _____ and a civil penalty against Duncan Capital Group in the amount of $ _____.

C.     Permanent Injunctions

50.     Exchange Act Section 21(d) entitles the Commission to permanent injunctive relief upon a showing that (1) violations of the securities laws have occurred, and (2) a reasonable likelihood exists that violations will occur in the future. 15 U.S.C. §§ 77(t)(b) & 78u(d); SEC v. Commonwealth Chem. Secs., Inc., 574 F.2d 90, 99 (2d Cir. 1978); SEC v. Manor Nursing Ctrs., Inc., 458 F.2d 1082, 1100 (2d Cir. 1972).

51.     To determine whether a reasonable likelihood exists that a defendant will commit future violations, courts generally consider: (i) the egregiousness of the conduct; (ii) the isolated or recurrent nature of the infraction; (iii) the degree of scienter involved; (iv) the sincerity of the defendant's assurances against future violations; and (v) the defendant's recognition of the wrongful nature of his conduct. SEC v. Cavanagh,155 F.3d 129, 135 (2d Cir. 1998); SEC v. Universal Major Indus. Corp., 546 F.2d 1044, 1048 (2d Cir. 1976); see also Manor Nursing, 458 F.2d at 1100-1101.

52.     Because Crow's and Fuchs' conduct involved several securities law violations that were egregious (particularly in hiding material information from the Commission) and involved a high degree of scienter, and because Crow and Fuchs have not acknowledged any wrongdoing (or given adequate assurance against future misconduct), the Court imposes against Crow and Fuchs permanent injunctions against future violations of the federal securities laws and regulations that they have violated.

53.     For the same reasons, and because Crow controlled Duncan Capital and Duncan Capital Group (and Fuchs was the nominal president of Duncan Capital), the Court likewise imposes against Duncan Capital and Duncan Capital Group permanent injunctions against future violations of the federal securities laws and regulations they have violated.

### B.     Defendants' Proposed Findings of Fact and Conclusions of Law

1. In or about the fall of 2003, Michael W. Crow met Dan Purjes who owned and controlled Rockwood Group, LLC ("Rockwood Group"). Rockwood Group was a merchant bank that had a synergistic relationship with a registered broker-dealer named Rockwood, Inc. As part of that arrangement, Rockwood Group paid all of the expenses of the broker-dealer in exchange for "reimbursement" and a "mutually agreed [profit] that would be negotiated between the parties". (Crow, Purjes, Fuchs).

2. Robert David Fuchs owned Santal Holdings LLC, which owned Rockwood, Inc., a corporation organized under the laws of the State of Connecticut. (Fuchs, Purjes, Exs. FFF, GGG, SSS).

3. Mr. Fuchs controlled Rockwood, Inc. through his ownership of Santal Holdings. (Fuchs, Purjes, Exs. GGG, SSS).

4. Mr. Crow owned and controlled Duncan Capital, LLC a merchant bank organized under the laws of the State of Delaware ("Duncan Capital (DE)"). (Crow, Ex. OOO).

5. Mr. Purjes and Mr. Crow soon decided to enter into a business partnership. Rockwood Group purchased twenty-five percent (25%) of Duncan Capital (DE) in exchange for $500,000 and a forty-seven and one-half percent (47.5%) interest in an asset management company called Bridges & Pipes Management LLC. (Crow, Purjes).

6. At or about the time that Mr. Purjes and Mr. Crow were discussing their joint venture, Mr. Purjes described to Mr. Crow the synergistic business relationship that Rockwood Group had with Rockwood, Inc. Mr. Purjes explained that Rockwood Group and Rockwood, Inc. referred business deals to each other and shared office space. (Crow, Purjes, Fuchs)

7. Mr. Purjes introduced Mr. Crow to Mr. Fuchs for the purpose of continuing to benefit (through Duncan Capital (DE)) from the natural synergy that exists between a broker-dealer and a merchant bank. (Crow, Purjes, Fuchs)

8. After discussion, Mr. Crow and Mr. Fuchs decided to create a synergistic business relationship between Rockwood, Inc and Duncan Capital (DE) provided that it could be accomplished in compliance with the securities laws. (Crow, Purjes, Fuchs)

9. Prior to consummating this business relationship and to ensure that he was complying with the securities laws, Mr. Crow sought the advice of counsel with respect to the propriety of such a relationship. He met with Mr. Purjes, Martin H. Kaplan, Esq. and Lawrence Nusbaum, Esq. Mr. Kaplan is an experienced securities attorney who has practiced in the area of broker-dealer regulation for more than 30 years. (Crow, Purjes, Kaplan, Ex. W).

10. Mr. Kaplan advised Mr. Crow that a non-registered entity could share office space with a broker-dealer without violating the securities laws. (Kaplan, Crow).

11. It is not inconsistent with the securities laws for a broker-dealer to share space with a non-registered entity. (Tucker, Kaplan).

12. Mr. Kaplan advised Mr. Crow that a merchant bank could legitimately license its name to a broker-dealer in exchange for commercial benefit in the form of a licensing fee. (Kaplan, Crow).

13. It is not inconsistent with the securities laws for a merchant bank to license its name to a broker-dealer in exchange for commercial benefit. (Kaplan, Tucker).

14. Mr. Kaplan advised Mr. Crow that a broker-dealer could legally share its profits with a non-registered entity (such as a merchant bank) where the broker-dealer is structured as a limited liability company and the non-registered entity's ownership interest is passive. (Kaplan, Crow).

15. It is not inconsistent with the securities laws for a broker-dealer to share profits with a non-registered passive owner. (Kaplan, Tucker).

16. Relying on the guidance he received from Mr. Kaplan, and the fact that Mr. Purjes and Mr. Fuchs had operated Rockwood Group and Rockwood, Inc. businesses under similar circumstances, Mr. Crow agreed to align his merchant banking business with Mr. Fuchs' broker-dealer business. (Crow, Fuchs, Purjes)

17. Messrs. Crow and Fuchs agreed that the "Duncan" name had a known and respected reputation in the financial services market and that it would be beneficial for both the merchant bank and the broker-dealer to use it in their respective names. (Crow, Fuchs)

18. Mr. Fuchs retained Mr. Nusbaum from Gusrae, Kaplan, Bruno, and Nusbaum PLLC to restructure the broker-dealer as a limited liability company and rename it "Duncan Capital LLC." (Fuchs, Crow, Perez, Kaplan, Exs. Y, Z, AA, YY, FFF)

19. To facilitate the name change, Mr. Crow caused Duncan Capital (DE) to change its name to Duncan Capital Group, LLC ("DC Group"). (Crow, Ex. OOO).

20. Mr. Nusbaum then formed Duncan Capital LLC, a New York limited liability company and merged Rockwood, Inc. (a Connecticut corporation) into the new entity to create a broker-dealer organized under the laws of New York ("Duncan Capital (NY)"). (Fuchs, Perez, Exs. L, Y, Z, AA, FFF).

21. Duncan Capital (NY) was wholly owned by Santal Holdings LLC which, in turn, was wholly owned by Mr. Fuchs. (Fuchs, Exs. GGG, SSS)

22. Mr. Nusbaum and Robert Perez, Esq. (a former SEC Brach Chief) also assisted Duncan Capital (NY) in obtaining approval and from the National Association of Securities Dealers ("NASD," now known as FINRA) for the broker-dealer. (Fuchs, Perez, Exs. Y, Z, DD, EE, FF, GG, HH).

23. There was confusion as to the terms of the financial relationship between Duncan Capital (NY) and DC Group. Mr. Crow believed that in exchange for the use of the "Duncan" name, DC Group would either receive payments from Duncan Capital (NY) pursuant to a licensing agreement or a passive profits interest in the entity for contributing the license. (Crow)

24. Documents memorializing the arrangement were never finalized, but a draft licensing agreement was circulated at some time. (Crow, Fuchs, Purjes).

25. In or about December 2003, prior to the name change, the broker-dealer and the merchant bank moved into the same office space. At that time, Mr. Crow and Mr. Fuchs hired Bradford Monks of Orrick, Herrington & Sutcliffe LLP to act as the shared general counsel for both entities to further ensure that the entities would conduct their respective business activities in compliance with the securities laws. (Crow, Fuchs, Purjes, Yingling, Ex. LLL)

26. While acting as general counsel for Duncan Capital (NY) and DC Group, Mr. Monks conferred with his colleagues at Orrick, Herrington & Sutcliffe LLP with respect to broker-dealer issues. (Crow, Fuchs, Purjes, Yingling, Ex. HHH).

27. Mr. Fuchs reviewed and signed all of Duncan Capital (NY)'s SEC and NASD filings prepared by Mr. Monks. (Fuchs, Yingling, Exs. LL, OO)

28. In or about the spring of 2004, Mr. Fuchs hired an outside audit firm named Capital Markets Compliance to conduct a mock NASD audit of the Duncan Capital (NY). Capital Markets Compliance is an entity comprised of persons who are former SEC and NASD regulators. (Fuchs, Crow, Yingling, Exs. II, JJ, RR)

29. Duncan Capital (NY) used Capital Markets Compliance as a resource to comply with the securities laws. For example, the Chief Financial Officer (CFO) specifically asked the audit firm whether it was good practice to have Duncan Capital (NY) pay all payroll expenses for DC Group. The audit firm advised the CFO that such a practice was permissible. (Crow, Fuchs, Yingling, Ex. JJ).

30. It is not inconsistent with the securities laws for a broker-dealer to pay the payroll expenses of a non-registered affiliate. (Tucker).

31. Mr. Crow met with Capital Markets Compliance and explained DC Group's relationship to the broker-dealer. The audit firm did not indicate to Mr. Crow or Mr. Fuchs that Mr. Crow's or DC Group's activities required registration. (Crow, Fuchs).

32. Nothing in the final report rendered by Capital Markets Compliance indicated that there was any problem with the relationship between Duncan Capital (NY) and DC Group. (Crow, Fuchs, Tucker, Ex. RR).

33. In or about the summer of 2004, Mr. Fuchs was advised by Mr. Monks that Mr. Macgregor should become registered in light of the role he was then performing. At that time, Mr. Fuchs took reasonable steps to register Mr. Macgegor and directed Mr. Monks

to arrange for Mr. Macgregor to receive study materials for the Series 7 Exam and assist him in becoming a registered person. (Fuchs).

34. In or about the early summer 2004, the NASD conducted an on-premises financial audit of Duncan Capital (NY). Mr. Crow met with the NASD during the audit, but neither Mr. Fuchs nor Mr. Crow were advised that there was a problem with the relationship between their respective businesses or that Mr. Crow's activities required registration. In fact, the NASD's report only indicated to Mr. Fuchs that Duncan Capital (NY) had a correctable net capital issue. (Crow, Fuchs, Yingling, Exs. NN, OO).

35. In or about the July 2004, the staff of the Securities and Exchange Commission ("SEC") conducted an on premises audit of Duncan Capital (NY). Mr. Crow identified himself to the staff of the SEC and met with them regarding, among other things, the business of DC Group during the audit. Neither Mr. Fuchs nor Mr. Crow were advised that there was a problem with the relationship between their respective businesses or that Mr. Crow's activities required registration. The SEC report did not find that the business relationship between Duncan Capital (NY) and Duncan Capital DC Group was problematic; it merely advised that a shared web site was confusing and should be submitted for NASD approval. Upon notice of the NASD issue, Mr. Fuchs removed the website pending NASD approval. (Crow, Fuchs, Exs. PP, QQ).

36. In or about October 2004, Mr. Macgregor found out from NASD that he had been barred from the securities industry due to the non-payment of an arbitration award. Mr. Macgregor later claimed that it was the first he had been notified of the bar due to an outdated address of record with NASD. (Fuchs).

37. Mr. Macgregor did not inform Mr. Fuchs of the information he had received from NASD in October 2004 for over two months. Instead, he advised Mr. Fuchs that the delay in becoming registered was bureaucratic. (Fuchs).

38. Mr. Fuchs advised Mr. Macgregor that he could not continue to work for Duncan Capital (NY) and asked him to resign immediately upon learning both that: (a) Mr. Macgregor had been barred by NASD; and (b) Mr. Macgregor learned of the bar months before he informed Mr. Fuchs. Mr. Macgregor then left to pursue other business opportunities. (Fuchs).

39. Michael Crow and DC Group voluntarily ceased to have any relationship with Duncan Capital (NY) years prior to the commencement of the instant action. (Crow, Fuchs, Exs. UU, XX, KKK, PPP, QQQ).

40. To Mr. Fuchs' and Duncan Capital's (NY) knowledge, no client or investor in a private placement conducted by it ever filed any complaint, arbitration, litigation or other proceeding regarding any transaction of Duncan Capital (NY). (Fuchs, UUU).

41. Duncan Capital (NY) is no longer a broker-dealer. (Fuchs, GGG).

42. No investor was defrauded or suffered any actual injury as a result of Michael Crow's alleged conduct. (Crow, Fuchs).

43. No investor was defrauded or suffered any actual injury as a result of DC Group's alleged conduct. (Crow, Fuchs).

44. Michael Crow currently does not have an ownership interest in any registered broker-dealers. (Crow).

45. DC Group currently does not have an ownership interest in any registered broker-dealers. (Crow).

46. Michael Crow currently does not control any registered broker-dealers. (Crow).

47. DC Group currently does not control any registered broker-dealers. (Crow).

48. Michael Crow is not currently acting as a broker-dealer. (Crow).

49. DC Group is not currently acting as a broker-dealer. (Crow).

50. Michael Crow did not control a registered broker-dealer at any time prior to June 2003. (Crow).

51. DC Group did not control a registered broker-dealer a any time prior to June 2003. (Crow).

52. Michael Crow did not control a registered broker-dealer during the period alleged in the first amended complaint.

53. DC Group did not control a registered broker-dealer during the period alleged in the first amended complaint.

54. Michael Crow has not controlled a registered broker-dealer from June 2005 through the present.

55. DC Group has not controlled a registered broker-dealer from June 2005 through the present.

56. DC Group does not currently conduct any business operations.  (Crow, Ex. OOO).

57. The SEC does not allege and has failed to prove any current or ongoing violation of Section 15 of the Exchange act by any of the Defendants. 15 U.S.C. 78o et seq.

58. The SEC has failed to demonstrate any reasonable likelihood that Michael Crow might engage in a violation of Section 15 of the Exchange Act in the future.

59. The SEC has failed to demonstrate any reasonable likelihood that DC Group might engage in a violation of Section 15 of the Exchange Act in the future.

60. The SEC has failed to demonstrate any reasonable likelihood that Robert David Fuchs might engage in a violation of Section 15 of the Exchange Act in the future.

61. The SEC has failed to demonstrate any reasonable likelihood that Duncan Capital (NY) might engage in a violation of Section 15 of the Exchange Act in the future.

62. Robert David Fuchs was at all times the controlling person of Duncan Capital (NY) (Fuchs, Crow).

63. Michael Crow did not control Duncan Capital (NY). (Crow, Fuchs).

64. Michael Crow did not act as an unregistered principal of Duncan Capital (NY) (Crow, Fuchs, Ex. GGG).

65. Robert David Fuchs at all times believed in good faith that Duncan Capital (NY)'s regulatory filings were accurate. (Fuchs).

66. Duncan Capital (NY) did not violate Section 15(b)(1) of the Exchange Act and Rule 15b3-1 thereunder. 15 U.S.C. §78o(b)(1); 17 CFR §240.15b3-1.

67. Michael Crow did not knowingly provide substantial assistance to any violation of Section 15(b)(1) of the Exchange Act and Rule 15b3-1 thereunder. 15 U.S.C. 78o(b)(1); 17 CFR 240.15b3-1; *SEC v. Kushner Promotions, Inc.*, 417 F. Supp. 2d 326, 333-335 (S.D.N.Y. 2006); *SEC v. Apolant*, 411 F. Supp. 2d 271, 276 (E.D.N.Y. 2006).

68. Robert David Fuchs did not knowingly provide substantial assistance to any violation of Section 15(b)(1) of the Exchange Act and Rule 15b3-1 thereunder. 15 U.S.C. 78o(b)(1); 17 CFR 240.15b3-1; *SEC v. Kushner Promotions, Inc.*, 417 F. Supp. 2d 326, 333-335 (S.D.N.Y. 2006); *SEC v. Apolant*, 411 F. Supp. 2d 271, 276 (E.D.N.Y. 2006).

69. Duncan Capital (NY) did not violate Section 15(b)(7) of the Exchange Act and Rule 15b7-1 thereunder. 15 U.S.C. § 78o(b)(7); 17 CFR § 240.15b7-1.

70. Michael Crow's activities did not require registration with state, federal, or self-regulatory bodies.

71. Robert David Fuchs did not knowingly provide substantial assistance to any violation of Section 15(b)(7) of the Exchange Act and Rule 15b7-1 thereunder. 15 U.S.C. §78o(b)(7); 17 CFR § 240.15b7-1; *SEC v. Kushner Promotions, Inc.*, 417 F. Supp. 2d 326, 333-335 (S.D.N.Y. 2006); *SEC v. Apolant*, 411 F. Supp. 2d 271, 276 (E.D.N.Y. 2006).

72. Michael Crow did not knowingly provide substantial assistance to any violation of Section 15(b)(7) of the Exchange Act and Rule 15b7-1 thereunder. 15 U.S.C. §78o(b)(7); 17 CFR §240.15b7-1; *SEC v. Kushner Promotions, Inc.*, 417 F. Supp. 2d 326, 333-335 (S.D.N.Y. 2006); *SEC v. Apolant*, 411 F. Supp. 2d 271, 276 (E.D.N.Y. 2006).

73. DC Group did not act as an unregistered broker-dealer in violation of Section 15(a) of the Exchange Act. 15 U.S.C. §78o(a).

74. Michael Crow did not knowingly provide substantial assistance to any violation of Section 15(a) of the Exchange Act. 15 U.S.C. 78o(a); *SEC v. Kushner Promotions, Inc.*,

417 F. Supp. 2d 326, 333-335 (S.D.N.Y. 2006); *SEC v. Apolant*, 411 F. Supp. 2d 271, 276 (E.D.N.Y. 2006).

75. Robert David Fuchs did not knowingly provide substantial assistance to any violation of Section 15(a) of the Exchange Act. 15 U.S.C. 78o(a); *SEC v. Kushner Promotions, Inc.*, 417 F. Supp. 2d 326, 333-335 (S.D.N.Y. 2006); *SEC v. Apolant*, 411 F. Supp. 2d 271, 276 (E.D.N.Y. 2006).

76. Duncan Capital (NY) did not violate Section 17(a) of the Exchange Act or Rule 17a-3(12) thereunder. 15 U.S.C. § 78q(a); 17 CFR 240.17a-3(12).

77. Robert David Fuchs did not knowingly provide substantial assistance to any violation of Section 17(a) or Rule 17a-3(12). 15 U.S.C. 78q(a); 17 CFR 240.17a-3(12); *SEC v. Kushner Promotions, Inc.*, 417 F. Supp. 2d 326, 333-335 (S.D.N.Y. 2006); *SEC v. Apolant*, 411 F. Supp. 2d 271, 276 (E.D.N.Y. 2006).

78. Robert David Fuchs at all times believed in good faith that Duncan Capital (NY)'s business arrangement was lawful and proper based upon advice from in-house counsel and outside counsel who structured the arrangement and participated in the transactions involving joint efforts of Duncan Capital (NY) and DC Group.

79. From the commencement of the business arrangement between Duncan Capital (NY) and DC Group through the first half of 2004, Mr. Fuchs believed in good faith that Mr. Macgregor did not need to be a registered person of Duncan Capital (NY).

80. Michael Crow acted in good faith at all times, consulting with counsel for advice with respect to the structure and arrangement between Duncan Capital (NY) and DC Group. (Crow, Kaplan).

81. Michael Crow lacked the scienter to cause DC Group to violate Section 15(a) of the Exchange Act. 15 U.S.C. §78o(a); *SEC v. Manor Nursing Ctrs.*, 458 F.2d 1082, 1102 (2d Cir. 1972); *SEC v. Harwyn Indus. Corp.*, 326 F. Supp. 943 (S.D.N.Y. 1971)).

82. Michael Crow lacked the scienter to cause DC Group to violate 20(e) of the Exchange Act. 15 U.S.C. § 78t(e); *SEC v. Manor Nursing Ctrs.*, 458 F.2d 1082, 1102 (2d Cir. 1972); *SEC v. Harwyn Indus. Corp.*, 326 F. Supp. 943 (S.D.N.Y. 1971).

83. Michael Crow lacked the scienter to aid and abet Duncan Capital (NY) in any alleged violation of Section 15(b)(1) of the Exchange Act and Rule 15b3-1 thereunder. 15 U.S.C. § 78o(b)(1); 17 CFR 240.15b3-1; *SEC v. Manor Nursing Ctrs.*, 458 F.2d 1082, 1102 (2d Cir. 1972); *SEC v. Harwyn Indus. Corp.*, 326 F. Supp. 943 (S.D.N.Y. 1971).

84. Michael Crow lacked the scienter to aid and abet Duncan Capital (NY) in any alleged violation of Section 15(b)(7) of the Exchange Act and Rule and 15b7-1 thereunder. 15 U.S.C. § 78o(b)(7); 17 CFR 240.15b7-1; *SEC v. Manor Nursing Ctrs.*, 458 F.2d 1082, 1102 (2d Cir. 1972); *SEC v. Harwyn Indus. Corp.*, 326 F. Supp. 943 (S.D.N.Y. 1971).

85. Michael Crow lacked the scienter to aid and abet DC Group in any alleged violation of Section 15(a) of the Exchange Act. 15 U.S.C. §78o(a); *SEC v. Manor Nursing Ctrs.*, 458 F.2d 1082, 1102 (2d Cir. 1972); *SEC v. Harwyn Indus. Corp.*, 326 F. Supp. 943 (S.D.N.Y. 1971).

86. An injunction against Michael W. Crow and DC Group is improper because there is no cognizable danger of a recurrent violation. *SEC v. Bausch & Lomb*, 565 F.2d 8, 18 (2d Cir. 1977); *SEC v. Jones*, 476 F. Supp.2d 374, 385 (S.D.N.Y. 2007); *SEC v. Power*, 2007 U.S. Dist. LEXIS 87632, *29 (S.D.N.Y. Nov. 27, 2007) (the SEC must "go beyond the mere facts of past violations and demonstrate a realistic likelihood of recurrence.")

87. Reliance on a defendant's past conduct along is insufficient to demonstrate a need for a permanent injunction. *Proffitt v. Fed. Deposit Ins. Corp.*, 200 F.3d 855, 862 (D.C. Cir. 2000). ("[an] offense cannot alone determine his fitness almost a decade later.").

88. An injunction should not be issued because the Plaintiff has failed to prove that Fuchs acted with scienter, the Plaintiff has failed to prove that Fuchs intentionally violated any law or rule, the Plaintiff has failed to show that Fuchs was not entitled to his share of the profits of the broker dealer, the Plaintiff has failed to make any showing whatsoever of ongoing wrongdoing after 2004 nor any likelihood of any future unlawful conduct.

89. Robert David Fuchs did not receive any "ill-gotten" gains since, as a registered broker-dealer, he was lawfully authorized to offer and sell securities in general and in particular to conduct placements to institutional investors.

90. Santal Holdings LLC did not receive any "ill-gotten" gains since there was no underlying unlawful conduct by Fuchs, who was legally entitled to all monies and securities from the offer and sale of securities in private placements to institutional investors.

91. Santal Holdings LLC has a lawful right to all monies and securities it received and is not subject to disgorgement.

92. Michael Crow did not violate the securities laws or regulations and any compensation he received during the time period relevant to the first amended complaint was the result of lawful activity.

93. DC Group did not violate the securities laws or regulations and any compensation it received during the time period relevant to the first amended complaint was the result of lawful activity.

94. Trevor Crow has a lawful right to all monies and securities she received and is not subject to disgorgement.

95. M.W. Crow Family LP has a lawful right to all monies and securities it received and is not subject to disgorgement.

96. Crow 2001 Children's Trust FBO Michelle Lee Crow, Crow 2001 Children's Trust FBO Spencer Michael Crow, Crow 2001 Children's Trust FBO Duncan Crow, Crow 2001

Children's Trust FBO Olivia Trevor Crow have a lawful right to all monies and securities they received and is not subject to disgorgement.

97. The vast majority of the warrants received by the Defendants during the relevant period alleged in the first amended complaint never were and may never be "in the money." Accordingly, many of the warrants have no value.

98. The vast majority of the warrants received by the Relief Defendants during the relevant period alleged in the first amended complaint never were and never may be "in the money." Accordingly, many of the warrants have no value.

99. The purpose of a disgorgement order is to "deprive violators of their ill-gotten gains." *SEC v. Robinson*, 2002 U.S. Dist. LEXIS 12811, *24 (S.D.N.Y. July 16, 2002). Although the court has broad discretionary powers to determine the amount a defendant has been unjustly enriched by a securities violation, this remedy should never impose a penalty. *See e.g. SEC v. Seaforth Meridian, Ltd.*, 2007 U.S. Dist. LEXIS 81345, 21 (D. Ka. Nov. 1, 2007). In order to prevent the assessment of a penalty, the relief defendants should be ordered to only disgorge the proceeds they received. *See SEC v. Tome,* 833 F.2d 1086, 1096 (2d Cir. 1987); *see also SEC v. Cavanaugh*, 2004 U.S. Dist. LEXIS 13372, * 106 (S.D.N.Y. July 15, 2004), *aff'd*, 2006 U.S. App. LEXIS 8809 (2d Cir. Apr. 10, 2006).

## V. ISSUES TO BE TRIED

The parties agree that the following issues are to be tried: (1) whether Defendant Duncan Capital violated Sections 15(b)(1), 15(b)(7) and 17(a) of the Exchange Act and Rules 15b3-1, 15b7-1, and 17a-3(a)(12) thereunder; (2) whether Defendant Duncan Capital Group violated Section 15(a) of the Exchange Act; (3) whether Defendant Crow aided and abetted Duncan Capital's alleged violations of Section 15(b)(1) and 15(b)(7) of the Exchange Act and Rules 15b3-1 and 15b7-1 thereunder and Duncan Capital Group's alleged violations of Section 15(a) of the Exchange Act; (4) whether Defendant Fuchs aided and abetted Duncan Capital's alleged violations of Sections 15(b)(1), 15(b)(7), and Section 17(a) of the Exchange Act and Rules 15b3-1, 15b7-1, and 17a-3(a)(12) thereunder and Duncan Capital Group's alleged violations of Section 15(a) of the Exchange Act; (5) whether the Commission is entitled to permanent injunctions against defendants for their alleged violations of each of those provisions; (6) whether the Commission is entitled to disgorgement from each of the defendants and relief defendants of their alleged ill-gotten gains arising from those violations; and (7) whether the Commission is entitled to civil money penalties against each of the defendants for their alleged violations of each of those provisions.

## VI. PLAINTIFF'S EXHIBITS

No exhibit not listed below may be used at trial except (a) for cross-examination purposes or (b) if good cause for its exclusion from the pretrial order is shown.

| Exhibit No.[6] | Description |
|---|---|
| 1 | E-mails and attachment 7/23/04 to 7/26/04 (Berman, Crow, Dittus and Levy) |
| 2 | E-mails 3/14/04 to 3/16/04 (MacGregor, Fuchs, and Ladin: Mbay). |
| 3 | Memorandum dated 9/27/04 from Fuchs to Quinn with no subject line. |
| 4 | E-mail 2/10/04 Crow to Gil: PIPE Investment |
| 5 | E-mail string 5/6/04 Crow to Gil with the subject line: Registration Statement. |
| 6 | E-mails 9/29/04 to 10/4/04 - Crow, Gil, and MacGregor: Dyntek PIPE |
| 7 | Joseph Gill Handwritten notes dated 1/10/08 and E-mails |
| 9 | E-mail string 2/10/04 - Crow to Gil: PIPE Investment |
| 10 | E-mail 2/19/04 Machett to Fuchs: Conference Calls for Monday |
| 11 | E-mails 4/6/04 MacGregor, Crow, Machett and Psztur: Thur. Conference Calls. |
| 12 | E-mail 4/23/04 Machett, Gil & Ross: Conf. Call Monday - Att. DYTK |
| 13 | E-mail 4/23/04 Machett, Ross: Conference Call Participants. |
| 14 | E-mail 4/23/04 Machett, Ross: If you are still available. |
| 15 | E-mail string dated 5/4/04 from Gil to Crow with the subject line: Dytk |
| 16 | E-mail string dated 5/18/04 from Handy to Crow with the subject line: Digene |
| 17 | E-mail chain 6/17/04 Crombie, Machett, Gil, Handy, & Wood: DYTK |
| 18 | E-mail 5/17/04 to 5/18/04 MacGregor to Crow: SF Meetings/Deals Shown. |
| 19 | E-mail 6/29/04 to 6/30/04 from Gil to Crow with no subject line. |
| 20 | E-mail 9/29/04 to10/4/04 Gil to MacGregor: Dyntek PIPE. |
| 21 | Form 10K dated 12/31/03, Re: MediaBay Inc. |
| 22 | E-mails 1/23/04 to 1/26/04- Handy, Wolf, and Crow: Deal. |
| 23 | E-mail dated 1/29/04 from Wolf to Crow with the subject line: Thanks |
| 24 | E-mail dated 2/4/04 from Handy to Wolf with the subject line: Lunch |
| 25 | E-mail 2/26/04 from Dittus to Smithline& Crow with no subject line. |
| 26 | E-mail dated 3/7/04 from Dittus to Crow with no subject line |
| 27 | E-mail 4/25/04 Wolf to Crow: Fairness Option Confidential. |
| 28 | E-mail dated 4/26/04 from Wolf to Crow with the subject line: Your E-mail |
| 29 | E-mail dated 4/26/04 from Wolf to Crow with the subject line: Your E-mail |
| 30 | E-mail 4/29/04 - Wolf to Crow with the subject line: Congratulations. |
| 31 | E-mail 7/1/04 Wolf to Crow with the subject line: How is it going |
| 32 | Duncan Company Description. (Bates-stamped 001630 through 001639.) |
| 33 | E-mail dated 11/26/03 from Green to Crow with the subject line: MediaBay |
| 34 | E-mail 2/11/04 Smithline to Heilshorn: MediaBay Investor Relations. |

---

[6] Exhibits 1 through 249 correspond to the deposition exhibits of the same number. Exhibits 500 through 664 were previously marked as exhibits to investigative testimony taken by the Commission staff.

| 35 | E-mail string 3/7/04 to 3/8/04 Crow to Wolf with no subject line. |
| 36 | E-mails 3/11/04 to 3/12/04 - Crow, Fuchs, and Wolf: Follow up software opp. |
| 37 | E-mails 3/17/04 MacGregor, Fuchs, Wolf and Coleson: Opportunity. |
| 38 | E-mails 4/11/04 to 4/12/04 Crow, Handy, Rosenbloom, Wolf: Hook Report. |
| 39 | E-mail 1/6/04 Levy to Wolf: Management change. (Att. MBAY press release) |
| 40 | E-mail 1/5/04 Levy to Wolf: Press Release (Att MBAY press release). |
| 41 | E-mail 1/5/04 Levy to Wolf: Revised Release (Att. MBAY press release) |
| 42 | E-mail 1/6/04 Levy to Wolf: Duncan Release. (Attached MBAY press release) |
| 43 | E-mail dated 1/6/04 from Levy to Wolf: Mgmnt Release. Att. MBAY PR |
| 44 | E-mail dated 1/6/04 from Levy to Wolf: Strategy Release. Att MBay PR |
| 45 | E-mail dated 1/6/04 from Levy to Wolf: Strategy Release. (Att.) |
| 46 | E-mail dated 1/6/04 from Levy to Norton with no subject line. (Att.) |
| 47 | E-mail dated 1/6/04 from Levy to Norton: Executive Summary. (Att) |
| 48 | E-mail dated 1/6/04 from Levy to Norton: More changes (Att.) |
| 49 | E-mail 1/27/04 from Levy to Wolf: Press release. (Att.) |
| 50 | E-mail dated 1/27/04 from Fuchs to Levy: Revised release. (Att.) |
| 51 | E-mail dated 1/27/04 from Levy to Wolf: Revised Press release. (Att.) |
| 52 | E-mail 1/28/04 Levy to Trachenberg: Press release (Att MBAY press release) |
| 53 | E-mail 1/30/04 Levy to Wolf: Dittus named CEO release. (Att. MBAY PR) |
| 54 | E-mails 1/12/04 Levy, Norton, and Lerner: Director's Home Addresses. |
| 55 | E-mail string dated 2/2/04 from Fuchs to Levy with the subject line: Laurus |
| 56 | E-mail 2/4/04 Levy to Regan: MediaBay Presentation (Att. Mbay Presentation) |
| 57 | E-mails 5/12/04 to 5/13/04 Levy, Lytel, and Dittus: Research Report. |
| 58 | E-mail 12/8/03 Gorodetskiy to Unknown: Dinner with Michael Crow Changed |
| 59 | E-mail 1/8/04 Crow to Grin: DYTK. (Bates-stamped LCM-CROW 00438). |
| 60 | Form 10K dated 6/30/05 Re: Dyntek |
| 61 | E-mail 1/12/04 Regan to Crow & MacGregor: Revised Term Sheet. (DYTK) |
| 62 | E-mails 1/29/04 Ross, Crow and Regan: Revised Laurus Agreement (Att) |
| 63 | E-mails dated 2/26/04 Regan, Crow and Grin: ICCA. |
| 64 | E-mail dated 4/30/04 Crow to Grin: Noble Romans (NROM). |
| 65 | E-mails dated 10/5/04 Grin, Crow and Regan: Pas Deal. |
| 66 | E-mail dated 2/5/04 Crow to Grin: Command Security. |
| 67 | E-mail dated 2/12/04 from Crow to Grin with no subject line. |
| 68 | E-mail dated 4/27/04 from Crow to Grin: DYTK. |
| 69 | E-mails 9/8/04 to 9/9/04 Grin, Crow and Regan: DYTK Term Sheet. |
| 70 | E-mails 9/10/04 to 9/13/04 Crow, Grin and Webber: Laurus (Att Prop Letter) |
| 71 | E-mail string 10/19/04 Regan to Crow subject line: Pension. |
| 72 | E-mail string dated from 11/3/04 to 11/4/04 Crow to Grin with no subject line. |
| 73 | E-mail 1/3/05 Crow to Grin subject line: Term Sheet, 12/3/04 v.1 (Att) |

| 74 | E-mail dated 3/12/04 from Handy to Grin: Referral Agreement (Att) |
| 75 | E-mails dated 3/29/04 Crow, Handy, and Regan: Referral Agr Comments. |
| 76 | E-mails 4/6/04 Crow, Grin, and Monks: Laurus Comments to Referral. |
| 77 | E-mail string dated from 9/3/04 to 9/7/04 from Grin to Crow: Dyntek. |
| 78 | E-mail dated 9/28/04 from Crow to Regan with the subject line: Dytk |
| 79 | E-mail 10/11/04 Regan to Crow: Knobias-Laurus Proposal Letter (Att) |
| 80 | E-mail string dated from 3/15/04 to 3/16/04 from Grin to Crow: LYXI |
| 81 | E-mails 7/30/04 to 8/2/04 Grins, and others: Laurus Tops Q2 PIPE Market |
| 82 | E-mail 5/3/04 Regan to Ross: DYTK/Laurus documents (Att). |
| 83 | Form 10-KSB dated 12/31/03, Re: INYX, Inc. |
| 84 | E-mails 9/29/03 Grin, Regan, and Green: Inyx Term Sheet-Laurus. (Att) |
| 85 | E-mail 10/27/03 Guzzi to Regan: Inyx Financing |
| 86 | E-mail string 5/25/04: Update for our meeting |
| 87 | E-mails 11/10/03 Crow, Purjes and Skriloff: Thank you. |
| 88 | E-mail 3/8/04 Skriloff to Dyett: PowerPoint on Duncan Capital. (Att). |
| 89 | E-mail 6/11/04 Skriloff to Crow with no subject line. |
| 90 | E-mail string dated 6/25/04 from Skriloff to Crow with no subject line. |
| 91 | E-mail string dated 10/22/04 from Skriloff to Crow: Update |
| 92 | E-mail dated 3/31/04 from Skriloff to Crow with the subject line: Impact |
| 93 | E-mail string dated 5/14/04 from Crow to Skriloff with the subject line: IBD |
| 94 | E-mail dated 5/16/04 from Crow to Skriloff: WRST & Portfolio P.R. |
| 95 | E-mails 8/16/04 to 10/1/04 Skriloff, MacGregor and Crow: Reallocation Stock |
| 96 | E-mail 5/26/04 Handy, Duncan Internal: Important Off. Memo (Summer attire) |
| 97 | E-mail dated 5/6/04 from Chazotsang to MacGregor with no subject line. |
| 98 | E-mails 5/10/04 Chazotsang, Fuchs, Yingling and Monks: Fingerprinting. |
| 99 | Brochure: Re: Duncan Capital titled, "About Us" |
| 100 | E-mail string dated 10/11/04 from Crick to Crow: Blackberry for Skriloff |
| 101 | Brochure: Duncan Capital with the subject line: Team. |
| 102 | E-mail string dated 3/18/04 from Crow to Skriloff: Dyntech. |
| 103 | E-mail 1/29/04 from Skriloff to Sherman: Engagement Ltr & Term Sheet (att) |
| 104 | E-mail dated 1/7/04 from Skriloff to Crow: Impact Diagnostics. |
| 105 | E-mail string 2/21/04 to 2/23/04 - Purjes to Skriloff: Impact Diagnostics. |
| 106 | E-mail 3/11/04 Skriloff to Fuchs: Letter for PIPE engagement. |
| 107 | E-mail string 5/2/04 to 5/3/04 - Skriloff to Ferrara: Possible Board Seat. |
| 108 | E-mails 5/18/04 to 5/20/04 K. Crow, Skriloff and M. Crow: Impact Board. |
| 109 | E-mail 6/18/04 Monks to Crow:  Impact Purchase Agr. Dr. Hu's Shares (att) |
| 110 | E-mails 6/25/04 to 6/28/04 Yakatan, Skriloff, Crow, Fuchs and Purjes: Closing. |
| 111 | E-mail 3/3/05 to 3/4/04 Crow to Yakatan subject line: Revised letter. |
| 112 | E-mail dated 6/22/04 from Fuchs to Soheili: Hepalife.  Attached PowerPoint |

| | |
|---|---|
| 113 | E-mails 1/2/04 Fuchs, Crow, Purjes, Monks, Bruno: Reorg Rockwood (att) |
| 114 | E-mails 8/31/04 to 1/12/05 Fuchs, Edelson, Reckamp, Crow: Audit Report (att) |
| 115 | E-mail 10/14/04 Crow to Fuchs & MacGregor: Media Bay [sec 136.] |
| 116 | E-mail string dated 4/26/04 from Crow to Ross with no subject line. |
| 117 | E-mail dated 4/26/04 from Crow to Rahman with the subject line: Dyntek |
| 118 | E-mails dated 5/3/04 Crow, Fuchs and Gil: Dyntek. [SEC EX 225.] |
| 119 | E-mails 5/3/04 to 5/4/04 Nguyen, Crow and Gil with the subject line: Dyntek. |
| 120 | E-mail 4/19/04 from MacGregor to Crow: Calling.  [SEC EX 126] |
| 121 | E-mail string dated 4/14/04 from Crow to Yingling: Benefits. [SEC EX 14] |
| 122 | E-mail string 4/12/04 Yingling to Crow with no subject line: [SEC EX 15] |
| 123 | Memorandum 3/1/04 Crow to Lindsay: Fin Advisory/Inv. Banking Agreement. |
| 124 | Agreement 12/01/04 Duncan Capital Group & Duncan Capital [SEC EX 62] |
| 125 | E-mail dated 12/22/04 Fuchs to Crow: Warrant Split Chart. (Att) [SEC EX 66] |
| 126 | Form BD-Amendment dated 4/12/04, Re: Duncan Capital LLC. [SEC EX 238] |
| 127 | E-mail 11/6/03 Crow to Ross: Status.  (Bates-stamped 002359.) |
| 128 | Memorandum 11/19/03 Crow to Ross: Inv. Banking Advisory Agreement. |
| 129 | Amend. 1 to Inv Banking Adv. Agr 2/1/04 bet. DYTK and Duncan Capital |
| 130 | E-mail 11/18/03 to 11/22/03 Crow to Ross: Mtgs. |
| 131 | E-mails 11/21/03 to 11/25/03 Handy, Crow and Ross: Dyntek Term Sheet (att) |
| 132 | Memorandum 12/5/03 from Crow to Ross with no subject line. |
| 133 | E-mail dated 12/8/03 from Crow to Ross with the subject line: Warrants |
| 134 | E-mails 12/3/03 Crow, Ross and Regan: DYTK/Laurus Proposal |
| 135 | E-mail dated 12/9/03 from Crow to Ross with no subject line. |
| 136 | E-mail dated 1/7/04 from Crow to Ross with no subject line. |
| 137 | E-mails dated 1/15/04 Crow, Ross and MacGregor: DYTK Proposal Letter(att) |
| 138 | E-mail string 1/20/04 to 1/28/04 Ross to Crow: Weather and Dinner |
| 139 | E-mail 1/29/04 Ross to Regan: Revised Laurus Agreement (att). |
| 140 | Memo 1/29/04 Crow/Ross: Payment Oblig. on Inv. Bank. Adv. Agr. |
| 141 | E-mails 1/29/04 - 2/10/04 incl. Ross, Regan, Handy, Monks: Rev. Laurus Agr. |
| 142 | Form S-1 dated 4/1/04, re: Dyntek Inc.  [SEC EX 54] |
| 143 | E-mails 4/12/04 to 4/13/04 Ross, Stevenson, Regan and Crow: DYTK. |
| 144 | E-mail dated 4/19/04 Cow, Ross and MacGregor: DYTK Term Sheet. |
| 144A | Proposed Term Sheet dated 4/16/04 re: Dyntek |
| 145 | E-mails dated 4/19/04 Ross, Griev, and Crow: Research. |
| 146 | E-mail string dated 4/26/04 from Crow to Ross with no subject line. |
| 147 | E-mail dated 4/29/04 from Crow to Ross with no subject line. |
| 148 | E-mails dated from 5/3/04 to 5/6/04 Crow and Gil: Dyntek and Reg. Statement. |
| 149 | Dyntek, Inc. Cross-Receipt 5/3/04 from Fuchs to Ross. [SEC EX 49] |
| 150 | E-mails 4/29/04 to 5/4/04 Crow, Ross, Regan and Grin. Att. DYTK Prop. Ltr. |

| | |
|---|---|
| 151 | E-mail Compilation 9-11/04 (Laurus/DYTK) |
| 152 | E-mails 9/23/04 to10/5/04 Ross and Crow. |
| 153 | E-mail string dated 9/30/04 from Ross to Crow with no subject line. |
| 154 | E-mails dated from 11/30/04 to12/6/04 Ross, Webber, Crow, and Edelson |
| 155 | E-mails 3/25/04 to 3/30/04 Ross, Linesch, Rothberg, Crow: DC Agr. & Shares |
| 156 | E-mails 5/28/04 to 6/7/04 Handy, Ron and Baker: Attached Crow resume. |
| 157 | E-mail string dated 6/23/03 from Crow to Green: Strategy BD Relationship. |
| 158 | E-mails 10/13/03-11/10/03 Crow, Beck, C. Crow, Ross, Test. [SEC Ex 184] |
| 159 | E-mail 4/26/04 Fuchs to Limon: Greetings.   Attached Overviews [SEC EX 35] |
| 160 | E-mails 3/31/04 Monks, Crow, Scanlan: Fund Raising Regs  [SEC EX 214] |
| 161 | E-mail dated 2/3/04 Crow, Guzzi and Fuchs: Payroll Questions |
| 162 | E-mail compilation 3-10/04 Skriloff/Crow |
| 163 | E-mail dated 4/19/04 Crow to Purjes with no subject line. [SEC EX 110] |
| 164 | E-mail string 2/11/04 to 2/12/04 MacGregor to Crow: Friday. [SEC EX 121] |
| 165 | E-mail dated 4/14/04 Crow to Yingling: Benefits.  [SEC EX 14] |
| 166 | E-mails 12/29/03 to 2/28/04 Crow/Fuchs/MacGregor/Haag: [SEC Ex 43/151] |
| 167 | E-mail 12/4/03 from Crow to Monks with the subject line: Key Matters-Legal. |
| 168 | Email Compilation 1-6/04 (PIPES) [incl. SEC Ex. 107, 127, 126, 130, 42] |
| 169 | E-mails 1/18/04 to 3/21/04 Monks, Crow and Purjes: Weekend Update. |
| 170 | Form SB2a dated 2/14/05 for INYX ; Amendment No.4 |
| 171 | E-mail string 12/29/03 from Kachkar to Crow with the subject line: Fee due. |
| 172 | E-mail string 11/21/03 to 11/22/03 MacGregor to Crow: DYTK Term Sheet. |
| 173 | Form S-1 dated 4/1/04 for Dyntek; Amendment No. 1. [SEC EX 54] |
| 174 | E-mail string 1/12/04 Crow to Monks: Dytk. [SEC EX 222] |
| 175 | E-mail Compilation 4/04 DYTK [incl. SEC Ex. 138] |
| 176 | E-mail Compilation 1/04 DYTK/Laurus: |
| 177 | E-mail string dated 2/10/05 from Crow to Webber with no subject line. |
| 178 | E-mail 2/10/05 from Edelson to Webber: Wire Instructions. [SEC EX 158] |
| 179 | Compilation of e-mails 12/03-2/04: MBAY |
| 180 | Executive Summary dated 1/2004 re: Media Bay |
| 181 | Duncan Financials dated from 1/2004 to 4/2004 [SEC EX 7] |
| 182 | Duncan Financials dated 4/2004. [SEC EX 8] |
| 183 | Duncan Financials dated 5/2004. [SEC EX 9] |
| 184 | E-mails 4/2/04 to 4/6/04 Yingling, Chazotsang, Norton, Reckamp: Audit. |
| 185 | Compilation of e-mails 3-4/04 (Duncan Capital mock audit): |
| 186 | E-mail & Org Chart dated 4/7/04 from Yingling to Monks with no subject line |
| 187 | E-mails 4/6/04 to 4/7/04 Norton, Yingling and Fuchs: Mock Audit. |
| 188 | E-mails 4/15/04 to 4/19/04 from Crow to Yingling with no subject line. |
| 189 | Agreement At-Will 2/10/04 Yingling & Duncan Capital LLC  [SEC EX 3] |

| | |
|---|---|
| 190 | E-mail string dated 4/12/04 from Crow to Yingling with no subject line. |
| 191 | • DC LLC Flash Estimate Reconciliation dated 3/31/04 [SEC EX 6] |
| 192 | Transcript of Robert Yingling SEC testimony 11/9/05 |
| 193 | E-mail 6/16/04 Yingling, Crow: Financial Statements, Duncan Capital Group. |
| 194 | E-mail string dated 5/25/04 from Crow to Yingling with no subject line. |
| 195 | E-mail 4/13/04 from Yingling to Crow: Brokerage Account. [SEC EX 16] |
| 196 | E-mails 6/21/04 to 6/22/04 from Yingling to Crow with the subject line: Cash |
| 197 | E-mails 4/14/04 Handy, Yingling, and Fuchs: For Bob Yingling. [SEC EX 21] |
| 198 | E-mail 4/16/04 Yingling, Fuchs: Wire to Duncan Capital Group. [SEC EX 23] |
| 199 | E-mails 5/7/04 to 5/10/04 Yingling to Crow with no subject line. [SEC EX 26] |
| 200 | E-mail 4/30/04 Crow to Yingling: Robert MacGregor |
| 201 | E-mail dated 5/28/04 from Crow to Yingling with no subject line. |
| 202 | Severance Agreement 7/31/04 Yingling & Duncan [SEC EX 4] |
| 203 | Transcript of testimony given before the S.E.C. MacGregor on 1/23/06 |
| **204-214** | *Reserved* |
| 215 | Hand-drawn office diagram |
| 216 | Purchase and Sale Agreement Purjes & Santal Holdings, LLC dated 2/19/02. |
| 217 | Compromise Agreement. Blank. Hearing Innovations, Santal Holdings, Fuchs. |
| 218 | Purchase and Sale Agreement 10/22/02 Roc Holdings Inc., Santal Holdings |
| 219 | Subscription Agreement 11/12/03 between Rockwood Group & Duncan |
| 220 | Contribution Agreement 11/15/03 Rockwood Group & Duncan Capital |
| 221 | Amended & Restated LLC Agreement, (Exhibit A), 11/15/03 Duncan Capital. |
| 222 | Invoice 12/22/03 Rockwood Group LLC: Re Management Service 2003 |
| 223 | Invoice 1/27/04 Purjes, Santal Holdings: Re Purchase & Sale Agreement. |
| 224 | E-mail 1/2/04 Monks, Purjes & Fuchs: Summary of Research Issues. |
| 225 | E-mails 1/26/04-1/28/04 Bailey-Beck, Guzzi, Purjes, Fuchs, Crow: BD Fin. |
| 226 | E-mail 4/6/04 Chazotsang to Purjes with the subject line: NASDR.com |
| 227 | E-mails 1/2/04 -1/3/04 Purjes, Crow, Bruno, Fuchs: Reorg. (Att) [SEC EX 33] |
| 228 | E-mail dated 4/1/04 from Purjes to MacGregor with the subject line: Nur Pipe. |
| 229 | E-mails 3/4/04 to 3/6/04 Crow, Purjes, Bailey-Beck: Request for documents. |
| 230 | Repurchase & Separation Agreement 8/31/04 Duncan Capital, Rockwood |
| 231 | Memorandum dated 8/31/04 from Purjes to Duncan Capital. |
| 232 | Assumption Agreement 8/31/04 re Rockwood Group. |
| 233 | E-mails dated 12/23/04 between and among Crow, Purjes, and Fuchs. |
| 234 | Chart with the subject line: 25% Proceeds to be repaid as sold to Rockwood. |
| 235 | E-mail string 6/29/05 to 6/30/05 Purjes, Crow. (Att) Warrants Owed. |
| 236 | E-mail 7/26/05 Purjes to Crow: Moving Out. |
| 237 | E-mail 8/12/05 Fuchs to Purjes: Purchase Agreement. (Att) |
| 238 | Transcript of testimony given before the S.E.C. by Purjes on 12/15/05 |

| | |
|---|---|
| 239 | Memorandum 10/31/03 from Gusrae, et al. to Crow: Invoice # 30618 |
| 240 | Compilation of Invoices 11/30/03-4/30/04 from Gusrae, et al to Fuchs. |
| 241 | E-mails 1/5/04 to 1/6/04 Crow, Handy and Nusbaum: Pam Reg Stat etc. |
| 242 | E-mail 1/28/04 Fuchs, Crow, Purjes & Monks: Duncan Capital. (Att) |
| 243 | E-mails 1/30/04 Fuchs, Kaplan, Nusbaum, and Perez: Management Agreement. |
| 244 | E-mail 1/30/04 Monks, Crow & Purjes with the subject line: Weekend Update. |
| 245 | E-mail string dated 1/5/04 from Crow to Nusbaum: Pam Reg Stat etc. |
| 246 | E-mails 2/4/04 to 2/23/04 Fuchs, Sterling, Purjes, Crow: Neoprobe. |
| 247 | E-mails 3/24/04 Fuchs, Seligman, uve@bellatlantic.net: NURM. |
| 248 | E-mails 1/14/04 Crow, Nusbaum, Monks: Two Other Quick Points. |
| 249 | E-mails 1/21/04 to 1/27/04 Nusbaum, MacGregor, Crow: Any interest?...(Att) |
| *250-299* | *Reserved* |
| 300 | *SEC v. Crow et al.*, Case No. 96-1661 S (S.D. Cal.), Judgment 4/16/98 |
| 301 | *SEC v. Crow et al.*, Case No. 96-CV-1661 W (S.D. Cal.), Order Denying Request to Modify Judgment of Permanent Injunction dated 2/21/02 |
| 302 | *In the Matter of Michael W. Crow*, 4/22/98 Order Instituting SEC AP |
| 303 | *SEC v. Crow et al.*, Case No. 96-1661 S (S.D. Cal.), 10/31/96 Amend.Comp. |
| 304 | Certificate of Merger Rockwood/Duncan 4/27/05, Articles of Organization of Duncan Capital LLC, Filing Receipt, and Seal. |
| 305 | Delaware Certification of Authenticity and Certificate of Amendment to Certificate of Formation of Duncan Capital LLC dated 2/26/04. |
| 306 | List of Form BD adoption and amendments (CCH) & current Form BD 7/1/08 |
| 307 | Rockwood and Duncan Capital LLC Form BD Application and Amendments |
| 308 | M.W. Crow Family L.P. Partnership - State Filing Documents |
| 309 | M.W. Crow Family L.P. Agreement of Limited Partnership 10/31/01, exhibits thereto, and letter from Trevor Crow to Michael Crow 12/11/01. |
| 310 | Second Amendment to M.W. Crow Family L.P. 2/20/02, Notices of Withdrawal Right 11/1/01, and Assignments of Limited Partner Units 2/20/02 and attached schedule. |
| 311 | *SEC v. Michael W. Crow et al.*, Case No. 96-CV-1661 W (S.D. Cal.), Litigation papers to Modify Final Judgment dated 10/01 |
| 312 | E-mails 1/2/04-1/3/04 Crow, Purjes, Fuchs, Bruno: Reorg. of Rockwood. |
| 313 | E-mail 6/25/04 Chazotsang, Crow, Purjes, Fuchs, Smithline, Yingling: List of Outstanding Matters. (Att). |
| 314 | E-mails 4/23/04 Monks, Crow, Chang: FW: Duncan DYTK Closing Docs |
| 315 | Compilation of e-mails 12/03-4/04 (Monks): |
| 316 | Appt. 4/30/04: Crow/Fuchs/Skriloff/Smithline/MacGregor-pipeline & fut. bus. |
| 317 | Email 11/4/04: Crow/Soriano/Fuchs/MacGregor: MBAY Term Sheet (Att) |
| 318 | E-mail string dated 12/12/03 between Crow and Guzzi: Matt Norton's Salary |
| 319 | E-mail string dated 1/24/05 between Crow and Eugene Grin: Plane |

| | |
|---|---|
| 320 | E-mail chain dated 1/14/04 through 1/15/04 and attachments (DYTK Allonge) |
| 321 | E-mail chain dated 1/13/04 through 1/14/04 and attachments (Laurus/DYTK): |
| 322 | E-mail chain dated 1/20/04: Crow, MacGregor, Purjes: Chdx |
| 323 | E-mail 1/26/04 Handy to Crow: Work Days. |
| 324 | E-mail 2/3/04 Crow, Regan with the subject line: Media Bay. |
| 325 | E-mail 2/12/04 Crow to Fuchs with the subject line: Media Bay |
| 326 | E-mail 2/17/04 from Crow to Fuchs: Media Bay |
| 327 | E-mail 3/18/04 from Crow to MacGregor with the subject line: Media Bay |
| 328 | E-mails 5/14/04 - 5/15/04: Crow to Fuchs & MacGregor: Genemax. |
| 329 | E-mail 9/14/04 from Crow to MacGregor: Knobias. |
| 330 | E-mail 9/21/04 - 9/22/04 MacGregor, Matchett, Crow: DYTK. |
| 331 | E-mails 9/23/04 - 9/24/04 MacGregor, Crow, Fuchs, Mindy Ross: Duncan |
| 332 | E-mails 9/30/04 Crow, MacGregor, Testaverde |
| 333 | E-mail 10/1/04 Crow, Fuchs with no subject line. |
| 334 | E-mail string dated 10/1/04 between Crow and MacGregor. |
| 335 | E-mail 10/12/04 - 10/19/04 Crow, Sagal: Dyntek. (Att) Appointment |
| 336 | E-mail 10/14/04 Crow, MacGregor: Knobias. |
| 337 | E-mail 10/14/04 from Crow to Fuchs with no subject line. |
| 338 | E-mails 11/25/03 - 11/26/03 Fuchs, Norton, Purjes, MacGregor: OTI Pipe |
| 339 | E-mail 11/20/04 -12/6/04 Ross, Webber, Crow, Edelson. |
| 340 | E-mails 5/3/04 - 5/4/04 Crow, Ross, Nguyen, Gil: Dyntek |
| 341 | Van Nguyen's contact information for Crow, Fuchs and MacGregor |
| 342 | Federal Register, Vol. 64, No. 132, 7/12/99 & Form BD dated 7/12/99 |
| 343 | Federal Register, Vol. 72, No. 78, entry dated 4/24/07. |
| 344 | E-mail 2/9/04 Fuchs, moskowitz@shamrock.com (Att) |
| 345 | Purchase and Sale Agreement 10/31/02 Roc Holdings, Inc. and Santal. |
| 346 | Promissory Note 10/31/02 from Santal to Roc Holdings, Inc. |
| 347 | Form BDW dated 4/14/05 for Duncan Capital LLC |
| 348 | E-mail string dated 3/23/04 between Monks and Crow with the subject line: Icc |
| 349 | E-mail 4/27/04 between Monks and Crow: DynTek/ OTIV |
| 350 | E-mail 4/27/04 Monks, Crow, Chang, Amaach, Luzi : E-mailing DOC004 |
| 351 | E-mail 2/26/04 Crow, MacGregor, Monks: EXBT Term Sheet1 2-26-04, (Att) |
| 352 | E-mail string 2/10/04 between Fuchs and Crow with no subject line. |
| 353 | E-mail string 12/23/03 - 12/30/03 Monks, Crow: Follow up Query |
| 354 | E-mails 12/8/03 Crow, Monks, MacGregor, Rothberg, Chang: Two More Items |
| 355 | E-mails 1/2/04 - 1/12/04 Monks, Fuchs, Crow, Norton, MacGregor |
| 356 | E-mail 2/1/04 from Monks to Crow with the subject line: Paralegal |
| 357 | E-mail 2/1/04 Monks, Crow: Missing Securities/MediaBay Allocations |
| 358 | E-mails 1/27/04 through 2/6/04: Monks Crow and Purjes: Research |

| 359 | E-mail 2/8/04 Monks and Crow with the subject line: Warrants—Two Matters |
| 360 | E-mail 2/26/04 Monks, Purjes & Crow: Distributing Warrants. |
| 361 | Rockwood Inc. engagement letter with Neoprobe Corp. 9/30/03 (att) Annex A |
| 362 | E-mail 5/3/04 Monks, Crow: Fees for DynTek Transaction—Please Confirm. |
| 363 | E-mail 5/18/04 from Monks to Crow with the subject line: A few items. |
| 364A | E-mail 9/30/04 Ross, Crow. |
| 364B | E-mail 6/1/04 Chazotsang, Ross: DynTek, Inc. (the "Company") (Att). |
| 364C | E-mail 3/18/04 Crow, MacGregor with the subject line: Media Bay |
| 364D | E-mails 12/22/03 from Crow, Fuchs, Monks: Blackberry |
| 364E | E-mail 4/30/04 Crow, Yingling: Robert MacGregor |
| 364F | E-mail 5/28/04 Crow to Yingling with no subject line. |
| 364G | E-mail 3/25/04 Crow to MacGregor: Placement Tracker |
| 364H | E-mail 2/17/04 from Crow to MacGregor with the subject line: Volume |
| 365 | Compilation of e-mails 12/8/03 Crow, Monks (MBAY) |
| 366 | E-mail string 12/22/03 Crow, Monks: Damon's comp on DynTek |
| 367A | E-mail 12/18/03 from Monks to Crow & MacGregor: Damon Test. Called. |
| 367B | E-mail string 12/12/03 Crow and Monks: PIPE Documents (Looking Ahead) |
| 367C | E-mail 12/19/03 Monks to Crow: Clarification on PA Warrants |
| 367D | E-mail dated 12/9/03 from Monks to Crow: DynTek Closing |
| 368 | E-mail dated 11/13/03 from Monks to Crow: Emp. Agreement (att.) |
| 369 | E-mail string 11/5/03 through 11/13/03 Monks and Crow: Emp. Agreement |
| 370 | E-mail chain 4/30/04 through 5/3/04: S-3 Reg. Statement/ Duncan's Shares |
| 371 | E-mail string 1/14/04 - 1/15/04 Crow, Monks: couple of items |
| 372 | Duncan Capital website images |
| 373 | E-mail dated 9/27/04 from Crow to Steve Ross with no subject line |
| 374 | E-mail string dated 7/26/04 with the subject line: Unity Wireless |
| 375 | Letter dated 12/5/03 from Crow to Ross |
| 376 | Placement Agent Warrant Agreement – DYTK & Rockwood dated 12/9/03 |
| 377 | Mutual Release Agreement dated 12/1/04 - DC Group/Santal/DC LLC |
| 378 | ICC engagement letter with Duncan Capital LLC dated 3/23/04 |
| 379 | Inyx, Inc. engagement letter with Duncan Capital LLC dated 8/25/03 |
| 380 | MIV Therapeutics, Inc. engagement letter with DC LLC 3/1/04 |
| 381 | Nur Macroprinters Ltd. engagement letter with DC LLC 3/31/04 |
| 382 | Pacific CMA, Inc. engagement letter with DC LLC 8/7/03 |
| 383 | Letter dated 10/31/03 from Jay Green to Alfred Lam with no subject line |
| 384 | MicroIslet, Inc. engagement letter with Duncan Capital LLC 2/25/04 |
| 385 | MediaBay, Inc. engagement letter with Duncan Capital LLC 12/15/03 |
| 386 | Letter dated 1/29/04 from John Levy to Crow |
| 387 | Letter dated 1/29/04 from Duncan Capital LLC to Carl Wolf |